1  HULETT HARPER STEWART LLP
   KIRK B. HULETT, SBN: 110726
2  BRIDGET FOGARTY GRAMME, SBN: 231953
   525 B Street, Suite 760
3  San Diego, CA 92101
   Telephone:      (619) 338-1133
4  Facsimile:      (619) 338-1139
   e-mail: kirk@hulettharper.com
5          bridget@hulettharper.com

6  LAW OFFICES BERNARD M.GROSS PC
   BERNARD M. GROSS
7  DEBORAH R. GROSS (*Admitted Pro Hac Vice*)
   Wanamaker Building, Suite 450
8  100 Penn Square East
   Philadelphia, PA 19107
9  Telephone:      (215) 561-3600
   Facsimile:      (215) 561-3000
10 e-mail: debbie@bernardmgross.com

11 Attorneys for Lead Plaintiff
   THE WHITE TRUST GROUP
12
                    **IN THE UNITED STATES DISTRICT COURT**
13
                    **SOUTHERN DISTRICT OF CALIFORNIA**
14

15 | SANDRA LIFSCHITZ, on behalf of herself | CASE NO. 3:08-CV-1697 LAB (WMc) |
   | and all others similarly situated,     | (consol. w/ 3:08-CV-01934 LAB (WMc)) |
16 |                                         |                                 |
   |                 Plaintiff,              | **CLASS ACTION**                |
17 |                                         |                                 |
   |         v.                              |                                 |
18 |                                         | **SECOND AMENDED CONSOLIDATED** |
   | NEXTWAVE WIRELESS INC., ALLEN           | **COMPLAINT FOR VIOLATION OF THE** |
19 | SALMASI and GEORGE C. ALEX,             | **FEDERAL SECURITIES LAWS**     |
   |                                         |                                 |
20 |                 Defendants.             |                                 |
   |                                         | JUDGE:     Honorable Larry Allen Burns |
21 |                                         | CTRM:      9                    |
   |─────────────────────────────────────── |                                 |
22 | ALEX BENJAMIN, Individually and on      |                                 |
   | behalf of all others similarly situated,|                                 |
23 |                                         |                                 |
   |                 Plaintiff,              |                                 |
24 |                                         |                                 |
   |         v.                              |                                 |
25 |                                         |                                 |
   | NEXTWAVE WIRELESS INC., ALLEN           |                                 |
26 | SALMASI and GEORGE C. ALEX,             |                                 |
   |                                         |                                 |
27 |                 Defendants.             |                                 |

28

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of NextWave Wireless Inc. ("NextWave" or the "Company") between November 14, 2006 and August 7, 2008 (the "Class Period") against the Defendants named herein for violations of the  Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.     Jurisdiction is conferred by § 27 of the 1934 Act.  The claims asserted herein arise under §§ 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

3.     Venue is proper in this District pursuant to § 27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

4.     NextWave's principal executive offices are located at 12670 High Bluff Drive, San Diego, California.

## PARTIES

5.     Lead Plaintiffs, The White Trust Group, purchased NextWave common stock as set forth in the certifications previously filed with the Court, incorporated herein, at artificially inflated prices during the Class Period and were damaged thereby.

6.     Defendant NextWave is a mobile broadband and multimedia technology company headquartered in San Diego, California.  NextWave develops, produces and markets mobile multimedia and wireless broadband products, including fourth generation ("4G") wireless technology (WiMAX) through production of broadband semiconductors, device-embedded software for mobile handsets, mobile television systems and mobile broadband network equipment.  On November 16, 2006, the Company's stock was listed and began trading on the Over The Counter ("OTC") US Market exchange.  On November 27, 2006, the Company moved its stock's listing to the OTC Bulletin Board exchange.   On January 3, 2007, the Company listed its common stock on the NASDAQ exchange under the symbol WAVE.

(a)      NextWave operates in three segments: Semiconductor, Multimedia, and Networks.   The Semiconductor segment offered WiMAX and long-term evolution baseband chipsets, and multi-band radio frequency integrated circuits.   The Multimedia segment provides device-embedded multimedia software, media content management platforms, and content delivery services.   The Networks segment develops 3GPP UMTS and WiMAX based wireless broadband and mobile broadcast products and services, as well as carrier-grade mobile Wi-Fi products and services.   The Company also markets various TD-CDMA end-user devices to network operators, including desktop modems and PCMCIA cards.

(b)      WiMAX, meaning *Worldwide Interoperability for Microwave Access*, is a telecommunications technology that provides wireless transmission of data using a variety of transmission modes, from point-to-multipoint links to portable and fully mobile internet access. The technology provides up to 3 Mbit/broadband speed without the need for cables. The technology is based on the IEEE 802.16 standard (also called Broadband Wireless Access). WiMAX technology is the next generation of wireless technology whose goal is to be used by consumers on the go because its antennas can "hand off" coverage.   As a wireless digital communications system, WiMAX is intended for "metropolitan area networks," providing broadband wireless access up to 30 miles for fixed stations and 3-10 miles for mobile stations.   In contrast, WiFi is limited in most cases to only 100-300 feet.   WiMAX is intended to allow higher date rates over longer distances through the use of large umbrella cells interconnected with numerous pico cells.   The name "WiMAX" was created by the WiMAX Forum, which was formed in June 2001 to promote conformity and interoperability of the standard. The forum describes WiMAX as "a standards-based technology enabling the delivery of last mile wireless broadband access as an alternative to cable and DSL."

2

(c)     NextWave's business strategy was to develop the key elements of an end-to-end mobile WiMAX/Wi-Fi network solution that includes a family of WiMAX chipsets and network components, thus ultimately providing a complete WiMAX solution to partners around the world.   To that end, NextWave engaged in an aggressive acquisition program of growth, characterized by acquisition, new network deployments and new product launches.

(d)     Throughout the Class Period, as alleged hereinafter, NextWave struggled, both financially and operationally.   The Company was unable to develop its WiMAX semiconductor product line in timely fashion and made very poor acquisitions of companies that had their own financial and technological problems.   NextWave burned considerable amounts of its available cash on both making these acquisitions and then infusing considerable additional cash into their operations.   Consequently, NextWave, while it was waiting for the hoped-for revenues from its new WiMAX semiconductor products, was not generating sufficient cash to continue to run its world-wide operations and to continue its aggressive acquisition strategy.   As the delay in bringing the WiMAX semiconductor products to market continued well into 2008, NextWave began to run out of money, closing down operations, and abandoning product development projects.   Finally, and belatedly, when NextWave was on the verge of financial collapse, Defendants disclosed NextWave's true operational and financial condition to the market and its stock price dropped dramatically.

7.     Defendant Allen Salmasi ("Salmasi") is the founder of NextWave.   Salmasi is, and, at all relevant times, was Chairman of the Board, President and Chief Executive Officer ("CEO") of NextWave.   During the Class Period, Salmasi was responsible for the Company's false financial and public statements.   Salmasi signed SEC filings and made statements quoted in NextWave's press releases.

3

8.    Defendant George C. Alex ("Alex") is, and, at all relevant times, was Chief Financial Officer ("CFO") of NextWave.  During the Class Period, Alex was responsible for the Company's false financial and public statements.  Alex signed NextWave's SEC filings.  Alex submitted his resignation effective May 4, 2009.

9.    Defendants Salmasi and Alex (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of NextWave's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance, or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading.  According to various confidential witnesses ("CWs"), whose testimony is set forth in paragraphs 54 – 68, Salmasi was extremely involved in every aspect of Nextwave, receiving summary reports on a weekly basis (CW2), feedback on the GO Networks acquisition (CW4), attending quarterly operations and program review meeting discussing networks products (CW7), and even receiving and responding to a trip report from a former North American Sales Director (CW14).

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

10.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about NextWave, as alleged in paragraphs 13 through 49, *infra*.  Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of NextWave common stock and was successful throughout the Class Period, as it: (i) deceived

4

the investing public regarding NextWave's prospects and business; (ii) artificially inflated the price of NextWave common stock; and, (iii) caused Lead Plaintiffs and other members of the Class to purchase NextWave common stock at inflated prices during the Class Period.

11. Unbeknownst to the market, however, because of Defendants' false and misleading statements concerning NextWave' financial and operating condition, as alleged in paragraphs 13, 16, 19, 22, 25, 26, 29, 32, 35, 38, 42, 43, 45, 47, 48, and 49, *infra*, NextWave did not have adequate sources of liquidity to: fund its ongoing operations; continue the development of its WiMAX semiconductor product line and other products; cure the financial and technological problems associated with certain of its acquisitions, such as GO Networks and IPWireless; and continue making aggressive worldwide acquisitions.  As a result, the Company's very ability to continue as a going concern was put at substantial risk as NextWave ran out of cash and was desperate to find new sources of funding. Thus, at the same time that Defendants were touting NextWave's successful execution of its growth strategy throughout the Class Period, they not only misrepresented the financial and technological benefits of that strategy but also failed to disclose NextWave's delays in bringing its WiMAX semiconductor product line to market, the Company's fragile liquidity position and its very ability to continue as a going concern.

12. Throughout the Class Period, Defendants issued false and misleading statements to the market concerning the business and financial condition of NextWave.  These statements, as alleged hereinafter in paragraphs 13, 16, 19, 22, 25, 26, 29, 32, 35, 38, 39, 42, 43, 45, 47, 48, and 49, *infra*, were false and misleading when made because Defendants failed to disclose and/or misrepresented the following material facts:

(a) NextWave did not have adequate sources of liquidity to continue operations as it executed its growth strategy and continued making aggressive worldwide

5

acquisitions;

(b) NextWave did not have the financial or technological wherewithal to timely launch its new WiMAX semiconductor products;

(c) NextWave's growth and acquisition strategy was not financially sound, was undertaken without proper due diligence and did not provide the basis for continued growth or financial success because it was straining NextWave's fragile liquidity position, and NextWave did not have the financial resources to continue to operate its world-wide operations;

(d) NextWave failed to timely disclose that it had invested all of its marketable securities in extremely high-risk and illiquid auction rate securities and had misrepresented these investments as marketable securities on its balance sheet included in its financial statements disseminated in its Forms 10-K and 10-Q and press releases, referenced below;

(e) Defendants had no reasonable basis to make favorable statements that the Company's WiMAX semiconductor products would be available for timely commercial sale when the facts available to Defendants concerning the development and marketing of the Company's WiMAX semiconductor products indicated that they would not be available for commercial sale until at least the first half of 2009, and that this delay would put further pressure on the Company's liquidity position; and,

(f) NextWave's ability to continue as a going concern was seriously in question by reason of the facts alleged in subparagraphs (a)-(e) above.

## **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

13. On November 14, 2006, NextWave filed its Form 10-Q for the third quarter of 2006 ("Q3 2006 10-Q"), signed by Defendant Alex. The Q3 2006 10-Q contained the following false and misleading statements:

(a) "While we expect to continue to grow and expand our multimedia software

6

business, we expect that, following the development of our WiMAX products and technologies, the majority of our revenues will ultimately be derived from the sale and licensing of our WiMAX compliant chipsets, network components and device technologies to network infrastructure and mobile terminal manufacturers on a global basis;" and

(b)    "[W]e believe that our current revenues, cash and short-term investments and financing activities will be sufficient to fund our operating activities at least through 2007 . . . .  We plan to fund our WiMAX technology development activities with our $222.2 million of unrestricted cash and investments until such point that we begin sales of our chipsets and network component products and enter into licensing arrangements for our wireless broadband technologies.  Our wireless broadband products and technologies are in the early stages of development and will require a substantial investment before they may become commercially viable."

14.    The quoted statements in paragraph 13 were false and misleading because Defendants failed to disclose the following material facts:

(a)    Defendants knew that it would be several years before NextWave's WiMAX semiconductor products would be available for commercial sale due to the length of time necessary to develop and market those products and due to problems that were already occurring that were slowing the process to bring the products to the commercial market; and,

(b)    Defendants knew that during the several-year period before NextWave's WiMAX semiconductor products would be available to the commercial market that NextWave would not have adequate liquidity to maintain its worldwide operations at a satisfactory level, due in large measure to the high costs of the acquisition strategy Defendants had determined to follow.

