1

WAYNE W. SMITH, SBN 54593
WSmith@gibsondunn.com

2

MERYL L. YOUNG, SBN 110156
MYoung@gibsondunn.com

3

JESSICA A. BOSCHEE, SBN 240575
JBoschee@gibsondunn.com

4

GIBSON, DUNN & CRUTCHER LLP

5

3161 Michelson Drive
Irvine, California 92612-4412

6

Telephone: (949) 451-3800
Facsimile: (949) 451-4220

7

8

Attorneys for Defendants
NEXTWAVE WIRELESS INC., ALLEN SALMASI, and GEORGE C. ALEX

9

UNITED STATES DISTRICT COURT

10

SOUTHERN DISTRICT OF CALIFORNIA

11

12

SANDRA LIFSCHITZ, On Behalf of Herself and All Others Similarly Situated

13

Plaintiff,

14

15

v.

16

NEXTWAVE WIRELESS INC., ALLEN SALMASI, and GEORGE C. ALEX,

17

Defendants.

18

19

20

ALEX BENJAMIN, Individually and on behalf of all others similarly situated,

21

22

Plaintiff,

23

v.

24

NEXTWAVE WIRELESS INC., ALLEN SALMASI, and GEORGE C. ALEX,

25

26

Defendants.

27

28

CASE NO. 08-CV-1697-LAB (WMc)
(consol. w/3:08-CV-1934 LAB (WMc))

**CLASS ACTION**

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT**

[*Notice of Motion and Motion; Request for Judicial Notice; Declaration of Jessica A. Boschee filed concurrently herewith*]

**HEARING**

Date:   June 28, 2010

Time:   11:15 a.m.

Place:  Courtroom 9

[ORAL ARGUMENT REQUESTED]

Gibson, Dunn & Crutcher LLP

**TABLE OF CONTENTS**

<u>Page</u>

I.    DISMISSAL OF CONSOLIDATED AMENDED COMPLAINT ......................................... 1

II.   INTRODUCTION ................................................................................................... 1

III.  FACTUAL BACKGROUND ...................................................................................... 2

    A.   NextWave Consistently Disclosed That Adverse Events Might Affect Its Liquidity, WiMax Development Or The Success Of Its Acquisitions .......................................... 2

    B.   NextWave Timely Made Disclosures Regarding The Impact Of Unanticipated Economic Conditions And Its Progress In Securing Additional Financing ................ 4

IV.   PLAINTIFF HAS FAILED TO PLEAD A SECTION 10(b) VIOLATION ........................... 5

    A.   The SAC Fails To The Extent It Relies On Protected Forward-Looking Statements .. 5

        1.   NextWave's Forward-Looking Statements Are Not Actionable Because They Were Accompanied By Meaningful Cautionary Language .............................. 6

        2.   Plaintiff Has Not Pled That Any Defendant Actually Knew That Any Forward-Looking Statement Was False Or Misleading ................................... 9

    B.   Plaintiff Fails To Plead Scienter ................................................................. 9

        1.   Allegations Concerning NextWave's Liquidity And Ability To Continue Operations Fail To Adequately Allege Scienter ............................................ 11

        2.   Allegations Regarding The Development Of The WiMAX Chip-Set Fail To Adequately Allege Scienter ......................................................................... 12

        3.   Allegations Questioning NextWave's Growth And Acquisition Strategy Do Not Support Scienter ................................................................................. 14

        4.   The Individual Defendants' Positions Within The Company Alone Do Not Give Rise To An Inference Of Scienter ................................................................ 15

        5.   Lack of Suspicious Or Unusual Insider Trading Weighs Against Scienter.... 16

        6.   Even From A "Holistic" Perspective The SAC Fails To Plead Scienter ........ 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**
**(continued)**

2

3

Page

4

C.    Plaintiff's CW Allegations Are Not Sufficient To Plead Falsity Or Scienter ............ 18

5

1.    The CWs Were Not In Positions To Know The Information Alleged............ 19

6

2.    Plaintiff's CW Allegations Contain Unreliable Hearsay And Speculation .... 20

7

3.    Plaintiff Does Not Specifically Tie Its CW Allegations to Any Particular Allegedly False or Misleading Statement ....................................................... 20

8

9

4.    CW Allegations Do Not Support Knowledge By Any Individual Defendant 21

10

D.    The SAC Fails To Adequately Plead Loss Causation................................................. 24

11

V.    PLAINTIFF'S FAILURE TO ADEQUATELY PLEAD A SECTION 10(b) CLAIM BARS PLAINTIFF'S SECTION 20(a) CLAIM ................................................................. 25

12

VI.    CONCLUSION .......................................................................................... 25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Cats v. Protection One, Inc.*,
   No. CV 99-3755, 2001 U.S. Dist. LEXIS 25726 (C.D. Cal. June 4, 2001) ................................. 15

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................................ 5, 24

*Gold v. Morrice*,
   No. CV 07-00931, 2008 U.S. Dist. LEXIS 43466, at *13 (C.D. Cal. Jan. 31, 2008) ................ 21

*In re Copper Mountain Secs. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ........................................................................................ 6

*In re Cypress Semiconductor Secs. Litig.*,
   No. C-92-20048, 1992 U.S. Dist. LEXIS 22480, at *6-7 (N.D. Cal. Sept. 24, 1992) ................. 17

*In re Daou Sys. Inc. Secs. Litig*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................................ 19, 22

*In re Downey Secs. Litig.*,
   No. CV 08-3261, 2009 U.S. Dist. LEXIS 83443, at *35 (C.D. Cal. Aug. 21, 2009) ....... 15, 16, 17

*In re Initial Pub. Offering Secs. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) ....................................................................................... 18

*In re Read-Rite Corp. Secs. Litig.*,
   335 F.3d 843 (9th Cir. 2003) ............................................................................................... 9, 18

*In re Silicon Graphics Secs. Litig.*,
   183 F. 3d 970 (9th Cir. 1999) ....................................................................................... 9, 10, 18

*In re Splash Tech. Holdings Secs. Litig.*,
   No. C 99-00109, 2000 U.S. Dist. LEXIS 15369, at *31 (N.D. Cal. Sept. 29, 2000) .................... 7

*In re U.S. Aggregates, Inc. Secs. Litig.*,
   235 F. Supp. 2d 1063 (N.D. Cal. 2002) ..................................................................................... 20

*In re Wet Seal, Inc. Secs. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................................................... 19

*In re Worlds of Wonder Secs. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ..................................................................................................... 14

*In re Zumiez Inc. Secs. Litig.*,
   No. C07-1980, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ................................................. 20

*Langley Partners, L.P. v. Tripath Tech., Inc.*,
   No. C-05-4194, 2006 U.S. Dist. LEXIS 12927 (N.D. Cal. March 27, 2007) .............................. 25

*McCasland v. FormFactor Inc.*,
   No. C 07-5545, 2009 U.S. Dist. LEXIS 59996, at *15-16 (N.D. Cal. July 14, 2009) ................. 23

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..................................................................................... 10, 13, 14

*South Ferry LP #2 v. Killinger*,
   No. C04-1599, 2009 U.S. Dist. LEXIS 91174, at *18 (W.D. Wash. Oct. 1, 2009) .................... 16

*Teamsters Local 175 v. Clorox Co.*,
   353 F.3d 1125 (9th Cir. 2004) ..................................................................................................... 6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tellabs Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308, 127 S. Ct. 2499 (2007) ............................................................. 5, 10, 17

*Tripp v. Indymac Bancorp, Inc.,*
   No. CV 07-1635, 2007 U.S. Dist. LEXIS 95445, at *12 (C.D. Cal. Nov. 29, 2007) ................. 17

*Weiss v. Amkor,*
   527 F. Supp. 2d 938 (D. Ariz. 2007) ............................................................. 24

*Zucco Partners v. Digimarc Corporation,*
   552 F.3d 981 (9th Cir. 2009) .................................................................. passim

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ........................................................................ 5

15 U.S.C. § 78u-4(b)(2) .......................................................................... 10

15 U.S.C. § 78u-4(b)(4) .......................................................................... 24

15 U.S.C. § 78u-5(c)(1)(A) ........................................................................ 5

15 U.S.C. § 78u-5(i)(1)(A)-(C) .................................................................... 5

Gibson, Dunn &
Crutcher LLP

## I.      DISMISSAL OF CONSOLIDATED AMENDED COMPLAINT

On March 5, 2010, this Court dismissed Plaintiff's Consolidated Amended Complaint ("Complaint") and admonished Plaintiff "to take the heightened pleading standards of the PSLRA to their keyboard, along with Rule 8 of the Federal Rules of Civil Procedure, in amending their complaint." (Order at 7).  Plaintiff has failed to heed the Court's direction.  Although Plaintiff has reorganized its allegations in the Second Amended Consolidated Complaint ("SAC"), Plaintiff still fails to plead falsity, scienter, or loss causation in accordance with the requirements of the PSLRA.