15.    Defendants knew that the statements quoted in paragraph 13 were false and

7

misleading when made because of their knowledge of NextWave's business, the timetables for development and marketing of the WiMAX semiconductor products, the sources of cash available to NextWave to fund ongoing operations and planned acquisitions, and the lack of adequate revenues to generate additional sources of cash for NextWave's operational needs.   The statements made by confidential witnesses, as detailed in paragraphs 54, 55, 56, 57(a)-(j), 58, 59, 60(i)-(m), 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

16.     On January 3, 2007, NextWave announced that it had signed a definitive agreement to acquire GO Networks, Inc.  Defendant Salmasi made the following false and misleading statements in the release:

> "After extensive field testing of several metro-scale WI-Fi network systems, we selected GO's Metr Broadband Wireless system as the most competitive and cost-effective Wi-Fi network solution for NextWave. . . .GO Network's' pioneering Wi-Fi technology is a natural complement to NextWave's WiMAX product line and will enhance our ability to deliver high-performance, wide-area and local-area wireless broadband services using stand-alone or integrated WiFi/WiMAX solutions . . . ."

17.     The quoted statements in paragraph 16 were false and misleading when made because Defendants failed to disclose the following material facts:

(a)     GO Networks had serious technology issues which would impair its ability to function properly without a sizable infusion of cash, which cash was not available from NextWave due to the demands from its own businesses, including the development and marketing of its WiMAX semiconductor products and other planned acquisitions; and,

(b)     Defendants' own team, which did the due diligence on GO Networks, had recommended not purchasing the company because of the technology issues.

18.     Defendants knew that the statements quoted in paragraph 16 were false and misleading when made because of their knowledge of GO Networks operations and technology by reason of the due diligence NextWave performed before acquiring the company and their own

team's recommendation not to acquire GO Network's because of the company's serious technology issues.  Defendants also knew of the financial constraints under which NextWave was operating in light of its cash needs of development of the WiMAX software product line and additional planned acquisitions and, as a result, NextWave would not be financially able to infuse GO Networks with the necessary capital to make its operations functional and profitable for NextWave.  The statements made by CWs, as detailed in paragraphs 57(k) and 60(d) further support Defendants' scienter.

19.     On March 30, 2007, Defendants filed NextWave's Form 10-K for year-end 2006, signed by Defendants Salmasi and Alex ("2006 10-K").  In the 2006 10-K, Defendants made the following false and misleading statements:

(a)     In discussing NextWave's competitive strengths, Defendants emphasized, *inter alia*, "**Integrated business model**.  We believe that each of our operating subsidiaries represents an attractive standalone business.  However, we believe that our business units are highly complementary to each other and together provide us with the ability to adapt our business model and allocate resources to maximize market share in a rapidly evolving industry" and **"Integrated WiMAX/Wi-Fi solutions.** Our GO Networks subsidiary offers carrier-class, mobile Wi-Fi systems specifically designed for wide-area deployments. We believe that Wi-Fi and WiMAX are complementary technologies and that the most cost-effective solution to provide mobile broadband services on a wide-area basis is to often deploy hybrid networks that utilize both technologies since WiFi-enabled devices, including laptops, have been widely adopted by the mass consumer market. In addition, because GO Networks utilizes a cellular-mesh network architecture, we believe that GO Network customers represent opportunities for future Wi-Fi to WiMAX upgrades that utilize NextWave's WiMAX products and technologies."

(b)     In discussing NetxWave's business strategy, Defendants noted the

9

Company's focus includes, *inter alia*: **"Develop the key elements of a mobile WiMAX system.** We intend to develop the key elements of an end-to-end mobile WiMAX/Wi-Fi network solution that includes a family of WiMAX chipsets and network components. Our development activities are focused on both sides of the radio connection, which we believe will enable us to deliver a superior system solution to our customers. To date, we have made significant progress in our WiMAX development efforts and we expect to begin field testing elements of our chipset product line in 2007. These field testing activities will be part of a comprehensive technical field trial of our technologies in Henderson, Nevada. We expect to utilize this field trial to showcase the capabilities of our WiMAX/Wi-Fi technologies, and believe that the trial will be an important step towards successful commercialization of our family of WiMAX/Wi-Fi products."

(c)     **"Grow our GO Networks mobile Wi-Fi business.** We believe that the worldwide market for wide-area, mobile Wi-Fi networks will continue to grow and intend to pursue these opportunities by offering customers our advanced GO Networks Wi-Fi system. Because the GO Networks system utilizes a cellular-type architecture, we believe it can be upgraded to a hybrid Wi-Fi/WiMAX solution at a total cost of ownership below that of competing Wi-Fi network solutions and intend to leverage this advantage in the marketplace."

(d)     **"WiMAX /Wi-Fi Semiconductors** Based in San Diego, California, our Advanced Technology Group (ATG), a division of our NextWave Broadband subsidiary, is creating a family of semiconductor products, based on WiMAX and WiFi technology, to enhance the capabilities and economics of fixed and mobile WiMAX/Wi-Fi networks."  2006 10-K (at pages 11-12).

*** 

To develop its semiconductor products, ATG has organized its engineering resources into several product development groups including:   a) RFIC engineering and design team; b) digital baseband engineering team; c) systems engineering team; and, d) BTS radio product group. In addition, ATG has established a large team of system engineers to create an end-to-end system that integrates the products and technologies developed by its various product teams.

***

Digital Baseband ASICs.   An ASIC is an integrated circuit or chip customized for a specific

10

1
2
purpose.   Our family of WiMAX/Wi-Fi based digital baseband ASICs under development represent the core of our system architecture.  Our first baseband WiMAX ASIC, the NW1100, is currently in the final stages of manufacture in Q3 2007.

3

4
***

5
6
Radio Frequency Integrated Circuits (RFICs):  An RFIC is part of the front-end of a radio system that receives a radio frequency signal, converts it to a lower frequency and modifies it for further processing.

7
Our initial multi-band RFIC, the NW1200, was sent to manufacture in late 2006.  Sample chips have undergone successful testing and evaluation.

8
9
        20.     The statements quoted in paragraph 19 from NextWave's 2006 10-K were false

10
and misleading when made because:

11
                (a)      it would be several years before NextWave's WiMAX semiconductor

12
products would be available for commercial sale due to the length of time necessary to develop

13
and market those products and due to problems that were already occurring that were slowing the

14
process to bring the products to the commercial market;

15
16
                (b)      during the several-year period before NextWave's WiMAX semiconductor

17
products would be available to the commercial market that NextWave would not have adequate

18
liquidity to maintain its worldwide operations at a satisfactory level, due in large measure to the

19
high costs of the acquisition strategy Defendants had determined to follow;

20
                (c)      there were serious issues with GO Networks operations and technology

21
which they learned by reason of the due diligence they performed before acquiring the company

22
and their own team's recommendation to them not to acquire the company because of GO

23
Network's serious technology issues; and,

24
25
                (d)      NextWave would not be able to provide Go Networks with the cash

26
infusions it needed, and would continue to need to remain a viable worldwide operation because

27
Defendants knew that in light of the huge development costs of NextWave's WiMAX

28
semiconductor products and the significant cost of Defendants' aggressive worldwide acquisition

spree, NextWave did not have sufficient sources of funds to infuse any money into the Go Networks business.

21.     Defendants knew that their statements quoted in paragraph 19 were false and misleading because Defendants knew of the financial and operational problems with GO Networks as a result of the due diligence conducted of the company and the recommendation of the NextWave team not to acquire the company because of those problems, of the status reports and team meetings concerning the delays and problems encountered in developing the WiMAX semiconductor products and of the amount of cash NextWave was burning in both its current operations and in making its acquisitions and the available source and amounts of cash and financing available to NextWave.  The statements made by CWs, as detailed in paragraphs 54, 55, 56, 57(k)-(n), 58, 59, 60(a)-(d), (i)-(m), 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

22.     On April 2, 2007, NextWave issued a press release entitled "NextWave Wireless Announces Full Year Financial Results – Revenues Exceed $24 Million in First Full Year of Operation."  Salmasi made the following false and misleading statements in the Press Release:

(a)     "The financial results achieved by the company are consistent with our expectations and reflect the successful growth strategy we implemented when we formed NextWave Wireless in April 2005;" and,

(b)     "In the twenty months since our inception in April 2005, we have successfully built a solid foundation for corporate growth and we remain optimistic about what 2007 holds for our company.  We expect to expand our commercial product offerings, expand our domestic and international licensed spectrum footprint, augment our engineering team, and execute on strategic acquisitions to allow us to take full advantage of what we see as exciting growth opportunities in the mobile broadband and wireless multimedia marketplace."

23.    These statements quoted in paragraph 22 were false and misleading when made because:

(a)    NextWave did not have adequate sources of liquidity to continue operations as it executed its growth strategy and continued making aggressive worldwide acquisitions;

(b)    NextWave did not have the wherewithal to launch its new WiMAX semiconductor products in the foreseeable future; and,

(c)    NextWave's growth and acquisition strategy was not financially successful, was undertaken without proper due diligence or in the face of due diligence that said not to undertake the acquisition and did not provide the basis for continued growth or financial success because it was straining NextWave's fragile liquidity position and NextWave did not have the financial resources to continue to operate its world-wide operations through the end of 2008.

24.    Defendants knew that the statements quoted in paragraph 22 were false and misleading because of their knowledge that: (a) it would be several years before NextWave's WiMAX semiconductor products would be available for commercial sale due to the length of time necessary to develop and market those products and due to problems that were already occurring that were slowing the process to bring the products to the commercial market; (b) during the several-year period NextWave would not have adequate liquidity to maintain its worldwide operations at a satisfactory level, due in large measure to the high costs of the acquisition strategy Defendants had determined to follow; (c) that there were serious issues with GO Networks operations and technology which they learned by reason of the due diligence they performed before acquiring the company and their own team's recommendation to them not to acquire the company because of GO Network's serious technology issues; and, (d) in light of the huge development costs of its WiMAX semiconductor products and the significant cost of

13

Defendants' aggressive worldwide acquisition spree, NextWave did not have sufficient sources of funds and would be unable to provide Go Networks with the cash infusions the company needed to remain a viable worldwide operation.  The statements made by CWs, as detailed in paragraphs 54, 55, 56, 57, 58, 59, 60(a)-(d), (h)-(m), 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

25.     On April 9, 2007, NextWave announced in a press release that it had signed a definitive agreement to acquire IPWireless Inc, a privately-held company, headquartered in San Bruno, California, with research and development facilities in the United Kingdom for approximately $100 million.  Defendant Salmasi made the following false and misleading statements in the press release:

> "The acquisition of IPWireless fits perfectly into our strategy of providing our customers with the most cost-effective and high-performance mobile broadband products and solutions available today. IPWireless and NextWave will work together to expand IPWireless' product portfolio to incorporate WiMAX and/or Wi-Fi technologies for those service providers and equipment vendors that require such solutions.   IPWireless's excellent global track record, including their successful introduction and commercialization of TD-CDMA technology, their development of several industry-first wireless broadband technologies, and their recent introduction of TD TV clearly demonstrate their strong capacity for technical innovation and the clear value they will bring to NextWave. We are very excited about the prospects of working together to develop and deliver advanced, next-generation wireless broadband solutions to the marketplace and welcome the entire IPWireless team to NextWave's family of companies."

26.     In an interview given to Investor's Business Daily, posted on May 4, 2007, Defendant Salmasi made the following further misrepresentations concerning IPWireless and the benefits of the acquisition for NextWave:

> "[IPWireless] developed one of the first 4G technologies.  They really have the most solid technology that has been developed to date, with high-speed connection rates."

27.     The statements quoted in paragraphs 25 and 26 were false and misleading when made because:

14

(a)     IPWireless' products were not as represented and were far from state-of-the-art, primarily because IPWireless lacked proper design documents for its products, had a software code which was poorly written, termed in the industry as "spaghetti code," and had products that had to be returned and replaced due to poor quality; and,

(b)     IPWireless needed, and would continue to need substantial cash infusions from NextWave to maintain its operations and be accretive to NextWave's revenues or earnings.

28.     Defendants knew that the statements quoted in paragraphs 25 and 26 were false and misleading as a result of the due diligence conducted before acquiring IPWireless and the NextWave due diligence team's strong recommendation against buying the company. Defendants' scienter is further supported by the statements of CWs, as detailed in paragraphs 55, 57(a)-(j) and 60(e)-(j).