## II.     INTRODUCTION

At the commencement of the putative class period in 2006, NextWave Wireless Inc. ("NextWave" or "the Company") was a wireless technology company operating in a new market for mobile multimedia and wireless broadband products.  As a "start up" company, NextWave had the potential for strong growth but also faced many challenges.  At all times, NextWave truthfully described its plans, its hopes, and its challenges (including risks associated with its liquidity, technology development, and acquisitions), and warned that its business would fail if it could not successfully meet its challenges.  Unfortunately, the collapse of the world economy heavily impacted the telecommunications industry, and some of the risks that NextWave had previously disclosed to its investors did come to pass.  Plaintiff now has seized upon the occurrence of those disclosed risks and attempts to hold NextWave and its officers liable – not for intentional or deliberately reckless misrepresentations to the public – but rather for simply having been unable to achieve its business goals during unprecedented economic times. "Fraud by hindsight" does not give rise to a securities fraud claim.

Moreover, Plaintiff's SAC also is fatally deficient for the following reasons:

- Reliance upon forward-looking statements and forecasts that are protected by the safe harbor provision of the PSLRA;
- Failure to adequately allege scienter;
- Reliance on inadequate allegations by confidential witnesses; and
- Failure to identify a corrective disclosure or to adequately allege loss causation.

Because Plaintiff's SAC fails to meet the heightened pleading requirements for a securities fraud claim, Defendants respectfully request that the Court dismiss the SAC with prejudice.

1

### III.    FACTUAL BACKGROUND

2

When NextWave emerged from its reorganization in April 2005, it was at an early stage of

3

development "with a new business plan" that was subject to the "risks typically associated with a start-

4

up entity."  *See* Defendants' Request for Judicial Notice ("RJN") Ex. A (2006 10-K) at 36.  Part of

5

NextWave's business plan involved the development of WiMAX (an acronym for Worldwide

6

Interoperability for Microwave Access) technology, mobile TV, multimedia software, and next-

7

generation mobile broadband semiconductor products.  *Id.*; RJN Ex. B (2007 10-K) at 2-4.  In

8

conjunction with its technology development, NextWave also identified and pursued acquisitions of

9

companies participating in WiMAX technology, wireless broadband and wireless multimedia sectors

10

that would enhance NextWave's capabilities and product offerings.  RJN Ex. A (2006 10-K) at 10.

11

### A.    NextWave Consistently Disclosed That Adverse Events Might Affect Its Liquidity, WiMax Development Or The Success Of Its Acquisitions

12

13

Throughout the putative class period, NextWave consistently disclosed that it was "subject to

14

all risks typically associated with a start-up entity" and that unexpected events such as increased

15

expenses or delays could adversely affect its operations and revenue generation.  RJN Ex. A (2006 10-

16

K) at 36; *see also* RJN Ex. C (Q3 2006 10-Q) at 42; RJN Ex. E (Q2 2007 10-Q) at 34; RJN Ex. B

17

(2007 10-K) at 30; RJN Ex. G (Q1 2008 10-Q) at 33.  More specifically, NextWave disclosed that:

18

> Other than our PacketVideo business, we will not have the benefit of any meaningful operations, and *we will incur significant expenses in advance of generating significant revenues*, particularly from our WiMAX/Wi-Fi semiconductor and network component products, and *are expected to realize significant operating losses for the next few years*.

19

20

RJN Ex. A (2006 10-K) at 36 (emphasis added); *see also* RJN Ex. E (Q2 2007 10-Q) at 37

21

("unexpected expenses and delays in development could adversely affect our liquidity"); RJN Ex. B

22

(2007 10-K) at 33; RJN Ex. F (Q3 2007 10-Q) at 34.  In fact, NextWave explicitly disclosed that "[i]f

23

we are unable to successfully implement our business plan and grow our business, either as a result of

24

the risks identified in this section or for any other reason, we may never achieve profitability, in which

25

event our business would fail." RJN Ex. G (Q1 2008 10-Q) at 33.

26

In addition, NextWave cautioned investors that its cash position might be insufficient to permit

27

continued operations and that additional funding might not be available:

28

Gibson, Dunn &
Crutcher LLP

2

> ***We may need to secure significant additional capital in the future*** to implement changes to, or expansions of, our business plan and to become cash flow positive. We may also require additional cash resources for other future developments, such as investments or acquisitions of other business or technologies . . . ***there can be no assurance that any additional financing will be available on acceptable terms, if at all***.

RJN Ex. D (Q1 2007 10-Q) at 25 (emphasis added); *see also* RJN Ex. G (Q1 2008 10-Q) at 29, 36. Furthermore, when NextWave did have to pursue additional sources of cash, it disclosed its progress to its investors, along with warnings about the potential impact on its business if it could not obtain the necessary funding.  *See infra*, § III (B).

   Moreover, while NextWave set forth projected timeframes for bringing its WiMAX products to market, it also expressly disclosed that it might be unable to meet those timetables, noting:

> We ***currently*** anticipate that our second generation WiMAX chipset . . . will initially be available in the first half of 2008 . . . ***we may not be able to meet these timeframes*** and therefore the commercial deployment of these products could be delayed, which could adversely affect our competitive position as well as our future profitability.  In addition, ***unexpected expenses and delays in development could adversely affect our liquidity***.

RJN Ex. B (2007 10-K) at 33 (emphasis added); *see also* RJN Ex. E (Q2 2007 10-Q) at 36-37.

   Lastly, NextWave consistently disclosed that it faced significant challenges with respect to its acquisitions and that its ability to manage growth and integrate its acquisitions was a major risk factor for the Company that would require "significant expenditures."  RJN Ex. A (2006 10-K) at 37. Specifically, NextWave disclosed that:

> Acquired businesses and technologies may not be successfully integrated with our products and operations . . . ***We may not realize the intended benefit of any acquisition or investment*** . . . If acquisitions disrupt our operations or if our investments are not successful, our business, financial condition and the results of operations may suffer.

*Id.* at 38 (emphasis added); *see also* RJN Ex. E (Q2 2007 10-Q) at 34 ("We will continue to incur significant expenses in advance of achieving broader commercial distribution of our IPWireless and Go Networks products"); RJN Ex. F (Q3 2007 10-Q) at 40 ("Our recent and future acquisitions could result in substantial cash expenditures, potentially dilutive issuances of equity securities, the incurrence of debt and contingent liabilities, a decrease in our profit margins and amortization of intangibles and potential impairment of goodwill.").

Gibson, Dunn &
Crutcher LLP

3

**B.**   **NextWave Timely Made Disclosures Regarding The Impact Of Unanticipated Economic Conditions And Its Progress In Securing Additional Financing**

By mid-2008, the mobile wireless industry, along with the rest of the economy, was experiencing a worldwide decline.  In the face of this unanticipated downturn in the wireless communications market, NextWave reported on August 7, 2008 that "adverse worldwide economic conditions" had "adversely affected manufacturers of telecommunications equipment and technology" causing NextWave "to experience lower than projected contract bookings and sales."  RJN Ex. H (Q2 2008 10-Q) at 5.  NextWave also reported that the rapid market decline in the semiconductor and mobile broadband industry had led to "a delay in global WiMAX network deployments" that impacted the "timing and volume of projected commercial sales of [NextWave's] WiMAX semiconductor products."  *Id.*

Previously, in May 2008, the Company had disclosed that it would need additional cash to fund its working capital requirements, and identified second lien indebtedness of up to $100 million and sales of additional equity securities as two potential sources for this cash.  RJN Ex. G (Q1 2008 10-Q) at 29.  On August 7, 2008, NextWave updated investors on that plan, stating:

> we have entered into a binding term sheet for a junior preferred stock private placement of $100.0 million, which may be supplemented with second lien indebtedness of up to $100 million. Our objective is to consummate the funding for the junior preferred stock transaction in September 2008.

RJN Ex. H (Q2 2008 10-Q) at 6.   In an abundance of caution, NextWave also disclosed that *if* it were to be unable to "obtain further financing in September 2008, [it] would not be able to meet [its] financial obligations at the beginning of the fourth quarter of 2008." *Id*.  In September 2008, following this appropriate and timely disclosure about the state of its finances and the potential risks to its operations, NextWave did secure the additional financing as planned and promptly disclosed completion of the financing to the public.  RJN Ex. N (September 17, 2008 Press Release).  As reported by NextWave in its next Form 10-Q, the additional financing would help NextWave to "meet [its] estimated working capital requirements at least through September 2009."  RJN Ex. I (Q3 2008 10-Q) at 7.