29.     On May 14, 2007, the Company reported its first quarter fiscal year 2007 financial results.  The Press Release contained the following false and misleading statements:

(a)     "Loss from operations increased primarily due to an increase in operating expenses related to the expansion of our research and development teams and related support organizations, through organic growth and acquisitions.  At present, 653 full time employees and 238 contractor personnel are engaged in developing and marketing our mobile broadband and wireless multimedia products and technologies;" and

(b)     "Our financial results are consistent with our expectations and reflect the important strategic and product development milestones we achieved during the first quarter of the year.  Our business activities will continue to be focused on providing customers with the leading-edge, cost-effective wireless broadband products and technologies they need to deliver next-generation mobile broadband solutions to businesses and consumers."

30.     The quoted statements in paragraph 29 were false and misleading when made

because Defendants painted a picture of NextWave that was at odds with the realities of its severely strained financial condition and the serious problems with the technology it had acquired with the GO Networks and IPWireless acquisitions, as well as the serious problems being encountered in developing the WiMAX semiconductor products.   In reality, NextWave was teetering on a financial and operational precipice and did not have either the financial or technological wherewithal to provide "next-generation mobile broadband solutions" in the foreseeable future.   Rather than disclose the true state of NextWave's technology, Defendants failed to disclose that:

(a)    development of the WiMAX semiconductor product line was encountering serious development problems that would delay NextWave's ability to bring the new products to market;

(b)    NextWave lacked the financial resources to continue to operate it worldwide businesses, continue its aggressive acquisition strategy and develop the WiMAX semiconductor product line  in light of the continuing delays in development and marketing of the WiMAX product line;

(c)    there were serious issues with GO Networks operations and technology and in light of the huge development costs of its WiMAX semiconductor products and the significant cost of Defendants' aggressive worldwide acquisition spree, NextWave did not have sufficient sources of funds and would be unable to provide Go Networks with the cash infusions the company needed to remain a viable worldwide operation; and,

(d)    that IPWireless' products were not as represented and were far from state-of-the-art, primarily because IPWireless lacked proper design documents for its products, had a software code which was poorly written, termed in the industry as "spaghetti code," and had products that had to be returned and replaced due to poor quality.  In addition, IPWireless needed,

16

and would continue to need substantial cash infusions from NextWave to maintain its operations and be accretive to NextWave's revenues or earnings.

31.    Defendants knew that the statements quoted in paragraph 29 were false and misleading because of their knowledge that: (a) it would be several years before NextWave's WiMAX semiconductor products would be available for commercial sale due to the length of time necessary to develop and market those products and due to problems that were already occurring that were slowing the process to bring the products to the commercial market; (b) during the several-year period NextWave would not have adequate liquidity to maintain its worldwide operations at a satisfactory level, due in large measure to the high costs of the acquisition strategy Defendants had determined to follow; (c) that there were serious issues with GO Networks operations and technology which they learned by reason of the due diligence they performed before acquiring the company and their own team's recommendation to them not to acquire the company because of GO Network's serious technology issues; and, (d) in light of the huge development costs of its WiMAX semiconductor products and the significant cost of Defendants' aggressive worldwide acquisition spree, NextWave did not have sufficient sources of funds and would be unable to provide Go Networks with the cash infusions the company needed to remain a viable worldwide operation.  The statements made by CWs,  detailed in paragraphs 54, 55, 56, 57, 58, 59, 60(a)-(d), (h)-(m), 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

32.    On May 15, 2007, the Company filed its Form 10-Q for the first quarter of 2007 ("Q1 2007 10-Q"), signed by Defendant Alex.  The Q1 2007 10-Q contained the following false and misleading statements:

(a)    "[w]e believe that our current revenues, cash and short-term investments and financing activities will be sufficient to fund our operating activities and contractual

17

commitments at least through 2008;" and

(b)  In itemizing short-term investments and restricted cash, $361,518 million was invested in municipal securities out of $380,952 million of total unrestricted short-term investments for that quarter (10-Q at 7).

33.    The statements in paragraph 32 were false and misleading when made in light of the following:  (a)  Defendants' aggressive acquisition strategy was not only costly but also failing to provide increased sources of operating cash; (b) NextWave's spiraling costs of product development in light of problems and delays in bringing the WiMAX semiconductor products to the commercial market and the technological problems with the products acquired in the GO Networks and IPWireless acquisitions; (c) the investment of substantial cash assets in municipal securities were actually in auction rate securities, which were restricted, further limiting NextWave's access to cash; and, (d) NextWave did not have sufficient source of cash to enable it to continue to fund and operate its worldwide businesses, continue to timely develop its WiMAX semiconductor product line, and continue with its acquisition strategy.

34.    Defendants knew that the statements in paragraph 32 were false and misleading because Defendants knew the amount of cash the NextWave was burning in its current operations, the amount of cash it was spending on its acquisitions, and the amount of cash and financing available.  Defendants also knew that its cash was invested in risky and restricted auction rate securities.  Defendants further knew of the delayed timetable for bringing is WiMAX semiconductor products to market.  The statements made by CWs, detailed in paragraphs 54, 56, 57(l)-(m), 58, 59 and 60(a), (l)-(m), 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

35.    On June 6, 2007, NextWave announced plans to introduce WiMAX chip sets through its subsidiary NextWave Broadband, Inc.  The announcement contained the following

18

false and misleading statement:  "[i]nitial availability of the company's second generation chips, designed for high-volume commercial production, is planned for the second half of 2008."

36.     The statement quoted in paragraph 35 was false and misleading when made because NextWave did not have the technological or financial ability to bring the WiMAX second generation chips to the commercial market in the second half of 2008.

37.     Defendants knew that the statement quoted in paragraph 35 was false and misleading because they were well aware of the requisite length of time necessary for the development schedule, and the serious delays in development and marketing of the WiMAX semiconductor products.  The statements made by CWs, as detailed in paragraphs 56, 60(a) and 66, further support Defendants' scienter.

38.     On August 14, 2007, the Company filed its Form 10-Q for the second quarter of 2007 ("Q2 2007 10-Q"), signed by Defendant Alex.  The Q2 2007 10-Q contained the following false and misleading statements:

(a)     "[w]e believe that our revenues, existing cash and short-term investments and financing activities will be sufficient to fund our operating activities and contractual commitments at least through 2008;"

(b)     "We currently anticipate that our second generation NextWave Broadband WiMAX technologies designed for high volume commercial production will initially be available in the first half of 2008" and that the revenue generated from the sale of the WiMAX products would alleviate some of NextWave's working capital requirements; and,

(c)     In itemizing short-term investments and restricted cash, $158,209 million was invested in municipal securities out of $189,025 million of total unrestricted short-term investments for that quarter (10-Q at 7).

39.     On August 15, 2007, NextWave reported its second quarter fiscal year 2007

19

financial results.  The press release contained the following false and misleading statements:

(a)      "Initial availability of the company's second-generation chips, designed for high-volume commercial production, is planned for the first half of 2008;" and,

(b)      "The acquisition of IPWireless and WiMAX Telecom, and the successful fabrication of our first-generation WiMAX chipset, which is one of the first paired multi-band chipsets to enable global roaming for WiMAX users, were some of the important milestones achieved during the second quarter of 2007.  Our team remains focused on accelerating revenue growth, on developing the advanced, end-to-end wireless technologies and solutions our customers require, and on further strengthening NextWave's position in the global wireless marketplace."

40.      The statements in paragraphs 38 and 39 were false and misleading when made because:

(a)      NextWave did not have the technological or financial ability to bring the WiMAX second generation chips to the commercial market in first half of 2008;

(b)      the acquisition of IPWireless was an operational and financial failure because IPWireless lacked proper design documents for its products, had a software code which was poorly written, termed in the industry as "spaghetti code," and had products that had to be returned and replaced due to poor quality.  In addition, IPWireless needed, and would continue to need substantial cash infusions from NextWave to maintain its operations and be accretive to NextWave's revenues or earnings;

(c)      Defendants' aggressive acquisition strategy which was not only costly but also failing to provide increased sources of operating cash and, in the case of GO Networks and IPWireless, would require additional sizeable cash infusions in order to generate revenues in light of the technological problems with the product line;

(d)     NextWave's spiraling costs of product development in light of problems and delays in bringing the WiMAX semiconductor products to the commercial market and the technological problems with the products acquired in the GO Networks and IPWireless acquisitions; and,

(e)     the investment of substantial cash assets in auction rate securities were investments in illiquid, restricted securities.

41.     Defendants knew that the statements quoted in paragraphs 38 and 39 were false and misleading because they: (a) were well aware of the requisite length of time necessary for the development schedules and the serious delays in development and marketing of the WiMAX semiconductor products; (b)   knew the amount of cash NextWave was burning in its current operations, the amount of cash it was spending on its acquisitions, and the amount of cash and financing available; and, (c)  knew that its cash was invested in risky and restricted auction rate securities. The statements made by CWs, detailed in paragraphs 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

42.     On November 13, 2007, the Company filed its Form 10-Q for the third quarter of 2007 ("Q3 2007 10-Q"), signed by Defendant Alex on November 13, 2007.  The Q3 2007 10-Q contained the following false and misleading statements:

(a)     "[b]ased upon our current plans, we believe that our existing cash, cash equivalents, working capital and strategic financing alternatives, together with the incremental gross margins forecasted from our newly acquired GO Networks and IPWireless wireless broadband network businesses, along with incremental margins from revenue growth in our PacketVideo multimedia software business, will be sufficient to cover our estimated liquidity needs for at least the next twelve months;"

(b)     "Initial availability of our second-generation, NW2000 chipset family, the

21

company's first chipset family designed for high-volume commercial production, is planned for the first half of 2008." (10-Q at 21);

(c)     "We currently anticipate that our second generation NextWave Broadband WiMAX technologies designed for high volume commercial production will initially be available in the first half of 2008";

(d)     the revenue generated from the sale of the WiMAX products would alleviate some of NextWave's working capital requirements; and,

(e)     NextWave had $179 million in municipal securities on its balance sheet, which represented 85% of its total unrestricted marketable securities.

43.     On November 14, 2007, NextWave reported its third quarter fiscal 2007 financial results.  The press release contained the following false and misleading statements:

(a)     "We are very pleased with the rapid revenue growth achieved by our PacketVideo and IPWireless subsidiaries this quarter and the transition from early-stage development to pre-commercialization status of our WiMAX chipset business. These achievements are the direct result of the investments we have made in our people, our business, and our technologies;"

(b)     "NextWave expects to realize improved contributions from [the GO Networks and IPWireless] businesses in the future resulting from the achievement of operating efficiencies, improved margin contributions and the one-time nature of approximately $11.2 million of these charges;"

(c)     "The company's second-generation [WiMAX] chips, designed for high-volume, full-commercial production is planned for the first half of 2008;"

(d)     "Our third quarter results are consistent with our expectations and will further strengthen our position for future growth;" and,

22

(e)   "We're looking forward to a successful commercial launch of [WiMAX] products in 2008. . . .  To accelerate the commercial introduction of our WiMAX chipsets and technologies, we have also undertaken joint development activities with world-class device vendors."

44.   The statements quoted in paragraphs 42 and 43 were false and misleading because Defendants: (a) were aware of the requisite length of time necessary for the development schedule and the serious delays in the development and marketing of the WiMAX semiconductor products; (b)  knew the amount of cash NextWave was burning in its current operations and that the amount of cash the Company was spending on its acquisitions outstripped the amount of cash and financing available to NextWave; and, (c)  knew that NextWave's cash was invested in risky and restricted auction rate securities. Defendants knew these true facts from their daily operations of the Company.  The statements made by CWs, detailed in paragraphs 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65 and 66, further support Defendants' scienter.