Gibson, Dunn & Crutcher LLP

4

## IV.    PLAINTIFF HAS FAILED TO PLEAD A SECTION 10(b) VIOLATION

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Plaintiff must allege: (1) a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) on which Plaintiff relied, (5) economic loss, and (6) "loss causation," i.e., a causal connection between the material misrepresentation and loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Securities fraud allegations must satisfy the heightened pleading requirements of FRCP Rule 9(b), as well as those in the PSLRA. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("The [PSLRA] requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." (citation omitted). In order to survive a motion to dismiss, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[1]  *See* 15 U.S.C. § 78u-4(b)(1)(B).  Plaintiff fails to meet this burden.

### A.    The SAC Fails To The Extent It Relies On Protected Forward-Looking Statements

As an initial matter, the majority of statements Plaintiff challenges are protected by the PSLRA safe harbor for forward-looking statements.  Under the safe harbor, Rule 10b-5 liability cannot result from a statement that is identified as forward-looking and is either (1) "accompanied by meaningful cautionary statements" or (2) "the plaintiff fails to prove that the forward looking statement . . . was made with actual knowledge by that person that the statement was false and misleading."  15 U.S.C. § 78u-5(c)(1)(A).  Forward-looking statements include statements such as projections of revenues, income, management's plans or objectives for future operations, and predictions of opportunity or economic performance.  *See* 15 U.S.C. § 78u-5(i)(1)(A)-(C).  In addition, "a present-tense statement may qualify as forward-looking 'if the truth or falsity of the statement cannot be discerned until some

---

[1]  Although Plaintiff has reorganized its allegations in the SAC, it still fails to plead any ***facts*** sufficient to demonstrate that any of NextWave's disclosures were ever false or misleading.  Once again, Plaintiff string cites virtually all of the Confidential Witness allegations without specifying how these allegations supposedly demonstrate that any challenged NextWave disclosure is false. More importantly, Plaintiff's Confidential Witness allegations do not begin to specify the ***facts*** necessary to plead falsity for reasons discussed in detail *infra* § IV(A)-(C).

point in time after the statement is made.'" *In re Copper Mountain Secs. Litig.,* 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (citation omitted).

In identifying forward-looking statements, companies need not label each forward-looking statement as such because "[t]o saddle companies with such a duty would be impractical at best and impossible at worst." *Id.* at 881. Instead, even "a statement at the end of each release or filing stating generally that forward-looking statements in this release or report are made pursuant to the safe harbor provisions of the PSLRA are considered sufficient, rather than a specific labeling of each statement as forward-looking." *Id.* at 880-81. Here, NextWave disclosed that its SEC filings contained forward-looking statements "which represent our expectations or beliefs concerning various future events [and] may contain words such as 'may,' 'will,' 'expects,' 'anticipates,' 'intends,' 'plans,' 'believes,' 'estimates,' or other words of similar meaning." *See e.g.* RJN Ex. B (2007 10-K) at 1. In addition, the statements in SAC paragraphs 32(a), 38(a), 42(a), 45(a) and 49(c) appear in the section of NextWave's SEC filings entitled "Looking Forward." In total, SAC paragraphs 13(a), 13(b), 22(b), 19(a)-(c), 29(b), 32(a), 35, 38(a)-(b), 39(a), 42(a)-(c), 43(b)-(e), 45(a)-(c), 48(c), 49(a), and 49(c)-(d) all challenge statements identified as forward-looking.

### 1.   NextWave's Forward-Looking Statements Are Not Actionable Because They Were Accompanied By Meaningful Cautionary Language

The forward-looking statements in paragraphs 13(a)-(b), 19(a)-(c), 29(b), 32(a), 38(a)-(b) 39(a), 42(a)-(c), 43(b)-(e), 45(a)-(c), 48(c), 49(a), and 49(c)-(d) were accompanied by meaningful cautionary language and thus are not actionable. *See Teamsters Local 175 v. Clorox Co.,* 353 F.3d 1125, 1132 (9th Cir. 2004) ("The PSLRA created a statutory version of [the bespeaks caution] doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements."). To fall within the PSLRA safe harbor, "[t]he cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." H.R. Conf. Rep. No. 104-369, at 43 (1995). But "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." H.R. Conf. Rep. 104-369, at 44

(1995).  In short, a defendant "is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk."  *Miller v. Champion Enters., Inc.,* 346 F.3d 660, 678 (6th Cir. 2003).  Furthermore, courts have not required that the cautionary language be in the forward-looking statement in question, or even in the same document as the allegedly false or misleading forward-looking statement.  *See id; see also In re Splash Tech. Holdings Secs. Litig.,* No. C 99-00109, 2000 U.S. Dist. LEXIS 15369, at *31 (N.D. Cal. Sept. 29, 2000).  Rather, it is sufficient for the forward-looking statement to reference a publicly filed document that contains a statement of risks.  *Miller,* 346 F.3d at 677-78.

Here, meaningful cautionary language accompanied each of the challenged forward-looking statements related to NextWave's future financial performance.[2]  In paragraph 38(a), Plaintiff quotes the following forward-looking statement from the "Looking Forward" section of NextWave's Form 10-Q for the second quarter of 2007: "*[W]e believe* that our revenues, existing cash and short-term investments and financing activities *will be* sufficient to fund our operating activities and contractual commitments at least through 2008."  (SAC, ¶ 38 (emphasis added)).  However, Plaintiff ignores the cautionary language in the *same* Form 10-Q:

> *We may need to secure significant additional capital in the future* to implement changes to, or expansions of, our business plan and to become cash flow positive . . . *there can be no assurance that any additional financing will be available on acceptable terms, if at all*.

RJN Ex. E (Q2 2007 10-Q) at 29-30 (emphasis added).  In similar fashion, in paragraph 49(c), Plaintiff quotes the following forward-looking statement from NextWave's Form 10-Q for the first quarter of 2008:

> Management *believes* our existing cash and cash equivalents, along with the release of $50.0 million of restricted cash . . . and the cash *forecasted* to be generated by operations, *as well as a combination of . . . potential sources* of cash *will be* sufficient to meet our *estimated* working capital and capital expenditures requirements through at least March 2009.

---

[2]  *Compare* (SAC, ¶ 13(a)-(b)) *with* (Q3 2006 10-Q) at 36, 42; *compare* (SAC, ¶ 29(b)) *with* (May 14, 2007 Press Release) at 2 and (Q1 2007 10-Q) at 25; *compare* (SAC, ¶ 32(a)) with (Q1 2007 10-Q) at 25; *compare* (SAC, ¶ 38(a)) *with* (Q2 2007 10-Q) at 29-30, 34; *compare* (SAC, ¶ 42(a)) with (Q3 2007 10-Q) at 34-36; *compare* (SAC, ¶ 45(a)) *with* (2007 10-K) at 30-33; and *compare* (SAC, ¶ 49(c)) *with* (Q1 2008 10-Q) at ¶¶ 29, 33, 36.

(SAC, ¶ 49(c)) (emphasis added).  However, Plaintiff fails to provide the Court with the accompanying cautionary language from the *same* filing:

> If events or circumstances occur such that **we are unable to obtain additional cash through the sources described above**, we may be required to reduce certain discretionary spending and we may be unable to develop or enhance our products or services, take advantage of business opportunities or respond to competitive pressures, **any of which could harm our business which could have a material adverse effect on our ability to achieve our intended business objectives**.  RJN Ex. G (Q1 2008 10-Q) at 36 (emphasis added).

Plaintiff also improperly challenges forward-looking statements accompanied by cautionary language regarding WiMAX development such as: "Initial availability of the company's second generation chips, designed for high-volume commercial production, **is planned for** the first half of 2008." (SAC, ¶ 38(b)) (emphasis added); *see also* (SAC, ¶¶ 39(a), 42(b)-(c), 43(c), 43(e), 45(b)-(c), 49(d)).  NextWave repeatedly cautioned investors that although:

> [w]e **currently anticipate** that our second generation NextWave Broadband WiMAX technologies, designed for high volume commercial production, will initially be available in the first half of 2008 . . . **we may not able to meet this timeframe** and therefore **the commercial deployment of these products could be delayed**, which could adversely affect our competitive position as well as our future profitability.  In addition, **unexpected expenses and delays in development could adversely affect our liquidity**.

RJN Ex. A (2006 10-K) at 38 (emphasis added) and RJN Ex. E (Q2 2007 10-Q) at 36-37 (emphasis added); *see also* RJN Ex. F (Q3 2007 10-Q) at 36.