45.   On March 13, 2008, the Company filed its Form 10-K for year end 2007 ("2007 10-K"), signed by Defendants Salmasi and Alex.  The 2007 10-K contained the following false and misleading statements:

(a)   "[b]ased on the operating plan for the year ended December 27, 2008 approved by our board of directors, management believes our existing cash, cash equivalent and marketable securities, the release of the $75 million of restricted cash . . . and cash forecasted to be generated by operations will be sufficient to meet our estimated working capital;"

(b)   "We currently anticipate that our second generation WiMAX chipset, designed for high-volume commercial production, will initially be available in the first half of 2008."; and,

(c)   "We believe that our NW2000 WiMAX chipset family, which will be

23

available in the first half of 2008, will offer WiMAX device manufacturers a powerful platform to develop next-generation WiMAX mobile terminals to support mobile multimedia applications such as mobile TV."

46.    For the first time, Defendants partially disclosed the truth about their investment in municipal securities noting that at December 29, 2007, the close of fiscal 2007, $102.2 million, or 90%, of NextWave's marketable securities were invested in auction rate securities.   Such securities were highly speculative bonds, the liquidity of which are subject to the weekly auctions, artificially maintained by the investment houses and banks that sponsored the issuance of the auction rate securities."   Further noting, that "none of the auctions involving our ARS holdings had failed as of December 29, 2007," but that eight such investments had failed by the beginning of March 2008.

47.    On March 14, 2008, NextWave reported its fourth quarter and fiscal year 2007 financial results, in a release which contained the following false and misleading statements:

(a)    "Our accelerated 2007 revenue growth was driven by our success in developing and delivering cutting-edge mobile broadband and multimedia products and technologies to our worldwide customers;"

(b)    "It is clear that our investments since formation have propelled the company into a leader in mobile TV and broadband multimedia technologies.   We are now delivering complete end-to-end technology platforms and products to our customers around the world, creating a new generation of personalized and advertising supported mobile multimedia over broadband devices and services;" and,

(c)    "As a result of the significant investments we made during 2007, we have charged into 2008 with a broad suite of new and innovative mobile multimedia and wireless broadband products."

24

48.     On April 14, 2008, NextWave filed its 2007 Annual Report, containing a letter to shareholders signed by Defendant Salmasi, which contained the following false and misleading statements:

(a)     "This [2007] revenue growth and workforce increase was a direct result of the substantial investments we made in research and development in the expansion of our global operations;"

(b)     "[W]e believe [the investments in IPWireless and GO Networks] were necessary to help us achieve the scale and technical capabilities needed to succeed in the highly competitive global wireless market;"

(c)     "As a technology company, one of our key goals is to commercialize our technical innovations as quickly as possible.  For NextWave, 2007 will be remembered as the year when we made the first customer deliveries of our mobile broadband network equipment and when we began the process of transitioning some of our most promising wireless technologies out of the lab and into pre-production.  These include our first family of WiMAX semiconductors to power next-generation WiMAX handsets and our ground-breaking MXtv mobile broadcast system that will let customers watch live TV and movies using a WiMAX-enabled mobile device. We are optimistic that demand for these technologies, along with our other WiMAX products, will increase as the global market for WiMAX-based network equipment and devices continues to expand;"

(d)     "In 2007, we began to commercialize some of our most innovative technologies, expanded our valuable spectrum portfolio, and further enhanced the financial strength of the company;" and,

(e)     "2008 is already shaping up to be a milestone-rich year for NextWave."

49.     On May 8, 2008, the Company reported its first quarter fiscal 2008 financial

results, in a press release, containing quotes from Defendant Salmasi, and in its Form 10-Q for the first quarter of 2008 ("Q1 2008 10-Q"), signed by Defendant Alex on May 7, 2008.  The press release and the Q1 2008 10-Q contained the following false and misleading statements:

(a)     "[W]e expect to begin generating revenues from our recently announced second-generation WiMAX chipsets and network products . . . later this year;"

(b)     "Driving revenues and developing cutting-edge mobile technologies while maintaining a tight focus on costs remains our top priority;"

(c)     "Management believes our existing cash and cash equivalents, along with the release of $50.0 million of restricted cash based on our payment of consent fees in March and April 2008 in accordance with amended purchase agreement for the Notes . . . and the cash forecasted to be generated by operations, as well as a combination of . . . potential sources of cash will be sufficient to meet our estimated working capital and capital expenditures requirements through at least March 2009;" and,

(d)     "we currently anticipate that our second generation WiMAX Semiconductor technology will initially be available in the first half of 2008."

50.     The statements in paragraphs 45, 47, 48 and 49 were false and misleading when made because NextWave was actually on the brink of failing and its ability to continue as a going concern was a serious question.  NextWave would run out of cash within several months and in the absence of additional financing sources would have to cease all operations.  Cash from operations was simply not sufficient to continue to operate the Company, let alone continue making acquisitions.  In addition, the problems in bringing WiMAX semiconductor products to market had still not been cured and there was no conceivable way they would be available anytime in 2008.  Furthermore, the acquisitions of Go Networks and IPWireless had not been successful, from both a technological and financial point of view.  In fact, 2008 would be a

26

"milestone-rich" year only in the sense that it would mark tremendous financial and operational failure for the Company.

51.     Defendants knew that the statements quoted in paragraph 45, 47, 48 and 49 were false and misleading because they knew that:  (a) NextWave would run out of cash within several months and in the absence of additional financing sources would have to cease all operations; (b) cash from operations was simply not sufficient to continue to operate the Company, let alone continue making acquisitions and that its ability to continue as a going concern was a very real and immediate concern; (c) the problems in brining WiMAX semiconductor products to market had still not been cured and there was no conceivable way they would be available anytime in 2008, and, (d) that the acquisitions of Go Networks and IPWireless had not been successful, from both a technological and financial point of view.  The statements made by CWs, detailed in paragraphs 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65 and 66 further support Defendants' scienter.

### FACTS SUPPORTING DEFENDANTS' SCIENTER OF THE FALSE AND MISLEADING STATEMENTS THEY MADE DURING THE CLASS PERIOD

52.     Defendants' scienter arises from their knowledge of the financial and operational condition of NextWave which they knew by reason of, *inter alia*:  (a)  their daily oversight of the activities of NextWave; (b) their direction of the acquisitions made by NextWave, including GO Networks and IPWireless, and their knowledge of the cash needs of those businesses and the serious technological problems with their product lines; (c) their direction of the investment of substantial amounts of NextWave's cash in restricted auction rate securities; (d)  their oversight of the development of the WiMAX semiconductor product line, including the timetable for bringing the products to the commercial markets; (e) their development of NextWave's operating and business plans; (d) their knowledge of NextWave's cash needs to fund ongoing operations and acquisitions; and, (e) their due diligence before they made the statements in NextWave's

27

press releases and SEC filings.

53.     Defendants also knew of specific non-public facts concerning NextWave's operations that made their statements, false and misleading, as set forth in the following paragraphs containing the statements made by CWs concerning the operations of NextWave. Each of the CWs held a position with NextWave that permitted him or her direct access to the information he or she provided.

54.     CW1 was a Director of Product Certification from January 2007 until mid 2008 responsible for obtaining certifications for NextWave's products from the appropriate regulatory authorities.  However, during CW1's tenure at NextWave, there were no certifications obtained for any of NextWave's products.  Instead, CW1 prepared for and planned for the WiMAX certification to ensure that CW1 and CW1's team understood the regulatory requirements for WiMAX.  At the time of CW1's departure, NextWave had not obtained WiMAX certification.

55.     CW2 was a Director and Product Manager for Application Layer Services based in NextWave's Henderson, Nevada location from March 2005 through October 2008.   CW2 reported to VP of Operations Alan Cameron, who reported to David Needham, President of NextWave Broadband, who in turn reported to Defendant Salmasi:

        (a)     CW2 explained that since the WiMAX technology was not yet available in 2006 and 2007, NextWave tried to persuade various companies to adopt its "preWiMAX" or TD-CDMA technology being developed by IPWireless, so that once WiMAX was available, implementation would go smoothly.   This TD-CMA technology was an IP mobile TV broadcasting application ("TD TV").   There were four project teams working on the project, comprised altogether of 45-50 personnel, including personnel from IPWireless, PacketVideo, a team in Nevada and a team in Denmark.  Legacy IPWireless Business Strategy Manager John Eskins had overall program management responsibility for the project; the U.K. and Denmark

project teams (approximately 20 people) were managed by Project Lead Michael Larson; and the PacketVideo team (approximately eight people) was headed by Mark Bannan.

        (b)     CW2 led the Nevada team (approximately 20 people) that was involved in the TD TV project and spent one week every month – from March until June of 2008 – in the United Kingdom visiting the U.K. facility of IPWireless in order to attend monthly planning meetings regarding the TD TV project. The meetings were hosted by Eskins, but Larson "ran the meeting agenda." CW2 said that there were also weekly status review conference calls held by Eskins and Larson.

        (c)     CW2 explained that there were executive summary reports on the TD TV project submitted to Defendant Salmasi on a weekly basis. Each of the project teams (*i.e.*, the U.K., Denmark, PacketVideo and Nevada teams) submitted their status updates to President of NextWave Broadband Needham and, after Needham resigned in May 2008, to CW2's supervisor Cameron. Needham and Cameron were responsible for consolidating the updates into an executive summary report, which was a Word document containing a summary of the week's events, and overall project risks (such as delays), as well as requests for additional financing, and submitted it to Salmasi.

        (d)     CW2 said that the TD TV product was being developed for Orange and T-Mobile, and there was a lot of pressure to deliver the pilot product to these carriers for their evaluation, which typically takes three to four months, by October 2008 and no later than November 2008. According to CW2, the project team believed that when the October 2008 delivery date was first established in March 2008 that it was a very "aggressive" deadline, although they thought November 2008 was a reasonable timeframe for the Company to be able to deliver a functional product to the customers. CW2 said that NextWave was hoping that upon a successful evaluation by Orange and T-Mobile, NextWave would sign "commercial-term"

29

contacts with these carriers sometime in the first quarter of 2009, which would result in some revenue flow.  However, CW2 said that "none of that came to fruition" because IPWireless was not able to complete development of the product due to the Company's layoffs and financial deterioration.

(e)     CW2 said that CW2's Nevada team's responsibility on the TD TV project was to obtain an "off-the-shelf" hardware platform, called CDS (Content Delivery System), and perform certification testing according to the customer's documented specifications and technology standards.  The CDS platform was supposed to be shipped to Orange and T-Mobile once the certification testing was completed and should have been shipped prior to the planned pilot product deadline of October 2008.  The CDS platform was an indispensible element of the overall TD TV project (and was on the "critical path" of the project management schedule), but procuring it required approval by NextWave's senior management.  According to the project schedule, the CDS platform was supposed to be purchased in June 2008 in order to meet the product delivery deadline of October/November 2008.  CW2 submitted a purchase order for the CDS platform to the Finance Department in early June 2008.  The cost of the CDS was $254,000 and the component was supposed to be purchased from IBM's value-added reseller Datatrend.

(f)     According to CW2, it took approximately one month to get the purchase order approved from when it was first submitted for approval in June 2008.  CW2 found the delay strange, because the TD TV was such a high-profile project and the CDS platform was an essential element for "driving the critical path" of the project.  In early July 2008, the purchase order was finally approved by President of IPWireless Jones, CFO Alex and CEO Salmasi, at which point the CDS platform was purchased from Datatrend.  CW2 said that Datatrend shipped the CDS platform to NextWave's facility in Henderson, Nevada in an "expedited" manner, and the platform was installed in the Nevada facility on July 7, 2008.  Given the one-month delay in

approving the purchase order, by July 2008 it was clear to CW2 that the plan to deliver the TD TV product to Orange and T-Mobile in October/November 2008 was no longer feasible.

(g)     According to CW2, another event that impacted IPWireless' ability to complete the TD TV project was a Company-wide layoff that began in July 2008 and continued until the end of 2008.  For instance, CW2 said that in July 2008 the entire Denmark team was "cut loose" and "we never heard of them again."  NextWave also began reducing its IPWireless and U.S.-based workforce in July 2008, which significantly impacted the TD TV project.  However, CW2 said that in July 2008, Gordon (the COO of IPWireless) told the remaining TD TV project teams that the plan was still to go forward at full-speed with the development and delivery of the product to Orange and T-Mobile, as planned, in October/November 2008.  But there was no way such a delivery date could be accomplished given the delay in procuring the CDS and the terminations of so many critical personnel.

56.     CW3 was a Senior Engineer at NextWave from mid-2004 until September 2008 and was based at the Company's facility in Nevada.  CW3 was responsible for testing NextWave's products on the NextWave test network based in Las Vegas to determine how these products would function in a simulated real-world network condition.