Defendants made similar cautionary disclosures about NextWave's acquisitions.  For example, SAC paragraph 19 quotes an excerpt from NextWave's 2006 10-K: "**[W]e believe** that GO Network customers represent **opportunities for future** Wi-Fi to WiMAX upgrades that utilize NextWave's WiMAX products and technologies."  (SAC, ¶ 19(a), citing 2006 10-K) (emphasis added); *see also* (SAC, ¶¶ 19(b)-(c) and 43(b)).  However, in the *same* Form 10-K, Defendants cautioned investors about the risks associated with NextWave's acquisitions:

> We acquired GO Networks in February 2007, CYGNUS Communications in February 2006 and PacketVideo in July 2005 and we **are still in the process of integrating these businesses** . . . manag[ing] our expanded operations . . . **will require significant expenditures and will demand the attention of management**.  Failure to fulfill any of the foregoing requirements could result in our failure to successfully manage our intended growth and development, and successfully integrate PacketVideo, GO and CYGNUS, **which would adversely affect our ability to develop and commercialize our products and achieve profitability**. . . Acquired businesses and technologies may not be successfully integrated with our products and operations . . . **We may not realize the intended benefit of any acquisition or investment**.

Gibson, Dunn & Crutcher LLP

1    RJN Ex. A (2006 10-K) at 37-38 (emphasis added).  Similarly, in paragraph 43(b), Plaintiff challenges

2    the forward-looking statement:  "NextWave **expects to realize** improved contributions from [the GO

3    Networks and IPWireless] businesses **in the future**."  (SAC, ¶ 43(b)) (citing November 14, 2007 Press

4    Release).  However, Plaintiff fails to include the language from page 5 of the *same* press release

5    cautioning the reader that actual results could differ materially from the forward-looking statements

6    contained in the press release and directing the reader to meaningful cautionary language in the

7    contemporaneously filed quarterly report, which states:  "We will continue to incur significant

8    expenses in advance of achieving broader commercial distribution of our IPWireless and GO Networks

9    products . . . If we are unable to successfully implement our business plan and grow our business . . .

10   we may never achieve profitability, in which event our business would fail."  RJN Ex. L (November

11   14, 2007 Press Release) at 5 and RJN Ex. F (Q3 2007 10-Q) at 34.

12        In light of the cautionary language provided, any forward-looking statements regarding

13   NextWave's financial future, the initial availability of NextWave's second generation WiMax chips, or

14   the Company's acquisitions are simply not actionable.  *See* 15 U.S.C. 78u-5(c)(1)(A)(i).

15               **2.     Plaintiff Has Not Pled That Any Defendant Actually Knew That Any
                          Forward-Looking Statement Was False Or Misleading**
16
17        Even if the Court were to determine that appropriate cautionary language had not been

18   included, NextWave's forward-looking statements still fall within the safe harbor because Plaintiff

19   "fails to prove that the forward looking statement . . . was made with **actual knowledge** by that person

20   that the statement was false and misleading."  *See* 15 U.S.C. 78u-5(c)(1)(A)-(B) (emphasis added).  As

21   set forth in more detail *infra*, § IV (B)-(C), Plaintiff has failed to even plead recklessness, let alone

22   actual knowledge.  Thus, all of NextWave's forward-looking statements are protected by the PSLRA

23   safe harbor.  *See In re Read-Rite Corp. Secs. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003).

24        **B.     Plaintiff Fails To Plead Scienter**

25        In addition to Plaintiff's inability to overcome the safe harbor protection for the challenged

26   forward-looking statements, the entire SAC fails because Plaintiff has not pled any *facts* even

27   suggesting scienter.[3]  To adequately plead scienter, a plaintiff must show that a defendant "acted with

28   ───────────────────────
     [3]  As discussed below (*see infra* § IV (C)), the CW allegations add nothing to the scienter analysis.

Gibson, Dunn &
Crutcher LLP

1   intentionality or deliberate recklessness or, where the challenged act is a forward looking statement,

2   with actual knowledge . . . that the statement was false or misleading." *Ronconi v. Larkin*, 253 F.3d

3   423, 429 (9th Cir. 2001) (internal quotations and citations omitted).  Even the *least* rigorous type of

4   scienter, "deliberate recklessness," involves "not merely simple, or even inexcusable negligence, but an

5   extreme departure from the standards of ordinary care . . . which presents a danger of misleading

6   buyers or sellers that is either known to the defendant or is so obvious that the actor must have been

7   aware of it." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991 (9th Cir. 2009) (quoting *In re*

8   *Silicon Graphics*, 183 F.3d 970, 976 (9th Cir. 1999)).

9        Mere conclusory allegations, unsupported by specific facts, will not suffice.  *Metzler Inv.*

10  *GMBH v. Corinthian Colleges*, 540 F.3d 1049, 1061, 1070 (9th Cir. 2008).  The SAC must "state with

11  particularity facts giving rise to a ***strong*** inference that [Defendants] acted with the required state of

12  mind," *i.e.*, scienter.  15 U.S.C. § 78u-4(b)(2) (emphasis added).  The Supreme Court has defined the

13  term "strong inference" to mean that scienter allegations are inadequate unless "a reasonable person

14  would deem the inference of scienter ***cogent and at least as compelling*** as any opposing inference one

15  could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added).  Under *Tellabs*, courts

16  engage in an "inherently comparative" inquiry when evaluating scienter allegations, and "must take

17  into account plausible opposing inferences" arising from the facts alleged.  *Id*. at 323.

18        After *Tellabs*, the Ninth Circuit established a two-step analysis for assessing scienter

19  allegations.  A court must first determine whether "any of the plaintiff's allegations, standing alone, are

20  sufficient to create a strong inference of scienter." *Zucco*, 552 F.3d at 992.  Then, "if no individual

21  allegations are sufficient, [the court must] conduct a 'holistic' review of the same allegations to

22  determine whether the insufficient allegations combine to create a strong inference of intentional

23  conduct or deliberate recklessness." *Id*.  Here, under both the standalone and holistic analysis, Plaintiff

24  has failed to state with particularity facts giving rise to an inference, let alone a ***strong*** inference, that

25  Defendants acted with scienter.  As a result, Plaintiff's SAC is fatally deficient.

26

27

28

Gibson, Dunn &
Crutcher LLP

10

### 1.    Allegations Concerning NextWave's Liquidity And Ability To Continue Operations Fail To Adequately Allege Scienter

Plaintiff vaguely alleges that NextWave's public statements during the class period were false or misleading because "NextWave *did not have adequate sources of liquidity to continue operations* as it executed its growth strategy and continued making aggressive worldwide acquisitions." (SAC, ¶ 12(a)); *see also* (*Id.*, ¶¶ 23(a), 24, 30(b)(c), 31, 33). However, Plaintiff does not present *any facts* that support this allegation or demonstrate that Defendants' statements regarding NextWave's liquidity during the putative class period actually were false or misleading – much less that Defendants knew that such statements were false or that Defendants were deliberately reckless in making the statements. To the contrary, NextWave repeatedly and accurately informed investors that it was reliant on "additional cash resources" through sources such as "public or private debt and equity financings" in order to continue operations, and that there could be "no assurance that any additional financing [would] be available on acceptable terms, if at all." RJN Ex. B (2007 10-K) at 40, 63; RJN Ex. G (Q1 2008 10-Q) at 29.

In May 2008, NextWave disclosed that it believed that its "existing cash and cash equivalents, along with the release of $50.0 million of restricted cash…. the cash forecasted to be generated by operations, *as well as a combination of … potential sources of cash* w[ould] be sufficient to meet [its] estimated working capital and capital expenditure requirements through at least March 2009." RJN Ex. G (Q1 2008 10-Q) at 35-36. NextWave identified the "potential sources of cash" as including "second lien indebtedness of up to $100.0 million" and the sale of additional equity securities. *Id*. However, NextWave also cautioned investors that:

> *If events or circumstances occur such that we are unable to obtain additional cash through the sources described* . . . we may be required to reduce certain discretionary spending and we may be unable to develop or enhance our products or services, take advantage of business opportunities or respond to competitive pressures, any of which could have a material adverse effect on our ability to achieve our intended business objectives.

*Id*. at 36. Subsequently, on August 7, 2008, NextWave updated investors on its progress in obtaining the potential sources of cash it had previously identified as being necessary to continue to fund operations into March 2009:

> We have entered into a binding term sheet for a junior preferred stock private placement of $100.0 million, which may be supplemented with second lien indebtedness of up to $100 million. Our

objective is to consummate the funding for the junior preferred stock transaction in September 2008. RJN Ex. H (Q2 2008 10-Q) at 5.

NextWave further cautioned that:

> If we do not obtain further financing in September 2008, we would not be able to meet our financial obligations at the beginning of the fourth quarter of 2008, will not be able to continue our operations in the normal course of business and may be forced to restructure our obligations. *Id*. at 6.

NextWave's August 7, 2008 disclosure is simply a continuation of a series of accurate and timely disclosures about the Company's potential and actual need for additional sources of financing. In May 2008, NextWave disclosed that in addition to its existing cash and cash equivalents it would need additional sources of cash in order to continue operations into March 2009.  In August 2008, NextWave updated investors on its progress in obtaining the additional sources of cash (that it previously had disclosed would be required) and reiterated the potential risks to the Company if further financing was not obtained.  On September 17, 2008, NextWave again timely and accurately disclosed that it in fact had been able to obtain additional financing through one of the previously identified sources. *See* RJN Ex. N (September 17, 2008 Press Release) (announcing "$100 million of new financing through the issuance of senior-subordinated secured second-lien notes").