(a)     CW3 said that NextWave had spent a lot of money to build its test network in Las Vegas.  The network had 30 "cell sites," which CW3 explained were cell towers mounted on top of small structures that contained wireless equipment.  According to CW3, NextWave spent approximately $500,000 per "cell site," including equipment and the cost to install them. Most of the equipment utilized at the "cell sites" was developed by **Cisco** and, therefore, had to be handled by Cisco-certified personnel.  For this reason, CW3 was encouraged to obtain Cisco certification, which CW3 accomplished in November of 2007.

(b)     CW3 said that it was widely known throughout the company that

31

NextWave's "burn rate" was $1 million a day.  CW3 said that such a high "burn rate" was not surprising; because NextWave had 18 operations in nine countries, and only one of them – PacketVideo – "was making money."  Some of the company's burn rate was attributable to high labor costs and rapid growth.

(c)     CW3 recalled that approximately two months before he was laid off, (*i.e.*, sometime in May/June 2008), CW3 began hearing that "we need to close at least one deal or we are going to be in big trouble."  That was when CW3 realized that "money was getting tight." CW3 said that "everybody" in the Company was acting as "a salesperson" trying to do everything possible to sell the Company's products.  In a desperate search for revenue sources, NextWave even attempted to sell leases on its test network based in Las Vegas.  CW3 said that the idea was to lease out NextWave's test network, which was referred to as a Global Network Operation Center, to various customers and NextWave would operate and manage the customers' global networks from its Las Vegas facility.  However, CW3 said that, as of September 2008, no such leases were signed.

(d)     CW3 said that another sign of the Company's financial difficulties occurred when CW3 could not get budget approval for the annual maintenance of the Las Vegas test network.  According to CW3, various "environmental" regulations required the Company to perform annual maintenance and repairs which typically took place in the summer of each year. The witness was not certain, but said that the maintenance and repairs would cost anywhere between $10,000 and $400,000 per "cell site," and NextWave had 30 "cell sites" in Las Vegas. CW3 did not know the exact date when CW3's supervisor Fuentez submitted the "paperwork" for the maintenance work which required management's approval, but CW3 believed it was sometime in May/June 2008.   Sometime in late July 2008, Fuentez told CW3 that the maintenance budget had not been approved and that the management "wouldn't let us spend

32

1  pennies." In fact, the operation in Las Vegas was shut down in September 2008.

2      57.    CW4 worked at NextWave Broadband in San Diego as Director of Field Test

3  Operations from July 2006 until May 2008. CW4 managed a team of 10 field test engineers and

4  was responsible for testing the functionality of NextWave's products in simulated field

5  environments.

6          (a)    Prior to its acquisition of IPWireless in April 2007, NextWave had been a

7  customer of IPWireless for several years. CW4 explained that NextWave had purchased five of

8  IPWireless' second generation base-stations and installed them in its Las Vegas facility in

9  Nevada. The base-stations were part of a network that was intended to test future WiMAX

10  products that NextWave was developing.

11          (b)    CW4 said that a base-station is a piece of wireless equipment installed in

12  the "small building" at the base of a cell-tower. A base-station looks like a "box," which is 19

13  inches wide, one foot high and three feet deep and is bolted onto a rack inside the small building

14  at the base of the tower. According to CW4, there is usually one base-station for one radio

15  frequency and there are often a few base-stations underneath one cell-tower.

16          (c)    CW4 said that at the time of the acquisition of IPWireless, IPWireless was

17  working on developing its fifth generation wireless base-station referred to as "V5" (version five)

18  base-station. In January 2008, NextWave's San Diego-based operation was "split" into two

19  divisions – the "ASICs division," which designed and developed ASICs for the future Wi-MAX

20  system to accommodate hand-held devices, and the "Base-Station division," which was to design

21  and develop equipment for WiMAX capable base-stations and networks. CW4's group became

22  part of the Base-Station Division after the acquisition of IPWireless.

23          (d)    CW4's involvement with IPWireless was to field-test its fifth generation

24  base-station (*i.e.*, the V5). According to CW4, after NextWave's acquisition of IPWireless,

33

NextWave was supposed to develop software for the IPWireless base-station.  CW4 explained that prior to the acquisition of IPWireless, NextWave had developed its own base-station that was intended to test NextWave's ASICs.  NextWave's base-station was built on an off-the-shelf product with some customization.  Therefore, NextWave intended to modify its software for possible use on the IPWireless base-stations.

(e)     CW4 said that it was very difficult for the NextWave Software Engineers to figure out how the IPWireless base-station worked in order to modify NextWave's previously developed software to work with the IPWireless base-station.  On numerous occasions, the NextWave team involved in the project requested the IPWireless team to provide design documents for the base-station, but received only a couple of minor documents that were in disarray.  According to CW4, NextWave's team did not believe that the IPWireless design documents for their base-station even existed.  However, such design documents were critical for the NextWave team to be able to develop software that could be used on the IPWireless base-stations.

(f)     NextWave's team also needed to see the IPWireless software code in order to modify the NextWave software for use on the IPWireless base station.  However, when NextWave's Software Engineers "saw" the IPWireless software code "they were horrified," because it was "a mess."  CW4 added that there is a term in the industry for the kind of poorly written and organized software code that IPWireless had turned over – "spaghetti code."  The software code that the IPWireless team turned over to NextWave's Software Engineers was without any documentation or test results that would show if the code was actually functional.  CW4 said that the IPWireless team told the NextWave team that the code "works and that was it."

(g)     The witness' impression of the IPWireless operation was that it was a small, start-up type of a company with employees working "off of their notes."  There were no

34

processes in place and not much of the IPWireless software or base station development work seemed to be documented.

(h)     With respect to the TD TV product development, CW4 participated in its demonstration at the annual Mobile World Congress held in Barcelona in February 2008. According to CW4, NextWave had a large booth at the show that was shared by two teams.  One team, including CW4, demonstrated NextWave's WiMAX base-station using a hand-held device that looked like Apple's iPhone.  CW4 said that CW4's team's demonstration was able to transmit real video over the air, enabling visitors to browse web pages, as well as make and receive calls.

(i)     However, according to CW4, IPWireless' demonstration of TD TV was "faked."  CW4 said that IPWireless team had a "big pile of fancy equipment" on their side of the booth, but they did not have a device that would enable IPWireless equipment to actually receive a signal over the air.  That was because such a device – which was the core technology supposedly being demonstrated at the Congress – was simply not functional at that time.  Instead, the IPWireless team had to "wire" their TD TV equipment to a laptop, and the video transmission ran through only a part of the IPWireless equipment, but not all of it.  CW4 stated that the IPWireless team "faked" the demonstration of its TD TV solution through a wired connection, although the team represented the demonstration to visitors as if the video was transmitted over the air.

(j)     While at the annual Mobile World congress, CW4 spoke with some IPWireless Engineers who expressed their frustration over the problems with the IPWireless base-stations which were delivered to Northrup Grunman Corporation for its contract with New York City's Department of Information Technology and Telecommunications.  As CW4 understood, the main problem with this project was related to the high rate of returned systems due to initial

quality and performance problems.   For instance, CW4 said that IPWireless shipped approximately 1,000 base-stations to Northrop Grumman for deployment in New York City. However, CW4 heard that 80% of the shipped base-stations were returned (although he could not say exactly when).   CW4 said that because IPWireless was not able to repair the returned units, it had to replace them with the new ones.   However, most of the replacement base-stations were also returned, because they did not work in the field either.   CW4 said these issues were unresolved as of August 2008.

(k)     With respect to the Company's acquisition of GO Networks, there were several people at NextWave who "adamantly" told Salmasi not to acquire GO Networks. Approximately six months prior to the February 2007 acquisition of GO Networks (*i.e.*, in August/September 2006), a team of NextWave employees headed by Senior VP of Engineering Rob Gilmore visited GO Networks in Israel and evaluated the company and its products.   Upon returning from Israel, the team provided their feedback regarding GO Networks to Salmasi, advising him not to acquire the company, and pointing out serious issues with GO Networks' technology.   One particular issue was related to "beam-forming," which CW4s said is used in wireless technology for signal transmission.   According to CW4, GO Network's "beam-forming" worked in a lab environment but, as soon as the product was taken out in the field and exposed to sunlight, it became very unstable.   CW4 said that there was no way to adequately calibrate GO Network's "beam-forming" in actual field conditions and, therefore, GO Network's technology worked only inside a test lab.   The consensus of Gilmore's team was that this problem was unlikely to be easily resolved.

(l)     With respect to NextWave's WiMAX chip development, CW4 said that CW4's team had evaluated test versions, *i.e.*, so called "early emulators," of the WiMAX chip in the field and they did not work for many reasons.   When CW4 was testing the emulators of the

NextWave's WiMAX chip on the NextWave test network in Las Vegas, CW4 said that there was a significant "range issue."  CW4 said that CW4 could not go two blocks from the base-station without losing the signal due to a negative signal interference ratio.  When CW4 was testing the WiMAX connectivity in a building, which was located just one block from the nearest base-station, CW4's hand-held device did not get any signal without holding the device out of the window and pointing it in the direction of the base-station.  CW4's conclusion was that the signal could not penetrate the building, and even the window glass was a thermal barrier that would absorb the signal and prevent it from penetrating the building.

(m)    CW4 said that CW4's team began testing the emulators in the late summer or fall of 2007 and, at that time, there were indications of the "range issue."  The issue was confirmed or proved by further tests, which were conducted over a period of several months, both with the emulators and the first generation WiMAX chip, beginning at the end of 2007 and up until CW4's termination in August 2008.  CW4 personally discussed this "range issue" with Salmasi on several occasions.  CW4 said the "range issue" was unresolved as of the time he departed the Company in May 2008.

(n)    There was another significant issue with NextWave's WiMAX development, relating to the "hand-off" process from one base-station to another.  CW4 said that this functionality had not been thought out well and therefore did not work.  CW4 explained that when a person using a mobile phone is driving in a car, the call will be dropped unless the mobile signal is properly "handed-off" from one cell-tower to the next.  CW4 said that when CW4's team tested a prototype of NextWave's WiMAX chip in a test lab environment, the "hand-off" never worked.  CW4 emphasized that this problem had not been resolved as of May 2008.

58.    CW5 was employed from mid 2006 until June 2008 as a Systems Engineer involved in the WiMAX infra-structure development project.  According to CW5, there were

37

significant issues that the development team had to deal with.  For instance, the "hand-over" capability, which would allow the wireless signal to transfer from one cell tower to another, did not work.  The development team still could not get this hand-over capability to work as of June 2008.

59.    CW6 worked at NextWave from July 2007 until February 2008 as a Senior Test Engineer.  CW6's specialty was RF (radio frequency) testing.  When CW6 joined NextWave in July 2007, CW6 was assigned to a "PMP" (Personal Media Player) development project.  CW6 said that PMP was a handheld device that was being developed by NextWave for "video streaming," meaning that the PMP device would receive and play live video.  The witness heard that NextWave was supposed to have LG produce 20,000 of the PMP devices but, at the end of 2007, the Company cancelled its plans for the order.  CW6 did not know why the plan was cancelled but speculated that, first of all, the PMP device was still under development in February 2008 and was not nearly ready for mass production.  CW6 said that there were some technical issues with the device, which had not been resolved as of February 2008.  CW6 said that the Company was also developing a wireless WiMAX card to be utilized in laptops.  The card was supposed to enable laptop users have wireless WiMAX connectivity.  However this development project was also cancelled at the end of 2007.

60.    CW7 worked at NextWave from May 2006 until the end of July 2008 beginning as a Program Manager reporting to the Program Management Office, then transferring to the Engineering organization.  From May until September 2006, CW7 reported to VP of Device Development Vincent Dorrian, from September until December 2006, to VP of Strategy and Project Execution Raju Thomas and then to Executive VP of Mobile Products Division and General Manager of the Semiconductor Business Unit Ed Redmond from December 2006 until November 2007.  From November 2007 and until July 2008, CW7 reported to Mark Kelley,

38

Senior VP and General Manager of the San Diego operations, who directly reported to CEO Salmasi. After the last of the re-organizations, which took place in January 2008, Kelley assumed a role of the Chief Technology Officer for the Network Products unit and began reporting to CEO of the Network Products unit Bill Jones, the former CEO of NextWave's subsidiary IPWireless.