Because Plaintiff fails to allege any facts that would support an inference that Defendants' disclosures about NextWave's liquidity were false or misleading, Plaintiff simply has not and cannot plead scienter.  The more plausible inference to be drawn from the facts is that Defendants acted in good faith and made appropriate and timely disclosures as NextWave's financial situation evolved.

### 2. Allegations Regarding The Development Of The WiMAX Chip-Set Fail To Adequately Allege Scienter

Plaintiff simply cannot establish that Defendants' statements about WiMax development were false or misleading.  Defendants repeatedly cautioned throughout the putative class period that the Company might not be able to meet its anticipated timeline for the WiMAX semiconductor deployment. *See supra*, § III (A).  For example, in its 2007 Form 10-K, the Company specifically stated that although:

> We ***currently anticipate*** that our second generation WiMAX chipset . . . will initially be available in the first half of 2008 . . . ***we may not be able to meet these timeframes*** and therefore the ***commercial deployment of these products could be delayed***, which could adversely affect our

competitive position as well as our future profitability.  In addition, ***unexpected expenses and delays in development could adversely affect our liquidity***.

RJN Ex. B (2007 10-K) at 33 (emphasis added); *see also* RJN Ex. G (Q1 2008 10-Q) (same) at 37.  In light of this type of cautionary language, Plaintiff cannot reasonably contend that Defendants made a false or misleading statement at all, let alone a knowing or reckless one.  *See, e.g.*, *Ronconi*, 253 F.3d at 432 ("Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness.").

Moreover, Plaintiff has not alleged any facts that support Plaintiff's conclusory assertion that Defendants "had no reasonable basis to make favorable statements that the Company's WiMAX semiconductor products would be available for commercial sale in the first half of 2008," or its claims that information provided by the CWs supports this contention.  (SAC, ¶ 12(e)).  While Plaintiff includes numerous allegations from various CWs regarding the development of the WiMAX semiconductor products (all of which contain deficiencies on their face, *see infra*, § IV (C)), Plaintiff fails to specify how any of these allegations support a finding that any public statements about WiMAX actually were false, let alone that any of the Defendants knew they were false.

For example, in SAC paragraphs 35 through 37, Plaintiff alleges that CW3, CW13 and paragraph (a) of CW7's allegations purportedly support an inference of scienter with respect to the statement: "Initial availability of the company's second generation chips, designed for high-volume production, is planned for the second half of 2008."  (SAC, ¶¶ 35-37 (quoting June 6, 2007 Press Release)).  However, neither CW3, nor paragraph (a) of CW7's allegations make any reference to WiMax development whatsoever, so such allegations could not possibly support an inference of scienter as to this statement.  Furthermore, the only conceivably pertinent allegations by CW13 are that "Salmasi attended between five and 10 meetings . . . regarding the development schedules for the WiMax semiconductors ***toward the end of 2007 and 2008***," and that Salmasi was aware of the "roadmap" for the development of the second generation WiMax chipset when "CW13 and his team 'came out with the plan' for the development of the semiconductor ***in approximately July 2007***." (SAC, ¶¶ 66(c)-(d)).  However, both of these alleged "facts" post-date the June 6, 2007 press release containing the statement at issue in SAC paragraph 35.  Thus, even aside from all the other deficiencies

in CW13's statements, described in more detail *infra*, § IV (C), CW13 cannot possibly provide support for an inference of scienter for this statement.

### 3. Allegations Questioning NextWave's Growth And Acquisition Strategy Do Not Support Scienter

Plaintiff also makes conclusory allegations that certain statements by NextWave were false or misleading because it failed to disclose that its growth and acquisition strategy:

- "was not financially successful" and "did not provide the basis for continued growth or financial success because it was straining NextWave's fragile liquidity position;" and

- "was undertaken without proper due diligence" or "in the face of" negative due diligence.

(SAC, ¶ 12(c)).  These types of vague allegations do not support an inference of scienter.

As a threshold matter, NextWave consistently disclosed throughout the putative class period that it would need to make "significant expenditures" to integrate its acquisitions, that NextWave might "***not realize the intended benefit of any acquisition or investment,***" and that if the "acquisitions disrupt our operations or if our investments are not successful, our business, financial condition and results of operations may suffer."  RJN Ex. A (2006 10-K) at 37-38 (emphasis added) and RJN Ex. F (Q3 2007 10-Q) at 34.  Moreover, following the acquisitions, NextWave specifically disclosed the costs and revenues generated by these acquired businesses, so any investor could have read NextWave's SEC filings to determine the success of its acquisitions.  *See* RJN Ex. G (Q1 2008 10-Q) at 17, 22 (*compare* "11.4 million dollars in revenue from GO, IPW and other WiMax Telecom subsidiaries acquired in 2007" *with*  "$15.0 million increase in engineering, research and development expenses . . .  of which $13.4 million relates to research and development activities at our IPWireless and GO Networks subsidiaries, which were acquired in 2007.").

In fact, all that Plaintiff really has alleged is that NextWave made business decisions that did not turn out to be successful.  Such a claim simply is not a basis for securities fraud liability.  *See In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud.") (citations omitted); *Ronconi*, 253 F.3d at 437 ("Calling executives bad managers, or bad forecasters, does not plead fraud.").  More importantly, Plaintiff fails to plead any facts to suggest that Defendants believed, when they made statements at the time of the acquisitions, that the acquisitions would be anything but

1   successful.  Nor does Plaintiff offer any explanation to support its illogical theory that management

2   would have intentionally tried to run NextWave into the ground by purposefully making poor

3   acquisitions.

4       Furthermore, Plaintiff relies exclusively on its CWs to support its allegations that the

5   acquisitions of GO Networks and IPWireless were made without proper diligence or in the face of

6   negative diligence.  As set forth in greater detail below, *see infra*, § IV (C), Plaintiff has not established

7   that its CWs have reliable first-hand knowledge regarding NextWave's "due diligence."  At best, the

8   CW allegations might support a claim that disagreements existed within the Company about whether

9   acquisitions would ultimately be successful; they certainly do not indicate that Defendants engaged in

10  intentional or reckless misconduct.  Mere disagreements about business strategies are not sufficient to

11  establish scienter, nor does "the second-guessing of management decisions by confidential witnesses . .

12  . provide a basis for securities fraud."  *In re Downey Secs. Litig.*, No. CV 08-3261, 2009 U.S. Dist.

13  LEXIS 83443, at *35 (C.D. Cal. Aug. 21, 2009); *see also Cats v. Protection One, Inc.*, No. CV 99-

14  3755, 2001 U.S. Dist. LEXIS 25726, at *35 (C.D. Cal. June 4, 2001) ("Plaintiffs must plead more than

15  a mere disagreement with [a company's] business judgment."); *In re DOT Hill Sys. Corp. Secs. Litig.*,

16  No. 06-CV-228, 2009 U.S. Dist. LEXIS 22022, at *20-21 (S.D. Cal. Mar. 18, 2009) (holding that

17  pleading "a litany of employee complaints about how [a company] was managed" does not establish

18  scienter).

19          **4.      The Individual Defendants' Positions Within The Company Alone Do Not**
20                  **Give Rise To An Inference Of Scienter**

21          Plaintiff alleges that NextWave's Chairman and CEO, Allen Salmasi, and CFO, George Alex,

22  by virtue of their "positions with the Company" had knowledge of facts that rendered certain

23  NextWave public statements false or misleading.  (SAC, ¶ 9).  Although Plaintiff makes the general

24  allegation that "Salmasi was extremely involved in every aspect of NextWave," Plaintiff's confidential

25  witnesses ("CWs") do not identify any information that was specifically conveyed to Salmasi that

26  would demonstrate fraud.  As the Ninth Circuit has held, "corporate management's general awareness

27  of the day-to-day workings of the company's business does not establish scienter – at least absent some

28  additional allegation of *specific* information conveyed to management and related to the fraud."

Gibson, Dunn &
Crutcher LLP

15

1  *Metzler*, 540 F.3d at 1068 (emphasis added).  "Core operation" allegations only create a strong

2  inference of scienter under two limited exceptions recently described by the court in *South Ferry LP #2*

3  *v. Killinger*, No. C04-1599, 2009 U.S. Dist. LEXIS 91174, at *18 (W.D. Wash. Oct. 1, 2009) as the

4  "actual knowledge" and "absurdity" analyses.  Neither exception applies here.