(a)     During the first year of CW7's employment with NextWave, between May 2006 and sometime in the third quarter of 2007, CW7 attended monthly Operations and Program Review meetings. Individual Defendants CEO Salmasi and CFO George Alex along with other senior executives, attended the quarterly Operations and Program Review meetings in person whenever they were visiting the San Diego facility. In addition to the Defendants, the meetings were attended by all senior-level managers based in the San Diego office. The attendees of the monthly meetings often discussed the Company's financial state. For instance, they discussed the amount of money NextWave had in the bank, as well as the Company's current burn-rate. CW7 said that during the meetings, the attendees calculated and determined when NextWave would "run out of money."

(b)     Sometime in the third quarter of 2007, the monthly Operations and Program Review meetings were split into two meetings – a Finance meeting and a Program Management meeting. From that point forward, CW7 attended only the Program Management meetings and, therefore, stopped participating in discussions related to NextWave's financial health. CW7 also said that whenever Salmasi was visiting the San Diego facility, there was always a program status review meeting held to provide Salmasi with high-level updates on all on-going projects.

(c)     Beginning in the third quarter of 2007 and onward, CW7 also participated in several meetings held between the members of the senior-level managers of the Network Products unit and Salmasi. The objective of these meetings was to discuss business strategies for

39

the Network Products unit.  According to CW7, on numerous occasions, Salmasi's senior staff expressed concerns regarding the Company's strategies for its Network Products unit.  CW7 said that, Chief Strategy Officer Rick Kornfeld and Salmasi constantly debated about strategies, which CW7 suspected was one of the reasons for Kornfeld's resignation at the end of 2007.  VP of Marketing Adam Gould also expressed concerns to Salmasi on numerous occasions.

(d)      With respect to NextWave's acquisition of GO Networks, CW7 explained that senior management had recommended against proceeding with the acquisition.  Prior to NextWave's acquisition of GO Networks in February 2007, a team from NextWave made numerous trips to the GO Networks facility in Israel, during which the team performed due diligence reviews of the Company's technology and financial condition.  CW7 said that there were numerous long and "heated" discussions among the executive- and senior-level managers of NextWave regarding the acquisition of GO Networks.  CW7 knew that there were documents, such as emails, reports and presentations – containing the senior management's recommendation to not acquire GO Networks.

(e)      With respect to NextWave's acquisition of IPWireless, CW7 said the Company did not perform the same type of due diligence reviews as it had during the acquisition of GO Networks.  In acquiring IPWireless, NextWave was hoping to take advantage of IPWireless' supposedly commercialized hardware and software products and obtain needed revenues.  However, following the acquisition of IPWireless, CW7's observations were that IPWireless was not a "self-sustaining" company but rather heavily reliant on venture capital financing.  IPWireless had expectations for large contracts in the near future but, to CW7's knowledge, was never even able to "break even."

(f)      CW7 said that one of the main problems with the IPWireless product – *i.e.*, the TDCMA base-station – was its poor quality.  In the second half of 2007, CW7's former

40

supervisor Raju Thomas became VP of Quality and Processes. At the end of 2007 or beginning of 2008, Thomas conducted internal audits at IPWireless and told CW7 that the audit results indicated that the failure rate for IPWireless base-stations was very high. As CW7 understood, there were numerous problems with the hardware components of the base-station caused by the manufacturing reliability issues. For instance, in some cases, the capacitors were put on "backwards" resulting in product returns.

(g)     Thomas told CW7 that IPWireless was supplying its base-stations to Northrop Gruman to be installed in a public safety network in New York City. According to Thomas, under IPWireless' contract with Northrop Gruman, the allowed return rate was 3%. In actuality, the return rate for the IPWireless base-station was 10%. Thomas also told CW7 that IPWireless had a contract with T-Mobile to supply the base-stations for installations in the Czech Republic. In this case, the return rate was 30%-35%, as opposed to the 3% return rate stipulated under the contract.

(h)     With respect to the company's development of its MXtv broadcast solution, this project was not staffed in any serious way until March 2007 even though Salmasi wanted to have trials in the middle of 2007. However, this trial did not take place. During the second half of 2007, NextWave demonstrated its preliminary MXtv broadcast solution to potential customers at the Company's Las Vegas facility. However, CW7 said that the "demo" solution was a "dead-end" application. CW7 explained that the software code that was developed for the "demo" solution was not branched out from the main software branch but was a sort of a stand-alone or a "side-branch" software code, which, according to CW7, could never be commercialized. CW7 added that the use of this dead-end code meant that the development team was nowhere close to completing the development of the final software code for the MXtv broadcast solution. CW7 said that the MXtv solution was nowhere near to commercialization by

41

July 2008.

(i)     With respect to the development of the company's WiMAX infra-structure project, the objective of which was to integrate NextWave's FPGA into the IPWireless hardware and software system of the TDCMA base-station, it was thought that NextWave's IPWireless base-station then could be WiMAX ready when the WiMAX chip became available.  Meetings between the NextWave and IPWireless teams started in May 2007, shortly following the acquisition of IPWireless.  In August 2007, there was a large meeting with the IPWireless team in the U.K. to discuss the project scope.  Some of the NextWave team members, including CW7, attended the meeting in the U.K. in person.  However, CW7 said that Jones (*i.e.*, the former CEO of IPWireless and current CEO of the Network Products unit) put clear "barriers and walls" between different project activities.  For instance, CW7 and the rest of the NextWave project team who were responsible for integrating NextWave's FPGA into the IPWireless base-station, did not have visibility into the TDCMA development being undertaken by the IPWireless project team.

(j)     During this planning phase in May 2007 there were no expectations for the infra-structure equipment to be commercially available in the first half of 2008, but to be completed sometime in the middle of 2009.  In the middle of 2007, CW7 presented the project schedule to CW7's supervisor and other members of the senior management team, including Salmasi.  CW7 learned during the review meeting that the middle of 2009 completion timeframe was not deemed acceptable, because NextWave's executive managers – and Salmasi specifically – were planning to have the WiMAX infra-structure product commercially available in the fourth quarter of 2008.  As CW7 understood, there was some sort of urgency for NextWave to get the WiMAX infra-structure equipment commercially deployed in the fourth quarter of 2008 in order to preserve its spectrum ownership.  Even if the equipment was not fully functional, at a

42

minimum, the goal was to get it to transmit signals in the field. CW7 understood that the owners of the wireless spectrums were obligated to gradually utilize their spectrums in order to maintain their spectrum licenses.

(k)      Given the reaction of Salmasi to the original project schedule, CW7 was asked to accelerate the completion date or put together a plan for what could be accomplished by the fourth quarter of 2008. In order to "pull" the completion date into the fourth quarter of 2008, the project team "began taking shortcuts." For instance, the engineers simplified network topology and deployment. Additionally, delays were caused, first of all, by the IPWireless team's inability to timely supply base-stations to the NextWave team, which were required for integrating and testing the FPGA. CW7 said that IPWireless failed to manufacture its base-stations fast enough for both commercial deliveries and internal utilization. To CW7's knowledge, IPWireless had a contract with a low-volume equipment manufacturer. According to the contract, the manufacturer was supposed to produce eight units (*i.e.*, base-stations) per day but, in actuality, only produced four units a day. CW7 also said that the NextWave project team did not receive much support from the IPWireless team in relation to the integration matters.

(l)      At the time of CW7's departure in July 2008, the project team had only attained the basic functionality of the integrated WiMAX infra-structure product. At that time, CW7 opined, NextWave still needed at least nine months before it would be able to commercialize its first WiMAX infra-structure product, which CW7 noted, was well into 2009 as opposed to the objective of getting the first WiMAX product deployed in the fourth quarter of 2008.

(m)      With respect to NextWave's development of the WiMAX semiconductor chip, CW7 said there were several iterations of the MSS chip. MSS 1 and MSS 1.5 were not intended for commercialization, because they were early versions of the chip that were "too big

43

and power hungry."  MSS 2 was supposed to be completed in February 2008.  However, the anticipated completion of the MSS 2 chip gradually was postponed until June 2008.  CW7 opined that, even if NextWave kept up with the original February 2008 completion date for the chip's development, the chip would not have been ready for commercial deployment earlier than the middle, if not the end, of 2008 due to the technical complexity of the chip.  When CW7 was leaving NextWave, at the end of July 2008, the development team had just finalized the physical design of the MSS 2 chip.  After CW7 had already stopped working at NextWave, sometime in August/September 2008, CW7 heard that the MSS 2 chip came back from the fabricator and, after the initial test cycle, showed "pretty good" power consumption numbers.  CW7 could not recall the name of the fabricator but remembered that it was a small company located in the Bay Area of California.

61.    CW8 began working for NextWave in February 2006 when NextWave acquired CW8's then employer, Cygnus, a privately-held fabless semiconductor company headquartered in Carlsbad, California.  CW8 continued at NextWave until CW8's departure in March 2009.  In December 2007, CW8 was promoted to the position of VP of Digital ASIC Development in the Company's semiconductor division and was in charge of a team employing 35 engineers at the beginning of 2008.  Throughout CW8's employment with Cygnus and NextWave, CW8 and his team were involved in developing three different digital ASICs.  CW8 defined a digital ASIC as a chip or chipset that is supposed to be integrated in various mobile WiMAX devices, such as mobile handsets and personal media players.

(a)    The development of the first ASIC began while CW8 was still working at Cygnus and was completed in May 2007, shortly after Cygnus was acquired by NextWave.  According to CW8 the development of the first ASIC was considered to be successful, because the chip had been fabricated and passed basic functionality testing, such as powering on and off.

(b)     The second digital ASIC was similar to the first one, but focused on low power consumption.  According to CW8, the team successfully completed the development of the second digital ASIC in late January 2008.  The third digital ASIC was developed in parallel with the second one.  It was supposed to be the final digital ASIC and was planned to be marketed and taken to mass production.  According to CW8, there were numerous issues in developing the third digital ASIC, largely caused by very "aggressive" design methodologies.  CW8 explained that the third digital ASIC had to provide low power consumption, which CW8 said was much more difficult to design than originally anticipated.  The design issues led to a delay in completing its development, and by the middle of 2008, the development was approximately one and a half or two months behind the original schedule.

(c)     CW8 also attributed schedule delays to certification requirements "at the system level," which were not available when CW8's team began designing the third digital ASIC.  CW8 commented that this is a common problem with any new technology since standards and requirements are introduced as the industry learns more information about the new technologies in this case, WiMAX.  CW8 said that some of such certification requirements for a WiMAX digital ASIC were introduced by the WiMAX Forum when the ASIC development was already underway.  Thus, the new standards had to be incorporated in the ASIC design late in the development cycle, causing further delays.

(d)     At the very end of August 2008, CW8's team finally received the ASIC from the fabricator.  Upon CW8's departure in March 2009, however, certification testing of the ASIC had yet to be completed.  As CW8 understood, the ASIC development was simply "abandoned" when the Company's senior management made a decision to "divest" its Semiconductor division.

62.     CW9 joined Cygnus in April 2005, continued working at NextWave upon its

45

acquisition of Cygnus in February 2006, and remained at NextWave until CW9's departure in September 2008.  CW9 was a Senior Staff Engineer in the Digital ASIC group, part of the Semiconductor division.  CW9 confirmed the story of CW8 concerning the development of the digital ASIC chip.  CW9 explained that MSS1 had basic WiMAX functionality but did not offer any advanced functionality and features desired by customers due to the lack of WiMAX standards at that time.

(a)     Once CW9 completed work on MSS1, CW9 was assigned to a project developing "enhancements" for the second generation digital ASIC chip referred to internally as MSS 2.  The project began, according to CW9, in the spring 2007 and was completed in the summer 2007.  CW9 was responsible for developing the "PHY modules" utilizing 65 nanometer (nm) technology and testing the MSS 2 chip for low power consumption.  The development of the MSS 2, began in the fall of 2007 and was completed in July 2008, at which time the MSS 2 design was sent to a fabrication house.  The development team received the fabricated MSS 2 in September 2008.