5  Under the "actual knowledge" exception, core operation allegations may support an inference

6  of scienter only if they are combined with particularized allegations that are sufficiently detailed to

7  establish defendants' actual knowledge of the relevant information.  *Zucco*, 552 F.3d at 1000.

8  Allegations that top executives had ***admitted*** that they were involved in "every detail" of their

9  company or that a CEO had touted that "all of our information is in one database" and "we know

10  exactly how much we have sold in the last hour around the world" fall within this exception.  *South*

11  *Ferry*, 2009 U.S. Dist. LEXIS 91174, at *34.  By contrast, Plaintiff's generic allegations here that the

12  Individual Defendants had "access to material non-public information," signed SEC filings, or attended

13  unspecified meetings, do not establish that any Defendant actually knew, or deliberately disregarded,

14  any relevant facts at the time he made any allegedly false or misleading statement.  *See Zucco*, 552

15  F.3d at 1000; *see also In re Downey*, 2009 U.S. Dist. LEXIS 83443, at *39 ("Plaintiff cannot base an

16  inference of scienter on the Individual Defendant's access to unspecified documents and

17  conversations.").

18  Under the "absurdity" exception, core operation allegations may support an inference of

19  scienter only in those rare circumstances where "the nature of the relevant fact is of such prominence

20  that it would be absurd to suggest that management was without knowledge of the matter."  *Zucco*

21  *Partners*, 552 F.3d at 1000 (internal quotation marks omitted).  This "narrow exception" applies in an

22  "exceedingly rare category of cases."  *South Ferry LP v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir.

23  2008); *Zucco*, 552 F.3d at 1001.  Plaintiff does not make any allegations sufficient to invoke the

24  absurdity exception.  Thus, because neither the actual knowledge nor absurdity exceptions apply,

25  Plaintiff cannot rely on the core operation inference to support an inference of scienter.

26  **5.      Lack of Suspicious Or Unusual Insider Trading Weighs Against Scienter**

27  A lack of suspicious or unusual insider trading suggests a lack of scienter, especially where as

28  here, the Defendants had a significant personal financial stake in the success of the Company, and the

crux of the SAC is that those same Defendants intentionally tried to drive the Company into the ground.  *See In re Downey*, 2009 U.S. Dist. LEXIS 25007, at *40  ("[A] strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal.").  Here, Plaintiff makes no allegations that either of the two Individual Defendants sold any of their significant holdings during the putative class period (and in fact, they did not do so).  Thus, "an inference of scienter is functionally negated."  *See Tripp v. Indymac Bancorp, Inc.*, No. CV 07-1635, 2007 U.S. Dist. LEXIS 95445, at *12 (C.D. Cal. Nov. 29, 2007); *In re Cypress Semiconductor Secs. Litig.*, No. C-92-20048, 1992 U.S. Dist. LEXIS 22480, at *6-7 (N.D. Cal. Sept. 24, 1992).  Moreover, as NextWave disclosed in March 2007, Salmasi and Navation, Inc., an entity owned by Salmasi, *invested* millions of dollars in NextWave through the purchase of preferred stock.  RJN Ex. M (March 28, 2007 Press Release) and RJN Ex. B (2007 10-K) at 61.  This further weighs against an inference of scienter and, as discussed above, is inconsistent with the idea that the Defendants somehow intended to take actions they knew would be harmful to NextWave.

### 6.    Even From A "Holistic" Perspective The SAC Fails To Plead Scienter

Under *Tellabs* and *Zucco*, the second step in the scienter analysis is a holistic review of the SAC "to determine whether '*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.'"  *Zucco*, 552 F.3d at 1006 (*quoting Tellabs*, 551 U.S. at 322-23).  Here, even a holistic review of Plaintiff's SAC cannot "transform [the SAC's] series of inadequate allegations into a viable inference of scienter."[4]  *Id.* at 1008.  To the contrary, the more plausible inference that can be gleaned from Plaintiff's allegations is that although NextWave was unable to meet all of its business goals, the investing public was fully informed about the risks attendant to its prospects, performance and

---

[4]  In addition to the statements discussed above, Plaintiff also alleges that: "NextWave failed to timely disclose that it had invested all of its marketable securities in extremely high-risk and illiquid auction rate securities and had misrepresented these investments as marketable securities on its balance sheet included in its financial statements disseminated in its Forms 10-K and 10-Q and press releases." (SAC, ¶ 12(d)).  Plaintiff, however, fails to plead *any* facts that suggest that the disclosure of NextWave's investment in auction rate securities was anything but timely and truthful.  In fact, none of Plaintiff's CWs even mention auction rate securities.  Plaintiff even acknowledges that the Company disclosed its investment in auction rate securities in its 2007 Form 10-K, filed on March 13, 2008.  *See* (SAC, ¶ 46 (citing 2007 10-K at 37)); RJN Ex. B (2007 10-K) at 37. Accordingly, Plaintiff's unexplained references to auction rate securities do not support an inference of scienter.

1   liquidity, and that Defendants had no motive whatsoever to intentionally run NextWave into the

2   ground.  Any assertion by Plaintiff to the contrary is particularly illogical given the substantial personal

3   financial investments the Individual Defendants and other NextWave directors and officers had made

4   in the Company.  In fact, throughout the putative class period, NextWave's officers and directors

5   beneficially owned more than fifty percent of NextWave's common stock.  *See* RJN Ex. J (April 19,

6   2007 Proxy Statement) at 11 and RJN Ex. K (April 10, 2008 Proxy Statement) at 11.  In addition, in

7   March 2007, Salmasi and Navation, Inc., an entity owned by Salmasi, *invested* millions of dollars in

8   NextWave through the purchase of preferred stock.  RJN Ex. M (March 28, 2007 Press Release) and

9   RJN Ex. B (2007 10-K) at 61.  This vested interest in the success of the Company weighs against any

10  inference that Defendants had an undisclosed "plan" to run NextWave's business into the ground.  To

11  the contrary, the only cogent inference is that Defendants wanted the Company to succeed and made a

12  series of business decisions that they believed would lead to the growth and success of NextWave's

13  business.  In hindsight, those business decisions may not have been as successful as hoped – in part,

14  due to global economic conditions unprecedented in recent times that adversely impacted the

15  Company's ability to develop and market its products and technology.  However, this does not

16  constitute fraud.  *See In re Read-Rite,* 335 F.3d at 846 ("[It] is clearly insufficient for plaintiffs to say

17  that a later, sobering revelation makes an earlier, cheerier statement a falsehood."); *In re Initial Pub.*

18  *Offering Secs. Litig.*, 399 F. Supp. 2d 261, 266-267 (S.D.N.Y. 2005) (holding that "failures to meet

19  forecasts and downward revisions" are not sufficient to assert a claim of securities fraud); *In re Silicon*

20  *Graphics*, 183 F.3d at 988 ("Congress enacted the PSLRA to put an end to the practice of pleading

21  fraud by hindsight." (internal quotation marks omitted)).

22        **C.      Plaintiff's CW Allegations Are Not Sufficient To Plead Falsity Or Scienter**

23        As set forth above, Plaintiff has utterly failed to plead scienter and Plaintiff's CW allegations

24  do nothing to remedy this deficiency.  What is missing are any alleged ***facts*** to demonstrate that any

25  NextWave disclosure was ever false, let alone intentionally or recklessly so.  The CW allegations,

26  string-cited throughout the SAC, consist of irrelevant and unreliable hearsay, opinions and speculation.

27  Because Plaintiff relies exclusively on the CWs to support its allegations of falsity and scienter, and

28

1    because Plaintiff's CW allegations fail to satisfy the heightened pleading standards of the PSLRA, the

2    SAC should be dismissed for failure to state a claim for securities fraud.

3               **1.      The CWs Were Not In Positions To Know The Information Alleged**

4               In order to satisfy the strict pleading requirements of the PSLRA, the CWs "must be described

5    with sufficient particularity to establish their reliability and personal knowledge." *Zucco*, 552 F.3d at

6    995 (citing *In re Daou Sys. Inc. Secs. Litig*, 411 F.3d 1006, 1015-16 (9th Cir. 2005)).  Merely stating a

7    CW's job title is insufficient.  *See In re Wet Seal, Inc. Secs. Litig.*, 518 F. Supp. 2d 1148, 1170-71

8    (C.D. Cal. 2007) ("The Court simply cannot infer that these job titles inherently conferred such

9    expertise.").  Instead, CWs must be described in the SAC with "sufficient particularity to support the

10   probability that a person in the position occupied by the source would possess the information alleged."

11   *Id.* at 1170 (citations omitted).

12              Here, Plaintiff fails to satisfy these requirements.  There are no allegations that support a

13   conclusion that any of the fourteen CWs had personal knowledge of NextWave's accounting or

14   financial practices and procedures or would have been in a position to have information concerning

15   company-wide performance.  In fact, ***not one of the CWs is alleged to have had any accounting or***

16   ***financial or SEC reporting responsibilities whatsoever*** at NextWave.