(b)     According to CW9, the main problem with the MSS 2 development was the complexity of its design.  For instance, because of the low power consumption requirements, there had to be a feature that would shut off power to different parts of the chip, which was very difficult to design and develop.  Another issue was the team's inability to utilize available Electronic Design Automation (EDA) tools to design MSS 2.  According to CW9, NextWave purchased and utilized Cadence Encounter design tools, which CW9 said were efficient for simple designs, but virtually incapable of handling complex designs, such as the MSS 2.  CW9 explained that MSS 2 was a very small chipset and was "full" and did not have much "room to move around."  Since the EDA tools could not be used, CW9 said that the design had to be executed manually, which added to the development time.

46

(c)     CW9 said that, according to the original project schedule, the development of MSS 2 was supposed to be completed in February 2008.  So, according to CW9, by the time the MSS 2 was completed in July 2008, it was already five months behind the original schedule. According to CW9, there was a lot of pressure to complete development and implement more features in the second generation chipset, because MSS 2 was being planned to be released to market.

63.     CW10 worked at NextWave from September 2006 until March 2009 as Director of Product Marketing for the semiconductor group, and later as VP of Product Management and Marketing for the semiconductor group.  During CW10's employment, CW10 met with all of the Individual Defendants and attended status review meetings addressing product development and customer matters, which the Individual Defendants also attended.  When CW10 joined NextWave in September 2006, the development of the first generation of the WiMAX Semiconductor chipset was already underway.  The chipset had already been defined and designed, and was in the process of being built.  According to CW10, within six months of CW10's employment with NextWave, NextWave's development and marketing teams determined that this first generation chipset was not suitable for the market.  It lacked features that were desired and required by wireless carriers and was unlikely to be certified by the standards of the WiMAX industry. CW10 explained that a WiMAX chipset had to pass a "WAVE 2" certification standard set by the so-called WiMAX Forum.

(a)     When it became clear in early 2007 that it would not be possible for NextWave to obtain such certification for its first generation WiMAX chipset, resulting in low demand among potential customers, NextWave moved forward in developing its second generation WiMAX chipset [*referred to as NW2000*].  There were delays in the WiMAX development – *i.e.*, the availability of the engineering samples of the chipset was delayed by a

47

couple of months.  Software development was also delayed.  Such delays were extensively discussed during the status review meetings, which Defendant Salmasi personally attended.

(b)     CW10 believed that the NW2000 engineering samples had been delivered to a few customers once they became available in September 2008.  Engineering samples represent a limited number of chipsets that are provided to potential customers for their testing prior to acceptance as satisfactory to the customer's requirements.  Although CW10 declined to name these customers due to CW10's non-disclosure agreement with NextWave, CW10 said that the engineering samples were delivered to a couple customers in Taiwan, one customer in South Korea and one customer in the U.S.  Although, these customers received the chipset samples, CW10 said that some of the software for the chipset was not quite ready.  The witness did not know whether the customers had begun testing NextWave's chipset samples, because even before then (*i.e.*, in August 2008), NextWave had announced that it was running out of money and needed to secure additional financing in order to continue its operations.  CW10 said that after the announcement, "everything" started falling apart very quickly.  For instance, NextWave began shutting down some of its functions (*i.e.*, its Network Broadband group) and subsidiaries (i.e., GO Networks and Cygnus).  In light of the Company's disclosures, CW10 assumed that the customers that received NextWave's chipset samples were not "eager" to invest their money and resources into testing NextWave's WiMAX chipset, because they likely doubted that NextWave would survive its financial problems and continue its WiMAX development.

64.     CW11 worked at NextWave from March 2006 until March 2009 in the semiconductor unit.  Initially, CW11, in conjunction with four program managers, managed the development of NextWave's WiMAX chipsets.  CW11 transferred to a new position, VP of Device Development in the semiconductor unit and managed a team of six to seven device managers responsible for managing projects in partnership with various ODMs (Original Device

48

Manufacturers) and external software developers.  According to CW11, CW11's team was working on the following development projects – a PMP (Personal Media Player) device in collaboration with LG, a smart phone in partnership with a company in Finland, and a "bridging" device that was supposed to "bridge" WiFi with WiMAX.  For instance, the "bridging" device would allow a WiFi device, such as an iPhone, to receive WiMAX signals.  The development of the PMP device was planned to be completed in June 2009, and the rest of the projects were supposed to be completed in the 2009-2010 time frame.

(a)    CW11 said that completion of the device development projects depended on the availability of the second generation WiMAX chipset.  According to CW11, the device development team utilized the first generation WiMAX chipset in the initial design phases of their projects.  However, because of the limited functionality of the first generation WiMAX chipset, CW11 knew that at some point the team would need the second generation chipset in order to proceed with their projects.  Although the availability of the second generation chipset was scheduled for the first half of 2008, CW11 never "believed the schedule."  CW11 believed the schedule for the second generation chipset was too aggressive and did not take into consideration all of the potential risks associated with the development of a brand new technology.  CW11 personally believed that the second generation chipset was not going to be available until the end of 2008.

65.    CW12 worked at NextWave from January 2007 until March 2009 as VP of Sales for the semiconductor division.  This team consisted of three people.  CW12 attended various trade shows and confirmed the statements by CW4 about the Mobile World Congress Show in Barcelona in February 2008 and that the demonstration was a "canned demo", *i.e.*, not a live transmission of the mobile TV application but a playback.  Subsequently, in April 2008, CW12 attended the CTIA Conference in Las Vegas where NextWave demonstrated its mobile TV

49

feature, MXtv. Although the MXtv demonstrated at the show was not yet fully functional, CW12 said NextWave was able to demonstrate its mobile TV feature "over air," meaning through a real WiMAX transmission.  The personal media player device utilized for the demonstration had been developed by NextWave with a consumer electronics company.  CW12 could not disclose the name of this company because NextWave had never received permission from this company to publicly use its name in relation to NextWave's products.

        (a)     As CW12 understood, the personal media device was developed strictly for the demonstration at the CTIA Conference.  As far as CW12 knew, there were no plans for mass producing this device, although CW12 recalled that there were a few discussions in 2008 to possibly commercialize it, given that there was consumer demand for the device.  However, to actually commercialize the product, NextWave would have had to find a third-party consumer electronics company to re-design the personal media player and, possibly, make some stylistic changes to make the device more appealing to consumers.  However, as far as CW12 knew, none of this ever materialized.

        (b)     At varying times throughout CW12's employment, there were as many as 18 customers who were interested in the WiMAX chipset.  However, according to CW12, NextWave issued three press releases in 2008 regarding its partnership with three customers that committed to NextWave's WiMAX chipset, even though these customers had never seen the chipset.  The three customers mentioned in NextWave's press releases were a South Korean company DigiFriends and two Taiwanese companies – dmedia and Global Mobile.  CW12 identified these companies, because they were publicly named in the press releases as NextWave's customers for its WiMAX products.  CW12 said that these press releases were based solely on the "potentiality" of NextWave's WiMAX products, which indicated that NextWave had customers that were seriously interested in NextWave's WiMAX products.  However,

according to the witness, no customer ever made any investments in NextWave's WiMAX products and NextWave did not actually have the WiMAX chipset available to sell to these customers at the time of the press releases.   Moreover, as described in more detail below, NextWave was already late in meeting its own internal goals for developing the chipset.   There were only some vague plans that the customers made for the time when NextWave's WiMAX chipset was supposed to be available to them (*i.e.*, September 2008).

(c)     CW12 explained the process for development of the WiMAX chipset and the delays in reaching certain milestones encountered by the NextWave team.   The WiMAX chipset development team began missing the milestones as early as in April 2008.   In May 2008, the development was one month behind the original schedule and by mid-July 2008, it was over two months behind.   CW12 said that in April 2008, CW12 had serious doubts that the entire development of the chipset was going to be completed by September 2008, as originally planned.   In the middle of July 2008, it was very clear to CW12 that the September 2008 milestone, upon which the chipset samples were to be delivered to customers, would definitely be missed.

(d)     The witness explained that the development team, (*i.e.*, NextWave's Engineers), were first supposed to receive fabricated chipsets to internally test the chipset and software.   Normally, this type of testing takes a few months, because there are a lot of unknowns whether all the parts and features of the chipset are going to work.   Sometimes, it is necessary to make changes to the chipset's hardware, which means that the chipset has to be "re-spun."   "Re-spinning" of the chipset includes implementing the hardware design changes and re-fabricating the chipset.   The chip also has to pass the required qualification testing for functionality, as well as obtain certification by the WiMAX Forum.

(e)     Only after the chipset and the software have been thoroughly and successfully tested and determined to be fully functional according to NextWave's standards, are

51

the final chipset samples fabricated and delivered to customers.  Once customers receive the samples, they begin their own testing, which, according to CW12, would usually take approximately one month.  When the customers are satisfied with the performance of the chipset, they begin designing their products, such as mobile handsets and personal media players, integrating the chipset into their future products.  CW12 said that the customer design and development process takes anywhere from six to 12 months.  Only when the customers complete designing and developing their own products, will the chipset be taken to mass production and the chipset vendor (*i.e.*, NextWave) actually begin generating sales.

(f)      CW12 said that NextWave took into consideration the required customer testing, design and development efforts when it put together a plan for its NW2000 chipset development and launch.  According to the plan, the chipset samples were supposed to be delivered to customers sometime in September 2008, followed by approximately 12 months of customer testing and development.  Therefore, the mass production and sales of NextWave's second generation WiMAX chipset – NW2000 – was planned to begin in September 2009.  CW12 commented that under the ideal circumstances, this would have been a great plan.  In actuality, not everything went according to plan.

(g)      For instance, CW12 said that NextWave's development team received the fabricated Engineering samples either at the very end of August or the very beginning of September 2008, which was almost the time when the customers were expecting their final samples of the chipset.  Because of these delays, a new plan was put into place to complete all of the internal testing in as little as four weeks just to prove that the chipset was working.  The final samples of the chipset were, then, still supposed to be delivered to customers at the end of September 2008, which CW12 said was a very aggressive, and not necessarily attainable, plan.  CW12 communicated the new delivery date to customers.  According to CW12, all of

52

NextWave's customers were very disappointed upon hearing that the chipset would not be delivered to them as promised in September 2008. Moreover, some of them were "outright angry." But the problems only grew worse once the internal testing began and numerous problems began emerging.

(h)     As soon as the NextWave development team began testing the chipset, the team ran into a number of problems. CW12 generally said that the development team was never able to get the software to work. Even the software for the basic functionality of the chipset, such as network entry authentication and encryption, was not working. Approximately seven to 10 days into the testing cycle, it was clear to CW12 that the testing was not going well and NextWave was not going to deliver the chipset samples to customers, as promised, at the end of September 2008.

(i)     Sometime in September 2008, CW12 received instructions from CW12's supervisor to communicate to the customers that the chipset samples were not going to be delivered to them until Thanksgiving 2008. CW12 was also instructed to communicate to the customers that NextWave had obtained additional funding of $100 million, which "would fund [NextWave's] development through the end of 2010." CW12 emphasized that CW12 was instructed to communicate to the customers that the funding would sustain NextWave's operations through the end of 2010 (and not just 2009). CW12 communicated these matters to the customers at the end of September 2008 at the WiMAX World Conference held in Chicago, Illinois.

66.     CW13 worked at NextWave from March 2006 until March 2009 as a program manager overseeing the planning and development of the WiMAX semiconductors from the San Diego office. CW13 was responsible for working with the WiMAX semiconductor team and driving the development processes.

(a) According to CW13, by approximately mid-calendar 2007, NextWave had completed the development of a first generation WiMAX semiconductor. However, the first generation chipset was "never meant to be commercially available." The public statements about a WiMAX chipset being commercially available by the first half of 2008 could not have applied to the first generation semiconductors because launching the first generation chipsets commercially was "not a viable strategy." The first generation WiMAX chipsets were not commercially viable because they were not designed to WiMAX standards. The WiMAX technology standard was still being defined at the time that NextWave was creating the first generation chipset. CW13 said that there was some overlap in the development schedules for the first and second generation chipsets. NextWave began development of the second generation WiMAX semiconductor in the beginning of calendar 2007 and the completion of the development of the first generation chipset was in the mid-calendar 2007 timeframe. The second generation chipset was designed to WiMAX standards. The development cycle for the second generation chipset was scheduled to take approximately two-and-a-half years and the chipset was anticipated to be "available for launch" in August or September 2009. The schedule for the second generation chipset was "on par" for similar "cycles of development" and for the chipset's level of complexity.