17              For example, CW3 is alleged to have been an engineer working at NextWave's testing site in

18   Las Vegas, Nevada.  (SAC, ¶ 56).  No basis is provided for CW3 to be in a position to credibly state

19   that "NextWave's 'burn rate' was $1 million a day" or that "money was getting tight."  (*Id*., ¶ 56(b),

20   (c)).  Similarly, CW4 worked on field test operations for NextWave's broadband division, and is not

21   alleged to have had anything to do with NextWave's decisions regarding acquisitions. (*Id*., ¶ 57).

22   Thus, there is no reason to believe that CW4 could know that "there were several people at NextWave

23   who 'adamantly' told Salmasi not to acquire Go Networks."[5]  (*Id*., ¶ 57(k)).  Moreover, Plaintiff fails

24   to even identify work locations or supervisors for CWs 1, 5-6, and 8-12, rendering it impossible to tell

25   whether these witnesses would even have had access to the information they purportedly provided to

26   Plaintiff.  In short, Plaintiff has failed to sufficiently allege an adequate foundation for the CW

27   _____

28   [5]  Even if CW4 could attest to this fact, it does not establish scienter.  At best, it merely establishes
     that there were people who disagreed with the business decision to acquire GO Networks.

1    allegations.  *See In re Zumiez Inc. Secs. Litig.,* No. C07-1980, 2009 U.S. Dist. LEXIS 26153, at \*23

2    (W.D. Wash. Mar. 30, 2009) (rejecting scienter allegations where "Plaintiffs rely primarily on eleven

3    confidential witnesses, most, if not all, of whom were in no position to have information concerning

4    company-wide performance."); *In re U.S. Aggregates, Inc. Secs. Litig.,* 235 F. Supp. 2d 1063, 1074

5    (N.D. Cal. 2002) (rejecting scienter allegations because "none of the confidential witnesses have any

6    first-hand knowledge of [defendant's] accounting decisions.").

7            **2.**       **Plaintiff's CW Allegations Contain Unreliable Hearsay And Speculation**

8           In addition to lack of personal knowledge, Plaintiff's CW allegations are rife with unreliable

9    hearsay and pure speculation that must be disregarded.  *See Zucco*, 552 F.3d at 996 (holding that

10   "unreliable hearsay" and "conclusory assertions of scienter" are "not sufficient to raise a strong

11   inference of scienter because they demonstrate that the confidential witnesses are not reliable.").  For

12   example, Plaintiff alleges that:

13       "CW6 ***did not know why*** the plan was cancelled ***but speculated*** that . . .." (SAC, ¶ 59) (emphasis
     added);

14
15       CW3 "***was not certain***, but said that the maintenance and repairs ***would*** cost anywhere between
     $10,000 and $40,000 per 'cell site.'"  (*Id*., ¶ 56(d)) (emphasis added);

16       "In light of the Company's disclosures, CW10 ***assumed*** that the customers that received
     NextWave's chipset samples were not 'eager' to invest their money and resources into testing
17   NextWave's WiMAX chipset, because ***they likely doubted*** that NextWave would survive its
     financial problems and continue its WiMAX development."  (*Id*., ¶ 63(b)) (emphasis added);

18       "CW3 ***began hearing*** that 'we need to close at least one deal or we are going to be in big
19   trouble.'"  (*Id*., ¶ 56(c)) (emphasis added); and

20       CW6 "***heard*** that NextWave was supposed to have LG produce 20,000 of the PMP devices."  (Id.,
     ¶ 59) (emphasis added).

21          These speculative and hearsay allegations should not be given any weight.  *See Zucco*, 552 F.3d

22   at 996 (discounting statements by CWs who "were simply not positioned to know the information

23   alleged" and reported "unreliable hearsay").

24           **3.**       **Plaintiff Does Not Specifically Tie Its CW Allegations to Any Particular**
25                   **Allegedly False or Misleading Statement**

26          In dismissing the Complaint, the Court noted that "the Plaintiffs don't match any particular

27   confidential witness statements with the allegedly misleading NextWave statements that are the basis

28   of their claims."  (Order at 5.)  Plaintiff has not remedied this deficiency in the SAC.  The SAC still

Gibson, Dunn &
Crutcher LLP

fails to match a *particular* CW allegation with any *particular* allegedly false or misleading NextWave statement.  The SAC contains 16 long paragraphs quoting NextWave statements, which often contain multiple sub-paragraphs and include statements on a variety of different topics.  After 13 of these 16 paragraphs, Plaintiff cross-references to virtually *every* CW allegation as support for pleading falsity and scienter, without specifying which particular fact alleged by which CW ties to which part of the excerpt in the cross-referenced paragraph.  In many cases, the CWs cross-referenced by Plaintiff could not actually support a finding of falsity or scienter because they did not work at NextWave at the time the allegedly false or misleading statement was made.  For example, CW6 joined NextWave in July 2007, and yet is cited as support regarding statements made by the Company in 2006 and early 2007.  (SAC, ¶¶ 13, 19, 29).  CW1 and CW12 are also cross-referenced as support for statements made before their arrival at the Company.[6]  (SAC, ¶ 13).  Because Plaintiff has failed for a second time to "clearly identify the allegedly false statements or which of the factual allegations support an inference that particular statements are false or misleading" the SAC must be dismissed.  *See Gold v. Morrice*, No. CV 07-00931, 2008 U.S. Dist. LEXIS 43466, at *13 (C.D. Cal. Jan. 31, 2008).

### 4.   CW Allegations Do Not Support Knowledge By Any Individual Defendant

Even more fatal than these foundational deficiencies, the CW statements simply "do not convey information sufficient to support the strong inference of scienter that the PSLRA requires."  *Metzler*, 540 F.3d at 1069 n.13.  In order to adequately plead scienter, Plaintiff's CW allegations would have to include sufficient facts to support a claim that Defendants actually knew or deliberately disregarded facts rendering any public statement false.  They fail to do so.  As to CWs 1, 3, 5-6, 8-9, and 11-12, the allegations by these CWs do not contain *any* references to communications with, or the knowledge of, the Individual Defendants or executive management, but rather simply make generalized claims about what that particular CW knew or believed.  What a CW knew is irrelevant if the CW does not tie that knowledge to those that actually made the public statements at issue.

In addition, while CWs 2, 4, 7, 10, 13, and 14 make some vague references to contact with Defendants Salmasi or Alex, they provide insufficient details to support any inference of scienter, let

---

[6]  In the few instances where Plaintiff cites to only certain CWs, these CWs still fail to support a finding of falsity or scienter for the reasons set forth *infra* § IV (C)(1-4).

1   alone a strong one.  For example, with respect to CW2, the only purported connection to the

2   Defendants is that CW2's supervisor's supervisor reported to Salmasi, and that "executive summary

3   reports on the TD TV project were submitted to Salmasi on a weekly basis."  (SAC, ¶¶ 55, 55(c)).

4   CW2, however, does not identify the content of these "executive summary reports" and makes no

5   allegations that CW2 or any of his supervisors ever communicated any concerns about the TD TV

6   project to Defendants.  Similarly, CW14's only purported connection to the Defendants was in the

7   form of a "trip report" which was "emailed to everyone in the Company" and to which Salmasi

8   "responded back with comments." (SAC, ¶ 67).  CW14, however, does not say what was in this trip

9   report, when it was sent, or what Salmasi's alleged comments were.  Likewise, while CW4 (a field test

10  director for NextWave Broadband) alleges that he or she discussed a "range issue" with Defendant

11  Salmasi on several occasions (*Id.*, ¶ 57(m)), no information is provided as to the content of such

12  discussions or how those discussions would have had any impact whatsoever on NextWave's public

13  statements.  Also, while CW10 alleges that he or she participated in meetings at which the Individual

14  Defendants also were in attendance, CW10 fails to provide dates[7] or locations and does not specifically

15  identify the discussions or conclusions drawn from the meetings other than in vague generalities.

16  "General allegations of defendants' . . . interaction with other officers and employees, their attendance

17  at meetings, and their receipt of unspecified weekly or monthly reports are insufficient."  *In re Daou*,

18  411 F. 3d at 1022.

19      In addition, while the SAC contains nearly six pages of allegations from CW7, who is identified

20  simply as a Program Manager, these allegations do not come close to supporting an inference of

21  scienter.  First, Plaintiff alleges that "CW7 attended ***monthly*** Operations and Program Review

22  meetings" and that Salmasi and Alex "attended the ***quarterly*** Operations and Program Review

23  meetings in person whenever they were visiting the San Diego facility."  (*Id.*, ¶ 60(a)). (emphasis

24  added).  CW7 does not indicate whether the monthly and quarterly meetings are the same meetings or

25  whether CW7 actually attended the quarterly meetings that Salmasi and Alex may have attended if they

26  were in town.  In fact, CW7 admits that he or she stopped attending the financial section of certain

27  _____

28  [7]  Indeed, as CW10 worked at NextWave until March 2009, the Complaint fails to make clear
    whether any of the purported meetings even took place during the putative class period.