(b) CW 13 explained that the chipsets were comprised of a radio chip and a digital chip. Semiconductors can either be made of one chip or a combination of chips, as in the case of the NextWave WiMAX first and second generation chipsets. The chips are designed and sent to the fabricator and then design and development is modified based on the testing of the semiconductor. NextWave used a fabricator from the Los Angeles, California area for the radio chip and TSMC for the digital chip. The first "spin" of the radio chips for the second generation WiMax semiconductors was completed by approximately March or April 2008. The first "spin"

of the digital chips for the second generation chipset was completed by approximately July 2008. There were some delays in the "tape out" and design of the second generation chipset. The first spins were completed in accordance with the schedule. However, there was an estimated one to one-and-a-half month delay in the design phase. The radio chip had to be sent to the fabricator a second time for a "respin." However, the "respin" was "not a full spin" and only entailed the "metal casting part" of the chip. Therefore, there was a quick turnaround on the second spin for the radio chip. "The plan" was to have the "respin" of the radio chip completed by the time that the digital chip "spin" was completed by TSMC. The second spin of the radio chip was completed in July 2008, according to plan. Testing of the second generation chipsets followed the completion of the fabrication of the semiconductors in July 2008.

(c)     Salmasi attended between five and 10 meetings that included conference calls and face-to-face meetings at the San Diego, California office regarding the development schedules for the WiMAX semiconductors toward the end of 2007 and beginning of 2008. Salmasi also wanted to "push up" the development of the second generation chipsets, so that they would be available for commercial release by the end of 2008. However, cutting the second generation WiMAX semiconductor development schedule by nine months or more was not realistic by any means. As noted above, the development of the second generation chipsets was scheduled to be completed by August or September 2009. It was possible that the second generation chipset would have "been ready" by approximately mid-calendar 2009 if the semiconductor group was "allowed to go full steam ahead" and development was not cut short by the lack of funding.

(d)     Salmasi knew by the mid-calendar 2007 timeframe that the release of the second generation chipsets by the even end of 2008 was not realistic. Salmasi was aware of the "roadmap" for the development of the second generation WiMAX chipset when CW13 and his

55

1  team "came out with the plan" for the development of the semiconductor in approximately July

2  2007. The roadmap called for the completion of the second generation chipset by August or

3  September 2009.

4       67.    CW14 was hired at Nextwave at the beginning of 2008 to build a sales

5  organization for the WiMAX semiconductors. CW14 left the Company in March 2009. CW14

6  did not hire sales representatives but consulted with manufacturer representatives. CW14 did not

7  have a WiMAX semiconductor to sell at any time during his employment with the Company as

8  there was no viable and available for commercial sale. When CW14 returned from a sales trip to

9  potential WiMAX customers, CW14 created a trip report which was emailed to everyone in the

10  Company. Salmasi received the report and responded back with comments.

11  

12            **THE TRUTH CONCERNING NEXTWAVE'S PRECARIOUS**
13      **FINANICAL CONDIITON, ABILITY TO CONTINUE AS A GOING**
    **CONCERN AND SIGNIFICANT DELAY IN THE DEVELOPMENT**
14        **AND MARKETING OF THE WiMAX SEMICONDUTOR**
    **PRODUCT LINE IS BELATEDLY REVEALED BY DEFENDANTS**
15  

16       68.    On August 7, 2008, after the market closed, NextWave issued a press release

17  entitled "NextWave Wireless Announces Second Quarter 2008 Financial Results," which stated

18  in relevant part that:

19       (a)    NextWave "[has experienced] a delay in WiMAX network deployments

20  that will continue to impact projected sales of our WiMAX semiconductor products;"

21       (b)    "Since the filing of the Company's Quarterly Report on Form 10-Q for the

22  quarterly period ended March 29, 2008, several factors have negatively impacted the Company's

23  current and future operations and potential sources of funding. These factors include adverse

24  

25  worldwide economic conditions, which the Company believes have adversely affected

26  manufacturers of telecommunications equipment and technology and caused the NextWave

27  Network Products group to experience lower than projected contract bookings and sales. The

28

Company believes these conditions have also led to a delay in global WiMAX network deployments that will continue to impact the timing and volume of projected commercial sales of its WiMAX semiconductor products. In addition, the Company's efforts to sell certain of its U.S. spectrum assets on favorable terms has been delayed by current market conditions, as well as regulatory and other market activities involving potential buyers;"

(c)     "NextWave's cash, cash equivalents, marketable securities, and restricted cash totaled $71.1 million at the end of the second quarter of 2008, compared to $142.5 million at the end of the first quarter of 2008. The Company utilized $71.4 million of cash in the second quarter of 2008 of which $51.4 million was used in operations; $7.8 million was used for spectrum lease payments, spectrum purchases, and capital expenditures; $7.0 million was paid in financing consent fees; and $5.2 million was used in working capital and other activities;"

(d)     "The Company currently believes its existing cash and cash equivalents, along with the $4.9 million received in July 2008 from the settlement of its escrow claim related to the acquisition of IPWireless, Inc., and the $21.5 million received in August 2008 from a collateralized borrowing against the Company's auction rate securities will be sufficient to meet its estimated working capital requirements into September 2008;"

(e)     "If the Company does not obtain further financing in September 2008, it would not be able to meet its financial obligations at the beginning of the fourth quarter of 2008, will not be able to continue its operations in the normal course of business and may be forced to restructure its obligations. If the Company successfully obtains financing, it will continue to seek buyers for its U.S. spectrum assets as previously disclosed, and will explore additional options for further cost reductions;"

(f)     "In order to meet our estimated working capital requirements through June 2009, we are in the process of negotiating the terms for $100 to $200 million of additional

57

financing.  We are working on a $100 million private placement of junior preferred stock to be completed in September 2008, subject to the execution of definitive agreements and board approvals. In addition, we are also exploring the possibility of obtaining up to $100 million in second lien debt financing;"

(g)    "The Company is reviewing…cost reduction measures, including additional operational consolidations, in response to current and anticipated marketplace conditions;" and

(h)    "In April 2008, NextWave announced that it had retained Deutsche Bank and UBS Investment Bank to explore the sale of its U.S. spectrum assets. The Company has also retained Canaccord Adams to explore the sale of its Canadian spectrum assets. The Company's efforts towards monetization of its remaining domestic and international spectrum through the investment banks and direct discussions with interested parties will remain on-going."

## LOSS CAUSATION/ECONOMIC LOSS

69.    Immediately upon the disclosures belatedly made on August 7, 2008, quoted above in paragraph 68,  the market price of NextWave's common stock plummeted $1.90 per share to close at $0.95 per share, a one-day decline of 67% on volume of 12.5 million shares; over 50 times the average three-month volume.  This stock price decline was the result of Defendants' admissions and the public revelations, made on August 7, 2008, regarding the truth about demand for NextWave's products, its ability to bring its WiMAX semiconductor product line to market, its actual business prospects going forward and its true precarious financial condition, including its lack of liquidity and ability to continue operations without significant additional financing.

70.    By misrepresenting demand for NextWave's products throughout the Class Period, Defendants presented a misleading picture of NextWave's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that NextWave's business was not as healthy as

58

represented, Defendants misrepresented the demand for NextWave's products and its actual business prospects going forward.

71.     Defendants misrepresentations, alleged in paragraphs 13, 16, 19, 22, 25, 26, 29, 32, 35, 38, 39, 42, 43, 45, 47, 48 and 49, above, caused and maintained the artificial inflation in NextWave's stock price in an efficient market throughout the Class Period and until the truth was revealed to the market on August 7, 2008.

72.     Defendants' false and misleading statements, alleged in paragraphs 13, 16, 19, 22, 25, 26, 29, 32, 35, 38, 39, 42, 43, 45, 47, 48 and 49, had their intended effect, and caused NextWave's stock to trade at artificially inflated levels in an efficient market throughout the Class Period, reaching as high as $12.75 per share in January 2007.

73.     The decline in NextWave's stock price removed the inflation from NextWave's stock, causing real economic loss to investors who had purchased the stock during the Class Period.

## CLASS ACTION ALLEGATIONS

74.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired NextWave common stock during the Class Period (the "Class"). Excluded from the Class are Defendants.

75.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. NextWave has over 103 million shares of stock outstanding, owned by hundreds if not thousands of persons.

76.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

59

(a)     whether Defendants violated the 1934 Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of NextWave's common stock was artificially inflated; and,

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

77.     Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

78.     Lead Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## <u>COUNT I</u>

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

80.     Lead Plaintiffs incorporate ¶¶ 1 through 79, above, by reference.

81.     During the Class Period, Defendants disseminated or approved the false and statements specified above in paragraphs 13, 16, 19, 22, 25, 26, 29, 32, 35, 38, 39, 42, 43, 45, 47, 48 and 49, which Defendants knew or deliberately disregarded were misleading in that they contained misrepresentations of, and failed to disclose material facts necessary in order to make

60

the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of NextWave common stock during the Class Period.

83.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NextWave common stock which was traded on an efficient market.   Lead Plaintiffs and the Class would not have purchased NextWave common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

84.     Lead Plaintiffs incorporate ¶¶ 1 through 83, above, by reference.

85.     The Individual Defendants acted as controlling persons of NextWave within the meaning of § 20(a) of the 1934 Act.   By reason of their positions with the Company, and their ownership of NextWave stock, the Individual Defendants had the power and authority to cause NextWave to engage in the wrongful conduct complained of herein.   NextWave controlled the Individual Defendants and all of its employees.   By reason of such conduct, Defendants are liable pursuant to § 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

1    WHEREFORE, Lead Plaintiffs pray for judgment as follows:

2    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

3    B.    Awarding Lead Plaintiffs and Class members damages, including interest;

4    C.    Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

5    D.    Awarding such equitable or other relief as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  March 26, 2010                    LAW OFFICES BERNARD M.GROSS P.C.
                                          BY:


                                           /s/ Deborah R. Gross
                                          DEBORAH R. GROSS (*Admitted Pro Hac Vice*)
                                          Wanamaker Building, Suite 450
                                          100 Penn Square East
                                          Philadelphia, PA  19107
                                          Telephone:    (215) 561-3600
                                          Facsimile:    (215) 561-3000

                                          HULETT HARPER STEWART LLP
                                          KIRK B. HULETT
                                          525 B Street, Suite 760
                                          San Diego, CA  92101
                                          Telephone:    (619) 338-1133
                                          Facsimile:    (619) 338-1139

                                          Attorneys for Lead Plaintiff
                                          THE WHITE TRUST GROUP

**PROOF OF SERVICE**
*Sandra Lifschitz v. Nextwave Wireless Inc., et al.*
CASE NO: 3:08-CV-01697 LAB (WMC)
*Alex Benjamin v. Nextwave Wireless Inc., et al.*
CASE NO. 3:08-CV-01934 LAB (CAB)

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action. I am employed in the County of Philadelphia, State of Pennsylvania. My business address is: 100 Penn Square East, Suite 450, Philadelphia, PA, 19107.

That on March 26, 2010, I served the following document(s) entitled: **SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** on ALL INTERESTED PARTIES in this action.

■   **BY MAIL**: By placing a true copy thereof in a sealed envelope addressed as listed below, and placing it for collection and mailing following ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence, pleadings, and other matters for mailing with the United States Postal Service. The correspondence, pleadings and other matters are deposited with the United States Postal Service with postage thereon fully prepaid in Philadelphia, Pennsylvania, on the same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Wayne W Smith
GIBSON DUNN AND CRUTCHER
3161 Michelson Drive
Irvine, CA 92612

■   **BY CM/ECF Electronic Service:** I caused such document to be served via the Court's (NEF) electronic filling system on all registered parties.

☐   **BY FAX:** I transmitted a copy of the foregoing document this date via telecopier to the above referenced counsel, I caused the machine to print a transmission record of the transmission.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 26, 2010, at Philadelphia, Pennsylvania.


  */s/ Deborah R. Gross*
DEBORAH R. GROSS