Gibson, Dunn &
Crutcher LLP

22

1    meetings in the third quarter of 2007, and thus could have no knowledge about who attended or what

2    occurred at these meetings after that time.  (*Id.*, ¶ 60(b)).  Moreover, while CW7 appears to allege that

3    the financial state of the Company was discussed at certain meetings, CW7 fails to provide any details

4    about those discussions, not even information sufficient to determine whether Defendants Salmasi

5    and/or Alex were present at those meetings.  Similarly, CW7's allegations about Network Products unit

6    meetings fail to provide sufficient detail to create an inference of scienter.  CW7 alleges only

7    secondhand rumors that Rick Kornfeld and Salmasi "debated about strategies" and that Adam Gould

8    "expressed concerns to Salmasi," with no detail about what these concerns or competing strategies

9    were.  (*Id.*, ¶ 60(c)).  At best, this allegation demonstrates that there may have been some disagreement

10   over business strategies, not that Defendants were deliberately reckless.

11         Lastly, CW13's conclusory allegation that "Salmasi knew by mid-calendar 2007 timeframe that

12   the release of the second generation chipsets by even the end of 2008 was not realistic" also lacks the

13   supporting details necessary to give rise to any inference of scienter.  (*Id.*, ¶ 66(a)).  For example,

14   although CW13 alleges that "Salmasi attended between five and 10 meetings…regarding the

15   development schedules for the WiMax semiconductors toward the end of 2007 and 2008," CW13 does

16   not provide any details about what was discussed at these meetings that would render any particular

17   statement false or misleading and doesn't even state that CW13 was in attendance at the same meetings

18   as Salmasi. (*Id.*, ¶ 66(c)).  In addition, although CW13 alleges that Salmasi was aware of the

19   "roadmap" for the development of the second generation WiMax chipset when "CW13 and his team

20   'came out with the plan' for the development of the semiconductor in approximately July 2007,"

21   CW13 does not say how Salmasi was supposedly aware of this plan.  (*Id.*, ¶ 66(d)).  No allegation

22   exists claiming that this plan was contained in a document that was given to Salmasi or that it was

23   provided orally in a conversation with Salmasi.  Thus, CW13 provides no basis for Plaintiff's

24   allegations that Salmasi "was aware" of this plan.  *See Zucco*, 552 F.3d at 991; *McCasland v.*

25   *FormFactor Inc.*, No. C 07-5545, 2009 U.S. Dist. LEXIS 59996, at *15-16 (N.D. Cal. July 14, 2009)

26   (rejecting a finding of scienter where a confidential witness merely alleged that defendants attended

27   meetings at which projects were discussed and that defendants received and/or had access to meeting

28   minutes documenting the same without including any detailed information about what was specifically

1    provided to defendants that contradicted any particular public statement).  Thus, CW13, like the rest of

2    Plaintiff's CWs, fails to provide sufficient details to support any inference of scienter.

3              **D.      The SAC Fails To Adequately Plead Loss Causation**

4              Loss causation is also an essential element of a Rule 10b-5 claim, and the burden of

5    establishing loss causation rests on the plaintiff.  15 U.S.C. § 78u-4(b)(4); *Dura Pharms., Inc. v.*

6    *Broudo*, 544 U.S. 336, 346-47 (2005).  As stated in *Dura*, Plaintiff is required to plead and prove "a

7    causal connection between the material misrepresentation and the loss."  544 U.S. at 342.

8              In the sections of the SAC entitled "The Truth … Is Belatedly Revealed" and "Loss

9    Causation/Economic Loss," Plaintiff relies exclusively on NextWave's August 7, 2008 press release,

10   entitled "NextWave Wireless Announces Second Quarter 2008 Financial Results," to plead loss

11   causation.  (SAC, ¶¶ 68-73).  Contrary to Plaintiff's characterization of this disclosure as "belated," the

12   press release was a timely disclosure of the unanticipated impact of *current* developments, including

13   the impact of adverse worldwide economic conditions, *"[s]ince the filing of the Company's Quarterly*

14   *Report on Form 10-Q for the quarterly period ended March 29, 2008*" on "the Company's *current* and

15   *future* operations and *potential* sources of funding."  (SAC, ¶ 68(b) (emphasis added)).  The press

16   release does not state that any prior disclosure made by NextWave regarding its financing, WiMAX

17   chipset availability, or acquisitions had been false or misleading.  Nor does it disclose any new facts

18   that correct any prior statements or otherwise reveal that any prior statements were false or misleading.

19   Instead, the press release simply updates the Company's present and future plans "in response to

20   *current and anticipated marketplace conditions.*"  (*Id.*)

21             It is not sufficient for Plaintiff to simply plead that the stock price plummeted "after the truth

22   ma[de] its way into the marketplace" or that "the price on the date of purchase was inflated because of

23   the misrepresentation."  *Dura*, 544 U.S. at 342.  Instead, courts applying *Dura* have confirmed that a

24   plaintiff must allege the revelation of a ***specific*** misrepresentation or omission that caused a ***specific***

25   loss.  *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 947 (D. Ariz. 2007) ("[C]ourts since *Dura*

26   routinely reject complaints that fail to allege facts that, if established, demonstrate the critical link

27   between the misrepresentations or omissions and the investor's loss.").  Here, by failing to identify any

28   statements in the press release that corrected any prior statements, Plaintiff has failed to demonstrate

Gibson, Dunn &
Crutcher LLP

24

1    the "critical link" between the prior statements and the loss allegedly resulting from the disclosures in

2    the August 7, 2008 press release.

3            It is hardly surprising that Plaintiff cannot demonstrate this "critical link" because Plaintiff has

4    not adequately pled any misrepresentations.  Where no prior false statement exists, there can be no

5    corrective disclosure.  *See In re DOT Hill*, 2009 U.S. Dist. LEXIS 22022, at *42 ("Where there is no

6    misrepresentation, there can be no link between that fictional misrepresentation and plaintiffs' loss.");

7    *see also Langley Partners, L.P. v. Tripath Tech., Inc.,* No. C-05-4194, 2006 U.S. Dist. LEXIS 12927,

8    at *17 (N.D. Cal. March 7, 2006) ("Because the Court finds that Plaintiff has not properly pled a

9    misrepresentation under the heightened pleading standard, the Court finds that Plaintiff cannot properly

10   plead loss causation.").  Thus, Plaintiff's allegations are insufficient to meet its burden of pleading loss

11   causation under *Dura* and its progeny.

12   **V.    PLAINTIFF'S FAILURE TO ADEQUATELY PLEAD A SECTION 10(b) CLAIM BARS
             PLAINTIFF'S SECTION 20(a) CLAIM**

13

14           Because Plaintiff's SAC does not adequately allege an underlying violation of Section 10(b),

15   the Court should also dismiss Plaintiffs' Section 20(a) claim.  *See Zucco*, 552 F. 3d at 990 ("Section

16   20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation

     of section 10(b).").
17

     **VI.   CONCLUSION**
18

19           Plaintiff's SAC is fatally deficient in numerous respects and simply does not state a claim for

20   securities fraud.  For the foregoing reasons, Defendants respectfully request that the Court grant

     Defendants' Motion to Dismiss the SAC without leave to amend.
21

22   Dated:  April 30, 2010

                                        GIBSON, DUNN & CRUTCHER LLP
23
                                        By:  s/Meryl L. Young
24                                      _____
                                               Meryl L. Young
25
                                        Attorneys for Defendants NEXTWAVE WIRELESS
26                                      INC., ALLEN SALMASI and GEORGE C. ALEX

     100855559_1.DOC
27

28

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 30, 2010, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- **Jessica A. Boschee**
  JBoschee@gibsondunn.com,anathan@gibsondunn.com,TStephens@gibsondunn.com

- **Bridget Fogarty Gramme**
  Bridget@hulettharper.com,office@hulettharper.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Kirk B Hulett**
  kbh@hulettharper.com,office@hulettharper.com

- **Jordan L Lurie**
  jlurie@weisslurie.com,infoca@weisslurie.com

- **James Marley**
  jlurie@weisslurie.com

- **Leigh A Parker**
  lparker@weisslurie.com,info@weisslurie.com

- **Jared Ray**
  jlurie@weisslurie.com

- **Wayne W Smith**
  wsmith@gibsondunn.com,dfkennedy@gibsondunn.com

- **Meryl L Young**
  myoung@gibsondunn.com,pmclean@gibsondunn.com

Executed on April 30, 2010.

                      s/Meryl L. Young
                         Meryl L. Young

Gibson, Dunn &
Crutcher LLP