HULETT HARPER STEWART LLP
KIRK B. HULETT, SBN: 110726
BRIDGET FOGARTY GRAMME, SBN: 231953
525 B Street, Suite 760
San Diego, CA  92101
Telephone:      (619) 338-1133
Facsimile:      (619) 338-1139
e-mail: kirk@hulettharper.com
           bridget@hulettharper.com

LAW OFFICES BERNARD M.GROSS PC
BERNARD M. GROSS
DEBORAH R. GROSS
Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:      (215) 561-3600
Facsimile:      (215) 561-3000
e-mail: debbie@bernardmgross.com

Attorneys for Lead Plaintiff
THE WHITE TRUST GROUP

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA LIFSCHITZ, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTWAVE WIRELESS INC., ALLEN SALMASI, GEORGE C. ALEX and FRANK A. CASSOU,<br><br>Defendants. | CASE NO. 3:08-CV-01697 LAB (WMc) (consol. w/ 3:08-CV-01934 LAB (WMc))<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT**<br><br>DATE:      June 28, 2010<br>TIME:      11:15 a.m.<br>JUDGE:    Honorable Larry Allen Burns<br>CTRM:      9 |
| ALEX BENJAMIN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXTWAVE WIRELESS INC., ALLEN SALMASI, GEORGE C. ALEX and FRANK A. CASSOU,<br><br>Defendants. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION AND PROCEDURAL HISTORY ......................................................1

II.   STATEMENT OF FACTS ..................................................................................................2

      A.    NextWave's Acquisition Strategy Was Not Complementary but Financially
            Draining ..........................................................................................................................3

      B.    Defendants Encounter Delays and Problems eith Company's Highly-
            Touted Commercial Launch of WiMAX ...............................................................4

      C.    NextWave Lacked Sufficient Funding and Liquidity ..........................................4

      D.    The Truth is Revealed ...............................................................................................6

III.  ARGUMENT .........................................................................................................................6

      A.    The Complaint States a Claim Under Section 10(b) and Rule 10b-5
            Promulgated Thereunder ..........................................................................................6

            1.    Exchange Act Legal Standards ......................................................................6

            2.    The Complaint Identifies Defendants' Knowingly False and
                  Misleading Statements ...................................................................................6

            3.    Viewed as a Whole, the Factual Allegations Give Rise to a Strong
                  Inference of Scienter ......................................................................................7

                  a.    The Ninth Circuit's Scienter Standard ...............................7

                  b.    Confidential Witness Statements Provide a
                        Solid Foundation to Support Allegations of a
                        Strong Inference of Defendants' Scienter ...........................8

                  c.    Defendants' Corporate Positions and Acts Add
                        Additional Support to the Cogent Inference of Scienter ............14

                  d.    Lack of Insider Trading Does Not Negate Scienter .................15

            4.    The PSLRA's Safe Harbor Provisions Do Not Shield Defendants
                  False and Misleading Statements from Section 10(b) Liability ...............15

                  a.    Defendants' Misrepresentations and Omissions
                        Concerned Existing and/or Historical Fact and
                        Thus Are Not Forward-Looking .........................................15

                  b.    Defendants' False and Misleading Statements and
                        Omissions Were Not Accompanied by Meaningful
                        Cautionary Language .........................................................17

i

5.   The Complaint Sufficiently Alleges Loss Causation ...............................19

B.   The Complaint Adequately Alleges Control Person Liability Under Section 20(a) ...........................................................................................................................21

IV.   CONCLUSION .......................................................................................................................22

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                                           **Page**

3

*Asher v. Baxter International Inc.*,
    377 F.3d 727 (7th Cir. 2004) ............................................................................... 18, 19

4

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) .............................................................. 12

5

6

*Backe v. Novatel Wireless, Inc.*,
    2009 U.S. Dist. LEXIS 68771 (S.D. Cal. July 23, 2009) ....................................... 7

7

*Batwin v. Occam Networks, Inc.*,
    2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ....................................... 15

8

9

*Berson v. Applied Signal Technology, Inc.*,
    527 F.3d 982 (9th Cir. 2008) ......................................................................... *passim*

10

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ............................................................................... 16

11

12

*Communs. Workers of America Plan for Emples. Pensions & Death Bens. v.*
    *CSK Automobile Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ................................................................... 8

13

14

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336, 127 S. Ct. 1627 (2005) ............................................................ 20, 21

15

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ............................................................................. 22

16

17

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ................................................................................ 18

18

*Fouad v. Isilon System*,
    2008 U.S. Dist. LEXIS 105870 (W.D. Wash. Dec. 29, 2008) .............................. 21

19

20

*Freudenberg v. E*Trade Financial Corp.*,
    2010 U.S. Dist. LEXIS 46053 (S.D.N.Y. May 11, 2010) ....................................... 2

21

*Howard v. Everex System, Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .......................................................................... 7, 21

22

23

*In re Cabletron System*,
    311 F.3d 11 (1st Cir. 2002) .................................................................................. 10

24

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 19003 (N.D. Cal. Mar. 2, 2010) ...................................... 10

25

26

*In re Commtouch Software, Ltd.*,
    2002 U.S. Dist. LEXIS 13742 (N.D. Cal. July 24, 2002) ..................................... 13

27

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................. 1, 2

28

iii

1  *In re Daou System Inc. Sec. Litig.*,
       411 F.3d 1006 (9th Cir. 2005) ...................................................................................9, 20, 21
2
   *In re Donald J. Trump Casino Sec. Litig.*,
3      793 F. Supp. 543 (D.N.J. 1992) ................................................................................... 9

4  *In re DOT Hill System Corp. Sec. Litig.*,
       2009 U.S. Dist. LEXIS 22022 (S.D. Cal. March 18, 2009) ................................................ 20
5
   *In re Gilead Sciences Sec. Litig.*,
6      536 F.3d 1049 (9th Cir. 2008) .................................................................................6, 20, 21

7  *In re Globalstar Sec. Litig.*,
        2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 12, 2003) .................................................... 19
8
   *In re Immune Response Sec. Litig.*,
9      375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................................ 7

10 *In re Infosonics Corp. Sec. Litig.*,
       2007 U.S. Dist. LEXIS 57784 (S.D. Cal. Aug. 7, 2007) .................................................... 19
11
   *In re LDK Solar Sec. Litig.*,
12     584 F. Supp. 2d 1230 (N.D. Cal. 2008) ........................................................................ 15, 16

13 *In re New Century*,
       588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................................ 14, 21
14
   *In re Nortel Networks Corp. Sec. Litig.*,
15     238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................................................... 16

16 *In re PMI Group, Inc. Sec. Litig.*,
       2009 U.S. Dist. LEXIS 56709 (N.D. Cal. July 1, 2009) ................................................ 16, 21
17
   *In re Secure Computing Corp.*,
18     184 F. Supp. 2d 980 (N.D. Cal. 2001) ........................................................................... 7, 11

19 *In re Seebeyond Technologies Corp. Sec. Litig.*,
       266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................................ 10
20
   *In re Stone & Webster, Inc. Sec. Litig.*,
21     414 F.3d 187 (1st Cir. 2005) ..................................................................................... 16, 17

22 *In re U.S. Interactive, Inc. Sec. Litig.*,
       2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002)..................................................... 16
23
   *In re Veeco Instruments, Inc., Sec. Litig.*,
24     235 F.R.D. 220 (S.D.N.Y. 2006) ..................................................................................... 17

25 *In re Wells Fargo Sec. Litig.*,
       12 F.3d 922 (9th Cir. 1993)........................................................................................... 9
26
   *Institutional Investors Group v. Avaya, Inc.*,
27     564 F.3d 242 (3d Cir. 2009) .................................................................................... 16, 18

28

*Langley Partners, L.P. v. Tripath Tach., Inc.*,
    2006 U.S. Dist. LEXIS 12927 (N.D. Cal. March 7, 2006) ................................................ 20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ......................................................................................... 19

*Metlzer Inv. GMBH v. Corinthian College, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................................... 20, 21

*Middlesex Retirement System V. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................................ 15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*,
    320 F.3d 920 (9th Cir. 2003) ......................................................................................... 15

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ....................................................................................... 12

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................................... 7

*Rudolph v. UTStarcom*,
    2008 U.S. Dist. LEXIS 63990 (N.D. Cal. Aug. 21, 2008) ................................................ 21

*Siracusano v. Matrixx Initiatives, Inc.*,
    2009 U.S. App. LEXIS 23716 (9th Cir. Oct. 28, 2009) ............................................ 15, 18

*South Ferry, LP, v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................................ *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499 (2007) ................................................................... *passim*

*Weiss v. Amkor Technology, Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ............................................................................ 20

*Zucco Partners, LLC v. Digimarc Corp.*,
    52 F.3d 981 (9th Cir. 2009) ................................................................................ 6, 9, 10, 12

**Statutes, Rules & Regulations**

15 U.S.C.
    § 78u-4(b)(1)(B) ............................................................................................................ 7
    § 78u-4(b)(2) ................................................................................................................. 7

Federal Rules of Civil Procedure
    Rule 8(a)(2) ................................................................................................................. 20

Securities Exchange Act of 1934
    § 10b ............................................................................................................................ 6
    § 20(a) ................................................................................................................. 21, 22

1

## I.   <u>INTRODUCTION AND PROCEDURAL HISTORY</u>

2

This securities class action was originally initiated on September 16, 2008.  The court-
3 appointed lead plaintiff, The White Trust Group (hereinafter "Plaintiffs"), filed a consolidated
4 amended complaint against NextWave Wireless Inc. ("NextWave" or the "Company"), a
5 NASDAQ-listed mobile broadband and multimedia technology company headquartered in San
6 Diego, California, and certain corporate officers alleging violations of the Exchange Act of 1934
7 ("Exchange Act") on behalf of all persons who purchased or otherwise acquired NextWave
8 common stock between November 14, 2006 and August 7, 2008 (the "Class Period"), at
9 artificially inflated prices and were damaged thereby (the "Action").   On June 29, 2009,
10 Defendants filed a motion to dismiss the Action which was fully briefed by the parties without oral
11 argument.

12

By court order dated March 5, 2010 (the "March 5th Order"), this Court instructed
13 Plaintiffs to amend the complaint and provide the Court with a more user-friendly pleading
14 "before moving on to consider the other, more substantive grounds on which Defendants argue
15 Plaintiffs' claims should be dismissed."  March 5th Order at 7.  Subsequently, on March 26, 2010,
16 Plaintiffs filed the Second Amended Consolidated Complaint (the "Complaint" or "SAC") which
17 cured all pleading concerns raised by the Court.  The SAC charges NextWave and its officers,
18 Defendant Allen Salmasi ("Salmasi"), founder, Chairman of the Board, President and Chief
19 Executive Officer ("CEO"), and Defendant George C. Alex ("Alex"), Chief Financial Officer
20 ("CFO"), with violations of the Exchange Act, by: (i) making false and misleading statements; and
21 (ii) failing to disclose adverse facts known to them about NextWave.  ¶¶ 10, 80-85.[1]

22

On April 30, 2010, Defendants again moved to dismiss the Action.  Conceding that the
23 SAC is no longer improper "puzzle pleading," Defendants argue that the SAC "still fails to plead
24 falsity, scienter, or loss causation in accordance with the requirements of the PSLRA."  Defs. Br.
25 at 1.  While Defendants now lay blame on the "unprecedented economic times" met by NextWave
26 at this time, Dfs. Br. at 1 & 4, "it is not the Court's role to speculate on the causes of the current
27 economic situation."  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173 (C.D.

28

---

[1]   References to the SAC are cited as "¶ ___."

1

1   Cal. 2008).  As the *Countrywide* court noted, "just as the Court could take judicial notice of the

2   fact that the country suffered from the Great Depression in the 1930s, the Court cannot use that

3   fact to infer anything in particular about a business operating at that time." *Id.* at 1174 (citation

4   omitted).  *See also Freudenberg v. E*Trade Financial Corp.*, 2010 U.S. Dist. LEXIS 46053, at

5   *51 (S.D.N.Y. May 11, 2010) ("The 'current financial crisis' is not necessarily an absolute defense

6   [in a securities fraud class action] if it is alleged that defendants misled the public as to the quality

7   of their holdings.").  Analysis of the SAC warrants denial of Defendants' motion on all fronts.

8   **II.    STATEMENT OF FACTS**

9           NextWave had a business strategy to develop the key elements of an end-to-end mobile

10  WiMAX/Wi-Fi network solution, thus ultimately providing a complete WiMAX solution to

11  partners around the world.  ¶ 6(c).  To that end, NextWave engaged in an aggressive growth

12  program throughout the Class Period, characterized by acquisition, new network deployments and

13  new product launches. ¶ 6(c).  The Class Period begins on November 14, 2006, when NextWave

14  filed its Q3 2006 10-Q, stating that,

15          current revenues, cash and short-term investments and financing activities will be
            sufficient to fund our operating activities at least through 2007. . . . We plan to
16          fund our WiMAX technology development activities with our $222.2 million of
            unrestricted cash and investments until such point that we begin sales of our
17          chipsets and network component products and enter into licensing arrangements
            for our wireless broadband technologies. Our wireless broadband products and
18          technologies are in the early stages of development and will require a substantial
            investment before they may become commercially viable.
19

20  ¶ 13(b).   Unbeknownst to the public, however, NextWave struggled both financially and

21  operationally. ¶ 6(d).  Defendants failed to disclose the truth about demand for NextWave's

22  products, the Company's ability to bring its WiMAX semiconductor product line to market, its

23  actual business prospects going forward and its true precarious financial condition, including its

24  lack of liquidity and ability to continue operations without significant additional financing.  ¶ 69.

25          As late as May 8, 2008, only 90 days prior to the Class Period end, Defendants continued

26  to insist that "the cash forecasted to be generated by operations, as well as a combination of

27  potential sources of cash will be sufficient to meet our estimated working capital and capital

28  expenditures requirements through at least March 2009." ¶ 49(c).  However, according to detailed

2

information provided by fourteen Confidential Witnesses ("CWs"), ¶¶ 54-67, Defendants were well aware of, but failed to disclose, adverse material information which directly impacted the Company's financial and operating condition.

**A.     NextWave's Acquisition Strategy Was Not Complementary but Financially Draining**

Contrary to public disclosures during the Class Period, the Company's growth policy resulted in acquisitions of companies that had financial and technological problems and did not provide NextWave with much-needed operating cash.   ¶¶ 33, 40.   With respect to the GO Networks acquisition, Salmasi emphasized in a press release issued January 3, 2007, that, it is "a natural complement to NextWave's WiMax product line and will enhance our ability to deliver high-performance, wide-area and local-area wireless broadband services using stand-alone or integrated WiFi/WiMAX solutions."   ¶ 16.   However, numerous long and "heated" discussions ensued among the executive- and senior-level managers of NextWave "adamantly" advising Defendant Salmasi against this acquisition.   ¶¶ 57(k), 60(d).   Approximately six months prior to this acquisition (i.e., in August/September 2006), Senior VP of Engineering Rob Gilmore and some NextWave employees visited GO Networks in Israel to conduct due diligence of the company's financials and its products.   ¶¶ 57(k), 60(d).   Upon returning from Israel, Gilmore's team advised Salmasi not to acquire the company, pointing out serious issues with GO Networks' technology, such as unstable "beam-forming" capability, which was unlikely to be easily resolved. ¶ 57(k).   Despite being aware of these potential problems, Defendants still went ahead and acquired GO Networks.   ¶ 16.

Similarly on April 9, 2007, NextWave announced that it had signed a definitive agreement to acquire IPWireless Inc., emphasizing that it "fits perfectly into our strategy of providing our customers with the most cost-effective and high-performance mobile broadband products and solutions available today."   ¶ 25.   However, IPWireless' products were not as represented and were far from state-of-the-art, primarily because IPWireless lacked proper design documents for its products, had a software code which was poorly written, termed in the industry as "spaghetti code," and had products that had to be returned and replaced due to poor quality.   ¶ 27(a).

3

Furthermore, IPWireless needed, and would continue to need substantial cash infusions from NextWave in order to maintain its operations and be accretive to NextWave's revenues or earnings.  ¶¶ 27(b), 57(f).  IPWireless proved to be nothing more than a small, start-up company that lacked critical developmental processes with respect to its products.  ¶¶ 57(g), 60(e).

**B.**     **Defendants Encounter Delays and Problems eith Company's Highly-Touted Commercial Launch of WiMAX**

Defendants made numerous misrepresentations about the progress and launch of NextWave's highly-touted WiMAX chipset platform, even while problems and delays with the product line were extensively discussed among and with the Individual Defendants.  ¶ 63(a).  For example, in March 2007, Defendants stated that NextWave's first baseband WiMAX ASIC, the NW1100, "is currently in the final stages of development expected to be sent to manufacture in Q3 2007."  ¶ 19(d).  However, the chip was still in design development in July 2008, having encountered delays due to its complexity, as well as certification delays, and would not be available for commercial sale in 2008.  ¶¶ 66(a), 63, 65, 54.  Moreover, field testing of the WiMAX chip in the late summer or fall of 2007 revealed that there was a significant "range issue" when tested outside of the lab environment ¶ 57(l).  This "range issue" was confirmed through testing up through May 2008, and the Director of Field Test Operations even discussed the issue with Salmasi personally on several occasions during the Class Period.  ¶ 57(m).  Additionally, the WiMAX chip "hand off" functionality also did not work and had not been resolved as of June 2008. ¶¶ 57(n), 58.

**C.**     **NextWave Lacked Sufficient Funding and Liquidity**

Instead of 2008 "shaping up to be a milestone-rich year," ¶ 48(e), NextWave was actually on the brink of failing and its ability to continue as a going concern was in serious question.  ¶¶ 50, 51.  While NextWave was waiting for the hoped-for revenues from its WiMAX semiconductor products, cash from operations was simply not sufficient to continue to operate the Company, let

4

alone continue its aggressive acquisition strategy.   ¶¶ 50, 51.[2]   Nonetheless, Defendants continuously insisted that the Company had sufficient funding and liquidity "to fund our operating activities and contractual commitments at least through 2008," ¶¶ 32(a), 38(a), "to cover our estimate liquidity needs for at least the next twelve months," ¶ 42(a), "to meet our estimated working capital," ¶ 45(a), and "to meet our estimated working capital and capital expenditures requirements through at least March 2009." ¶ 49(c).

The precarious financial situation, widely known throughout the Company as NextWave's "burn rate," was estimated to be approximately $1 million a day.   ¶ 60(j).   The Company's financial state was often discussed by senior-level managers, as well as the Individual Defendants, at the Operations and Program Review meetings held in NextWave's San Diego facility.   ¶ 60. For instance, discussions revolved around the amount of money NextWave had in the bank, the Company's current "burn rate," and the attendees calculated and determined when NextWave would "run out of money." ¶ 60(a).

Furthermore, NextWave failed to timely disclose that it had invested its marketable securities in extremely high-risk and illiquid auction rate securities and had misrepresented these investments as marketable securities on its balance sheet included in its financial statements in public disclosures.   ¶ 12(d).   Although a large percentage of NextWave's itemized short-term investments and restricted cash were invested in municipal securities, ¶¶ 32(b), 38(c), 42(e), Defendants conveniently omitted that these were actually auction rate securities, which were restricted securities, further limiting NextWave's access to cash.   ¶¶ 33(c).   Defendants partially disclosed the truth about these investments for the first time in NextWave's 2007 10-K.   ¶ 46. Although it was noted that "none of the auctions involving our ARS holdings had failed as of December 29, 2007," eight such investments had failed by the beginning of March 2008. ¶ 46(e).

---

[2]   As the delay in bringing the WiMAX semiconductor products to market continued well into 2008, NextWave began to run out of money, close down operations, and abandon other product development projects.   *See, e.g.*, ¶¶ 55, 57, 65 ("TD TV" had development delays forcing NextWave to present "canned" demonstrations at industry conferences); ¶ 60 (MXtv broadcast solution was not properly staffed on the development end, while demonstrations proved the product was nowhere near commercialization by July 2008); ¶¶ 59, 64(a), 65(a) (the "PMP" (Personal Media Player) handheld device was still under development in February 2008 and was not nearly ready for mass production in 2008 as it depended on the availability of the second generation WiMAX chipset).

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    The Truth is Revealed

Finally, and belatedly, when NextWave was on the verge of financial collapse, Defendants disclosed the Company's true operational and financial condition to the market and its stock price dropped dramatically.  ¶¶ 6(d), 69.  On August 7, 2008, after the market closed, NextWave issued its second quarter 2008 financial results reporting a six month loss of $194 million, announcing it had only $71.1 million in cash and similar instruments available as of June 30, 2008 and that unless it raised money, its cash would run out at the beginning of October 2008, and delays had occurred in the WiMAX network deployments and products.  ¶ 68.  On this news, NextWave's stock plummeted $1.90 per share to close at $0.95 per share, a one-day decline of 67% on volume of 12.5 million shares; over 50 times the average three-month volume.  ¶ 69.

## III.    ARGUMENT

### A.    The Complaint States a Claim Under Section 10(b) and Rule 10b-5 Promulgated Thereunder

#### 1.    Exchange Act Legal Standards

A plaintiff bringing an action under the Exchange Act and SEC Rule 10b-5 must allege (1) a material misrepresentation or omission of fact, (2) in connection with the purchase or sale of a security, (3) reliance, (4) scienter, (5) economic loss, and (6) loss causation.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007).  In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, the Court "will accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and will hold a dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that is plausible on its face." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (internal citations and quotations omitted).  "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (citations omitted).

#### 2.    The Complaint Identifies Defendants' Knowingly False and Misleading Statements

Under the PSLRA, a plaintiff must plead the falsity of a defendant's misrepresentations by

6

"specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  As instructed by the March 5th Order, the SAC specifies each statement alleged to be misleading and identifies who made the statements, what the statements were regarding, and when and where the false and misleading statements were made.  *See* ¶¶ 13, 16, 19, 22, 25, 26, 29, 32, 35, 38, 39, 42, 43, 45, 47, 48 and 49.  The SAC also sets forth the reason or reasons why the statements are misleading, based on Defendants' knowledge or deliberate recklessness at the time, ¶¶ 14, 15, 17, 18, 20, 21, 23, 24, 27, 28, 30, 31, 33, 34, 36, 37, 40, 41, 44, 50, 51, 52, 53, supported by information provided by Confidential Witnesses ("CWs").  ¶¶ 54-67.

Contrary to Defendants' brief, the SAC does not simply allege in conclusory fashion that Defendants planned "to run NextWave's business into the ground," Defs. Brief at 1.  Instead, the SAC alleges with sufficient particularity that Defendants disseminated misleading statements to the market during the Class Period that falsely portrayed NextWave's "then-current financial state" as a healthy company with legitimate business prospects and strong product demand.  *See In re Secure Computing Corp.*, 184 F. Supp. 2d 980, 986 (N.D. Cal. 2001); *see also Backe v. Novatel Wireless, Inc.*, 2009 U.S. Dist. LEXIS 68771, at *31 (S.D. Cal. July 23, 2009) (denying motion to dismiss and finding the complaint sufficiently alleged defendants' false and misleading statements regarding company's position in the "3G market" as well as "strong demand" for its products).  This is sufficient.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018-19 (S.D. Cal. 2005).

### 3.   Viewed as a Whole, the Factual Allegations Give Rise to a Strong Inference of Scienter

#### a.   The Ninth Circuit's Scienter Standard

To plead scienter, the SAC must allege, with particularity, facts giving rise to a strong inference that Defendants acted with the required state of mind.  *See* 15 U.S.C. §78u-4(b)(2); *Tellabs*, 127 S. Ct. at 2504.  In this Circuit, a defendant acts with the requisite scienter when he or she acts either intentionally or with deliberate recklessness.  *See South Ferry, LP, v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).  A defendant is deliberately reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort."  *Howard v.*

7

1   *Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

2          The Supreme Court in *Tellabs*, provided two key principles to guide courts in evaluating

3   allegations of scienter.   First, the Court rejected a piecemeal analysis and held that "the

4   [appropriate] inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong

5   inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

6   standard."  127 S. Ct. at 2509 (emphasis in original); *see also South Ferry, LP*, 542 F.3d at 784 (in

7   light of *Tellabs*, a court "should look to the complaint as a whole, not to each individual scienter

8   allegation as *Silicon Graphics* suggests").

9          Second, *Tellabs* held that "[t]he inference that the defendant acted with scienter need not

10  be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing

11  inferences.'"  127 S. Ct. at 2510 (citation omitted).  Rather, a plaintiff adequately pleads scienter if

12  "a reasonable person would deem the inference of scienter cogent and at least as compelling as any

13  opposing inference one could draw from the facts alleged."  *Id*.  In other words, "a tie goes to the

14  Plaintiff."  *Communs. Workers of Am. Plan for Emples. Pensions & Death Bens. v. CSK Auto

15  Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).  Here, Defendants' scienter is sufficiently

16  alleged.  *See* ¶¶ 15, 18, 21, 24, 28, 31, 34, 37, 41, 44, 51, 52-67.

17                      **b.      Confidential Witness Statements Provide a Solid Foundation to
                                 Support Allegations of a Strong Inference of Defendants'
18                               Scienter**

19         Defendants' knowledge or reckless disregard of the adverse facts alleged in the SAC is

20  supported by the numerous and corroborative statements of the 14 former NextWave employees

21  described in the SAC.   ¶¶ 54-67.  These witnesses establish that during the Class Period,

22  NextWave was plagued by the following ongoing problems:  inadequate sources of liquidity

23  (CW2, CW3); aggressive and  financially draining and noncomplementary  acquisitions that

24  jeopardized NextWave's ability to continue as a going concern  (CW3, CW4, CW7, CW8, CW10);

25  numerous problems and developmental delays with NextWave's WiMAX chipset which precluded

26  launching the products in the first half of 2008 and generating new revenues (CW1, CW4, CW5,

27  CW7, CW8, CW9, CW10, CW11, CW12, CW13, CW14); and, numerous problems with other

28  NextWave development projects such as the TD TV, an IP mobile TV broadcasting application,

1   and the Personal Media Player, PMP, delaying the projects, precluding new revenues and

2   eventually causing their death (CW4, CW6, CW7, CW11, CW12).  These allegations, taken with

3   the rest of the SAC, adequately aver that more than mere recklessness or mismanagement was

4   afoot at NextWave.[3]   The quantity and quality of the facts provided by the CWs sufficiently

5   support a strong inference of scienter by Defendants.

6       The Ninth Circuit applies a two-part test to analyze "whether a complaint has provided

7   sufficient detail about a confidential witness' position within the defendant company to provide a

8   basis for attributing the facts reported by that witness to the witness' personal knowledge." *Zucco*

9   *Partners*, 552 F.3d at 995.  The SAC satisfies this test: (1) describing each confidential witness

10  "with sufficient particularity to establish their reliability and personal knowledge" and (2) showing

11  that the information provided by the witnesses is "indicative of scienter."  *Id.* (citations omitted).

12      Here, the SAC easily satisfies the "personal knowledge" prong set forth under *Zucco* by

13  providing sufficient detail about each confidential witness' position within the defendant company

14  to provide a basis for attributing the facts reported to each witness' personal knowledge.  *Id.*  In

15  addition to providing the job titles, the SAC "describe[s] the confidential witnesses with a large

16  degree of specificity."  *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1015-16 (9th Cir.

17  2005).  For example, four of the CWs held positions as vice presidents (¶¶ 61, 63, 64, 65); three

18  held positions as directors (¶¶ 54, 55, 57); two held the positions as managers (¶¶ 60, 66); and four

19  held positions as engineers (three of which were senior-level) (¶¶ 56, 58, 59, 62).  Additionally,

20  the SAC also describes in detail each CW's job responsibilities, the division or unit each worked

21  in, the product or development process/project each worked on during the relevant time period,

22  and described any contact with senior management or the Individual Defendants.  *See* ¶¶ 54-67.

23  Hence, "the information attributed to each [confidential witness] does not appear unreliable or

24

---

25  [3]   Furthermore, Defendants' motion is misplaced because the Complaint properly focuses on
    actionable misstatements by Defendants constituting securities fraud and not management's

26  business acumen or business judgment. Defs. Brief at 14-15.  *See In re Wells Fargo Sec. Litig.*, 12
    F.3d 922, 927(9th Cir. 1993) (corporate mismanagement exclusion rule from § 10(b) and Rule

27  10b-5 liability is not implicated when plaintiffs allege specific misrepresentations or material
    nondisclosures in violation of the federal securities laws); *see also In re Donald J. Trump Casino*

28  *Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. 1992) ("[T]he object of the securities fraud laws is
    disclosure, not business judgment.").

1  clearly beyond the type of knowledge that each source might have." *In re Seebeyond Techs. Corp.*

2  *Sec. Litig.*, 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003).

3      Defendants belittle the reliance on former employees such as the engineers, arguing that they

4  lack "any accounting or financial or SEC reporting responsibilities whatsoever." Defs. Br. at 19.

5  However, "[i]t is entirely plausible that engineers or technical editors would know, or could

6  reasonably deduce, that the company had suffered such setbacks." *Berson v. Applied Signal Tech.,*

7  *Inc.*, 527 F.3d 982, at *4 (9th Cir. 2008) (internal citation omitted).[4]   For example, CW6's

8  information concerning NextWave cancelling the production of 20,000 "PMP" devices at the end of

9  2007 is reliable since it falls within the realm of CW6's personal knowledge and supports the

10  allegations that Defendants knew this product was encountering problems and delays.  ¶ 59.  As a

11  Senior Test Engineer who personally worked on the "PMP" development project, CW6 knew that

12  the PMP device was still under development in February 2008 and experiencing technical issues and

13  concluded that production was cancelled at that time because the device was not ready.   ¶ 59.

14  Similarly, CW3 provided detailed information on the Company's test network facility in Nevada,

15  explaining the 30 cell sites, the costs to build and maintain them, including environmental

16  regulations which had to be met and the delay in getting approval for maintenance and repairs.  ¶ 56.

17      CW10, a Director and later VP of Product Management and Marketing for the

18  semiconductor group, had personal knowledge to support the allegations that Defendants knew the

19  second generation WiMAX chipset [referred to as NW2000] was encountering numerous

20  development problems and delays.  ¶ 63.  According to CW10, development delays of the

21  WiMAX chipset were extensively discussed during the status review meetings, which Salmasi

22  personally attended.  ¶ 63.  CW10 met with the Individual Defendants and attended status review

23  meetings addressing product development and customer matters for the semiconductor unit, which

24  ────────────────

[4]   Additionally, Defendants "cherry-pick" facts in an attempt to undermine the reliability of the

25  statements of CW3, CW6 and CW10, by mischaracterizing them as "unreliable hearsay and
speculation" while disregarding all the information provided by these confidential witnesses which

26  supports personal knowledge.  "[T]he fact that a confidential witness reports hearsay does not
automatically disqualify his statement from consideration in the scienter calculus."  *Zucco*

27  *Partners*, 552 F.3d at 998, n.4; *see In re Cabletron Sys.*, 311 F.3d 11, 33 (1st Cir. 2002) (noting
that "the rigorous standards for pleading securities fraud do not require a plaintiff to plead

28  evidence."); *In re Cadence Design Sys., Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 19003, at *14
(N.D. Cal. Mar. 2, 2010) (although preferable, "personal knowledge" is not a hard-and-fast rule).

10

1   the Individual Defendants also attended.  ¶ 63.  Delays in the WiMAX and software development

2   were extensively discussed during these status review meetings.   ¶ 63.   According to CW2,

3   executive  summary  reports  were  submitted  to  Salmasi  on  a  weekly  basis.   ¶ 55(c).  David

4   Needham,  President  of  NextWave  Broadband,  and  Alan  Cameron,  VP  of  Operations,  were

5   responsible for consolidating weekly updates into an executive summary report and submitted it to

6   Salmasi.  ¶ 55(c).

7        According to CW7 and CW11, the ASIC chip (MSS 2) was supposed to be completed in

8   February 2008 but was gradually postponed until June 2008.  ¶¶ 60, 64.  According to CW12,

9   NextWave did not actually have the WiMAX chipset available to sell to customers in 2008 and

10  that the WiMAX chipset development team began missing its milestones as early as in April 2008.

11  ¶ 65.  Both CW4 and CW5 discovered significant "range issue" and "hand off" functionality

12  issues with WiMAX chip beginning in 2007 and continuing up through June 2008.  ¶¶ 57, 58.

13  CW4 personally discussed the "range issue" with Salmasi on several occasions but this issue

14  remained unresolved up through CW's departure in May 2008.  ¶ 57.  According to CW8 and

15  CW9, numerous design and certification issues for NextWave's digital ASIC chip led to a delay in

16  completing its development, and by the middle of 2008, the development was approximately one

17  and a half or two months behind the original schedule and could not be released to the market.

18  ¶¶ 61, 62; *see also* CW1 (during tenure as Director of Product Certification, there were no

19  certifications obtained for any of NextWave's products).  ¶ 54.

20       "The precise amount of detail required in describing confidential witnesses varies based

21  upon  the  circumstances  of  the  case."   *In  re  Secure  Computing*, 184 F. Supp. 2d at 988.

22  NextWave's financial health, and its ability to continue as a going concern, revolved around its

23  ability to develop and license its WiMAX technology and products and to do that in a timely

24  fashion.  The more prolonged the process exacerbated by product development problems, the more

25  NextWave was burning through its cash reserves without generating new revenues.  Here, the

26  CWs were all engaged, at various levels, in the development of NextWave's wireless networks,

27  products and WiMAX technology.  Due to their daily exposure to NextWave product delays and

28  functionality problems, the CWs "offer[] a substantial window into the overall financial health of

1    the corporation." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231

2    (9th Cir. 2004).   Clearly, the information attributed to them is plausible and reliable to infer

3    personal knowledge.

4         The detailed information provided by the CWs is also "indicative of scienter," satisfying

5    the second prong of the *Zucco* analysis. *Zucco Partners*, 552 F.3d at 995.  The Ninth Circuit has

6    held that scienter can be inferred where facts "suggested that defendants had actual access to the

7    disputed information" or it would be "absurd to suggest that management was without knowledge

8    of the matter."  *South Ferry*, LP, 542 F.3d at 785-86; *Berson*, 527 F.3d at 988.  Information

9    provided by the CWs supports the fact that Defendants were personally aware of, or had access to

10   the "disputed" information.  During CW10's employment, CW10 met with all of the Individual

11   Defendants and attended status review meetings addressing product development and customer

12   matters, which the Individual Defendants also attended.  ¶ 63.  According to CW7, Salmasi and

13   Alex, along with other senior executives, attended quarterly Operations and Program Review

14   meetings whenever they visited NextWave's San Diego facility.   ¶ 60(a).  Senior-level managers

15   in San Diego attended monthly meetings where they discussed the amount of money NextWave

16   had in the bank, the Company's current burn-rate, and attendees calculated and determined when

17   NextWave would "run out of money."  ¶ 60. *See also Atlas v. Accredited Home Lenders Holding

18   Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) (strong inference of scienter established where

19   plaintiffs alleged that defendants had access to reports, and former employees asserted their

20   managers pressured them to approve non-compliant loans to increase volume).

21        According to CW3, it was widely known throughout the Company that NextWave's "burn

22   rate" was $1 million a day and "money was getting tight" as the Company had 18 operations in

23   nine countries, and only one of them – PacketVideo – "was making money."  ¶ 56.  Budget

24   requests for costly, yet mandatory, maintenance on its test network in Las Vegas were being

25   denied as management "wouldn't let us spend pennies."  ¶ 56(d).  In a desperate search for

26   revenue sources, NextWave even attempted to sell leases on its test network based in Las Vegas,

27   but no such leases were signed.  ¶ 56.  According to CW2, Defendants Alex and Salmasi were

28   involved in approving a purchase order with respect to a costly component of the TD TV product

12

1   which delayed delivery to customers Orange and T-Mobile.  ¶ 55(f).  NextWave also began

2   reducing its IPWireless and U.S.-based workforce in July 2008, which significantly impacted

3   development of the TD TV project.  ¶ 55.

4       Defendants also knew that their aggressive acquisitions were, in fact, financially draining

5   investments that neither enhanced NextWave's revenue stream, nor accelerated its product

6   development, but further weakened the Company's liquidity.  CW4 and CW7 both stated that the

7   due diligence team, as well as senior management, strongly advised Salmasi not to acquire GO

8   Networks due to serious technology issues.  ¶¶ 57, 60.  *See In re Commtouch Software, Ltd.*, 2002

9   U.S. Dist. LEXIS 13742, at *40 (N.D. Cal. July 24, 2002) (finding that "the complaint's

10  allegations dovetail and reinforce each other" for purposes of pleading scienter).  Furthermore,

11  CW7 stated that documents existed, such as emails, reports and presentations, containing the

12  senior management's recommendation to not acquire GO Networks.  ¶ 60.  CW7 noted that

13  NextWave did not perform the same type of due diligence reviews with IPWireless as it had

14  during the acquisition of GO Networks; subsequently learning that the IPWireless product – i.e.,

15  the TDCMA base-station – was of poor quality and had a high rate of return from customers.  ¶ 60.

16  According to CW4, after the acquisition, NextWave learned that IPWireless did not have the

17  proper design documents, had a software code which was poorly written, termed in the industry as

18  "spaghetti code," and had products that had to be returned and replaced due to poor quality.  ¶ 57.

19      Defendants were also well apprised of the complex developmental issues that delayed key

20  product launches and impacted the commercial availability of its WiMAX products in the first half

21  of 2008.  CW7 presented the project schedule for the WiMAX infra-structure project to CW7's

22  supervisor and other members of the senior management team, including Salmasi, in mid-2007.

23  ¶ 60(j).  CW7 learned that a suggested mid-2009 completion timeframe was not acceptable, and

24  thus the engineering team had to take shortcuts with respect to network topology and deployment

25  in order to "pull" the completion date into the fourth quarter of 2008.  ¶ 60(j).  According to CW7,

26  IPWireless failed to manufacture its base-stations fast enough for both commercial deliveries and

27  internal utilization, making it unfeasible to have WiMAX infra-structure equipment commercially

28  available in the first half of 2008, as demanded by Salmasi.  ¶ 60.

13

1    The collective and corroborative statements of the CWs clearly support a strong inference

2  of Defendants' scienter.  Despite Defendants' selective attacks on certain witnesses with respect to

3  their positions, reliability or their degree of contact with Defendants, the totality of the allegations

4  cannot be ignored.  *See In re New Century*, 588 F. Supp. 2d 1206, 1229-30 (C.D. Cal. 2008)

5  (finding complaint created a compelling inference that the officers were deliberately reckless in

6  light of the totality of the evidence provided by confidential witnesses).  As a whole, the plethora

7  of CW statements supports an inference "more cogent or compelling than an alternative innocent

8  inference." *Tellabs*, 127 S. Ct. at 2151.

9              **c.      Defendants' Corporate Positions and Acts Add Additional**
                         **Support to the Cogent Inference of Scienter**
10

11    The cogent inference that Defendants knew or recklessly disregarded these adverse facts

12  when making their statements to the market is further supported by the following well-pleaded

13  facts: (a) Alex and Salmasi, either individually or together, signed numerous SEC filings during

14  the Class Period, (¶¶ 13, 19, 32, 38, 42, 45, 49); (b) Salmasi discussed these matters publicly in

15  Press Releases, as well as an interview,  (¶¶ 16, 44, 25, 26, 29, 39, 43, 47, 49); and (c) Salmasi,

16  who founded the Company, and Alex were the most senior officers of NextWave, (¶¶ 7-9).

17    Courts have found that allegations of misrepresentation that involve the core-operations of

18  a company and that the Individual Defendants were the high-ranking officers and directors of the

19  company provide further support to a cogent inference of scienter.  *South Ferry*, *LP*, 542 F.3d at

20  782.  The Ninth Circuit's discussion of these factors in light of *Tellabs* is persuasive.  The Ninth

21  Circuit determined that:

22        Allegations regarding management's role in a company may be relevant and help
          to satisfy the PSLRA scienter requirement in three circumstances.  First, the
23        allegations may be used in any form along with other allegations that, when read
          together, raise an inference of scienter that is "cogent and compelling, thus strong
24        in light of other explanations." *Tellabs*, 127 S. Ct. at 2510.  This view takes such
          allegations into account when evaluating all circumstances together.  Second, such
25        allegations may independently satisfy the PSLRA where they are particular and
          suggest that defendants had actual access to the disputed information. . . .  Finally,
26        such allegations may conceivably satisfy the PSLRA standard in a more bare form,
          without accompanying particularized allegations, in rare circumstances where the
27        nature of the relevant fact is of such prominence that it would be "absurd" to
          suggest that management was without knowledge of the matter.  *See Berson v.*
28        *Applied Signal*, 527 F.3d at 988 (internal quotation marks omitted).

14

1    *South Ferry* LP, 542 F.3d at 785-786.  The Ninth Circuit found plaintiffs' inferences sufficient that

2    high-level managers – responsible for day-to-day operations in the company – must have known

3    about the problems because the effect they were having on the company made it hard to believe

4    that they did not know.  *Id.*

5                    **d.        Lack of Insider Trading Does Not Negate Scienter**

6           As numerous courts have held, a lack of insider sales does not negate scienter by the

7    Individual Defendants.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d 920,

8    944 (9th Cir. 2003) ("the lack of stock sales by a defendant is not dispositive as to scienter")

9    (citations omitted); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1247 (N.D. Cal.

10   2008)(absence of insider trading by a defendant did not weigh against scienter); *Middlesex Ret. Sys.*

11   *v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007) (same); *Batwin v. Occam*

12   *Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at *43-*54 (C.D. Cal. July 1, 2008) (same).  Indeed,

13   insider stock sales are merely one type of motive evidence and, as the Supreme Court has

14   recognized, a plaintiff need not even allege motive in order to demonstrate scienter.  *Tellabs*, 127 S.

15   Ct. at 2511.  Recently, the Ninth Circuit has noted:  While it is true that motive can be a relevant

16   consideration, and personal financial gain may weigh heavily in favor of a scienter reference, we

17   agree with the Seventh Circuit that *the absence of a motive allegation is not fatal.*"  *Siracusano v.*

18   *Matrixx Initiatives, Inc.*, 2009 U.S. App. LEXIS 23716, at *39 (9th Cir. Oct. 28, 2009) (emphasis

19   added).[5]

20          **4.        The PSLRA's Safe Harbor Provisions Do Not Shield Defendants False
                        and Misleading Statements from Section 10(b) Liability**

21
22                     **a.        Defendants' Misrepresentations and Omissions Concerned
                                  Existing and/or Historical Fact and Thus Are Not Forward-
23                                Looking**

24          The PSLRA's statutory safe harbor provision is reserved for forward-looking statements

25   and does not insulate Defendants from liability since it "does not apply to a description of past or

26   _____

27   [5]  Defendants attempt to negate scienter by referring to a March 28, 2007 press release (Boschee
     Decl., Exhibit M), which states that Salmasi invested in a private placement of NextWave
     preferred stock.  Defs. Br. at 17.  Salmasi's holdings, however, are not even referenced in the SAC
28   and should be disregarded by the Court.  *See* Plaintiffs' Objection to Defendants' Request for
     Judicial Notice, dated May 28, 2010.

                                            15

present events." *LDK Solar*, 584 F. Supp. 2d at 1250; *Berson v. Applied Signal Tech.*, 527 F.3d 982, 990 (9th Cir. 2008).  A statement is misleading if it "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also In re PMI Group, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 56709, at *25 (N.D. Cal. July 1, 2009) (finding disclosures did not insulate defendants based on *Brody*).

Although the term "forward-looking statement" is broadly defined under the statute, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (internal quotations and citations omitted).  Hence, Defendants cannot insulate entire statements by simply mixing a present statement of fact with a future projection, and categorizing it as "forward looking."  *See In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009, at *56 n.11 (E.D. Pa. Aug. 23, 2002) ("Defendants cannot convert a larger statement containing a series of misstatements about current factual conditions into one forward-looking statement simply by including one statement that is clearly forward-looking"); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) ("Linking future success to present and past performance does not render statements immune from liability").

Here, statements concerning NextWave's liquidity, as late as May 8, 2008, that "the cash forecasted to be generated by operations, as well as a combination of . . . potential sources of cash will be sufficient to meet our estimated working capital and capital expenditures requirements through at least March 2009," ¶ 49(c), are present facts of which Defendants had knowledge and therefore cannot be protected under the safe harbor provision.  In *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005), plaintiffs alleged that the defendant company's statement that it "has on hand and has access to sufficient sources of funds to meet its anticipated [needs]" was a statement of present fact that did not qualify for safe harbor protection.  *Id*. at 212.  The First Circuit found that a statement that "speaks of the quantity of cash on hand," can be characterized as a present fact not subject to protection under the safe harbor statutory provision.  *Id*.

Additionally, statements concerning the GO Network and IPWireless acquisitions were

16

1   assertions of current facts to which the safe harbor provisions does not apply.  ¶¶ 16, 19(a), 25, 26.

2   Defendants misrepresented the truth and failed to disclose that they failed to perform adequate due

3   diligence and knew that these acquisitions, instead of being complementary, were a drain on

4   NextWave's cash and resources because the technology of each company did not work and had

5   serious issues and problems.  ¶¶ 57(a)-(k); 60(d),(g).

6       Furthermore, allegations that Defendants failed to timely disclose that NextWave's

7   marketable securities were invested in extremely high-risk and illiquid auction rate securities are

8   not protected forward-looking statements.  In December 2007, Defendants partially disclosed the

9   truth about their investment in "municipal securities."  ¶ 46.  The Company noted that at the close

10  of fiscal 2007, $102.2 million, or 90%, of NextWave's marketable securities were actually

11  invested in auction rate securities.  ¶ 46.  During the entire Class Period, Defendants were aware

12  that these securities were highly speculative bonds, the liquidity of which are subject to the weekly

13  auctions, artificially maintained by the investment houses and banks that sponsored the issuance of

14  the auction rate securities.  ¶ 46.

15          **b.      Defendants' False and Misleading Statements and Omissions**
                      **Were Not Accompanied by Meaningful Cautionary Language**
16

17      Defendants argue that their Class Period statements regarding NextWave were couched in

18  sufficient "meaningful cautionary statements" that precludes liability.[6]  Defendants point to the

19  following purported cautionary statements:

20      •   NextWave was subject to all risks typically associated with a start-up entity

21      •   Unexpected events could adversely affect operations, liquidity and revenues

22      •   NextWave may need to secure significant additional capital in the future

23

24  _____
    [6]  Like the safe harbor provision, the bespeaks caution doctrine applies only to those statements
    that are forward-looking, not those that are misstatements of present or historical fact.  *See In re*
25  *Stone & Webster*, 414 F.3d at 213 ("The mere fact that a statement contains some reference to a
    projection of future events cannot sensibly bring the statement within the safe harbor if the
26  allegation of falsehood relates to non-forward-looking aspects of the statement."); *In re Veeco
    Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) ("The remainder of
27  defendants' allegedly fraudulent statements or omissions, however, are not protected by either the
    bespeaks caution doctrine or the safe harbor provision, and thus are actionable under the securities
28  laws.  These challenged statements are not forward-looking; rather they are either affirmative
    representations about the current or historical performance.").

1          •      We may not realize the intended benefit of any acquisition

2          •      We may not meet our timeframe for commercial deployment

3    Defs. Br. at 2-4, 7-9.  However, these statements are not "meaningful" in nature, i.e., "substantive,

4    extensive, and tailored to the future-looking statements" that are alleged to be misleading.  *Avaya*,

5    564 F.3d at 258 (internal quotes and citations omitted).  In other words, "for the bespeaks caution

6    doctrine to apply, the cautionary language must be directly related to the alleged misrepresentation

7    or omissions."  *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000).  These

8    generalized risks and warnings could apply to every start-up technology company.  Here, however,

9    serious omissions were made by Defendants with respect to facts that directly impacted

10   NextWave's cash flow, profitability and product demand.  Defendants repeatedly misrepresent to

11   the market that NextWave was sufficiently funded to operate as a going concern, ¶¶ 32(a), 38(a),

12   45(a), 49(c), despite the fact that it was burning through $1 million a day.  ¶ 60(j).  Furthermore,

13   Defendants' "warnings" did not apprise shareholders of NextWave's worsening circumstances, but

14   rather remained static throughout the Class Period "even as the risks changed."  *Asher v. Baxter*

15   *Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004).  To the extent that the warnings disclosed some risks,

16   they made no mention of the actual, known risks which already materialized – i.e., numerous

17   problems impacting the timely launch of its WiMAX semiconductor product in 2008.  *See Berson*,

18   527 F. 3d at 987 (stating that "[i]t goes without saying" that investors would appreciate, and find

19   material, the difference between a "risk" and a "certainty").  Recently, the Ninth Circuit opined:

20          In *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), the
           defendants argued that a passage in the company's SEC filings regarding
21         backlogged work alerted reasonable investors to the risk that the company might
           not get paid for work that had actually been stopped.  We rejected the argument,
22         stating that "[t]he passage . . . speaks entirely of as-yet-unrealized risks and
           contingencies.  Nothing alerts the reader that some of these risks may already have
23         come to fruition, and that what the company refers to as backlog includes work
           that is substantially delayed and at serious risk of being cancelled altogether."  *Id.*
24         at 986. . . . Similar to *Berson*, the passage in the Form 10-Q speaks about the risks
           of product liability claims in the abstract, *with no indication that the risk "may*
25         *already have come to fruition*."

26   *Siracusano*, 2009 U.S. App. LEXIS 23716, at *35-*36 (emphasis added and citations omitted).

27   The same is true here.  Defendants, while cautioning investors about the inability to realize

28

                                                      18

1  benefits from the acquisitions, knew that IPWireless did not have critical design documents, and

2  that the software code was a "spaghetti code," all of which made futile any attempt to modify

3  NextWave's software to work with the IPWireless design station. ¶¶ 57(a)-(g). Defendants also

4  knew that the larger contract, touted as one of the reasons supporting the acquisition, had an 80%

5  return rate for shipped products. ¶ 57(j). *See also In re Infosonics Corp. Sec. Litig.*, 2007 U.S.

6  Dist. LEXIS 57784, at *32 (S.D. Cal. Aug. 7, 2007) (finding forward looking statements did not

7  contain "meaningful cautionary statements" as required by safe harbor provision of PSLRA since

8  language did not reveal that Defendants already knew that Company had lost biggest customer and

9  its reputation had been damaged). As a result, Defendants are not entitled to protection under the

10 bespeaks caution doctrine as there is "no protection to someone who warns his hiking companion

11 to walk slowly because there might be a ditch ahead when he knows with near certainty that the

12 Grand Canyon lies one foot away." *In re Globalstar Secs. Litig.*, 2003 U.S. Dist. LEXIS 22496, at

13 *33 (S.D.N.Y. Dec. 12, 2003).

14        Finally, the adequacy of cautionary language is normally a jury question, which may not be

15 resolved on a motion to dismiss unless reasonable minds could not disagree that the challenged

16 statements were misleading. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940,

17 946-48 (9th Cir. 2005). Meaningfulness cannot be determined at the pleading stage because "any

18 issuer could list its lines of business, say 'we could have problems in any of these,' and avoid

19 liability for statements implying that no such problems were on the horizon even if a precipice was

20 in sight." *Asher*, 377 F.3d at 733 ("meaningful cautionary statements" is "difficult if not

21 impossible" to decipher, particularly "at the pleading stage before plaintiffs have access to

22 discovery. *Id*. at 730, 729, 734). Defendants have not met the stringent showing required.[7]

23             **5.    The Complaint Sufficiently Alleges Loss Causation**

24        Pleading loss causation requires only a short, plain statement, consistent with Fed. R. Civ.

25

26 [7] Oddly, Defendants argue that attempts at securing additional financing were timely disclosed in
   a *post-class period* press release on September 17, 2008 (Boschee Decl., Ex. N). The fact that

27 NextWave was able to secure "$100 million of new financing" *after* the truth was revealed on
   August 7, 2008, does nothing to support Defendants' argument. ¶¶ 69-73. Furthermore, this press

28 release is not contained in the SAC and cannot be considered by the Court on this motion. *See*
   Plaintiffs' Objection to Defendants' Request for Judicial Notice, dated May 28, 2010.

1   Proc. 8(a)(2), that "provides the defendants with notice of what the relevant economic loss *might*

2   *be* or of what the causal connection *might be* between that loss and the misrepresentation" alleged

3   in the complaint. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347, 127 S. Ct. 1627 (2005)

4   (emphasis added). *See also In re Daou*, 411 F.3d at 1026 (loss causation is adequately pled where

5   the plaintiff gives "*some indication*" that the drop in the company's stock price was "causally

6   related" to the company's fraud) (emphasis added). When the complaint alleges "facts that, if

7   taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re*

8   *Gilead Sciences*, 536 F.3d at 1057. *See also, Metlzer Inv. GMBH v. Corinthian College, Inc.*, 540

9   F.3d 1049, 1064 (9th Cir. 2008) ("neither *Daou* or *Dura* require an admission or finding of fraud

10  before loss causation can be properly pled").

11      Defendants incorrectly argue that the SAC simply alleges that the "stock price plummeted"

12  after the August 7, 2008 disclosure, ¶ 68, and fails to allege the "critical link" causally connecting

13  Plaintiffs' injury to the alleged fraud.[8]   Defendants disregard the allegations clearly identified

14  under the heading, "LOSS CAUSATION/ECONOMIC LOSS," ¶¶ 69-73, which unmistakably

15  support the element of causation, adequately alleging the causal link between Defendants' fraud

16  and Lead Plaintiff's loss. The SAC alleges that the truth was revealed after the market closed on

17  August 7, 2008, in the press release disclosing NextWave's second quarter 2008 financial results,

18  a net loss of $194 million, lower than anticipated sales on NextWave's network products, a delay

19  in its WiMAX network deployments (which would impact projected sales of its highly anticipated

20  WiMAX semiconductor products), and also that NextWave had only $71.1 million in cash and

21  similar instruments available as of June 30, 2008 and that, unless it raised money, its cash would

22  run out at the beginning of October 2008. ¶ 68(e). Contrary to Defendants' assertions, Plaintiffs

23  are not required to plead a "fact-for-fact" corrective disclosure to sufficiently allege loss causation

24

25  ────────────────

    [8]  The cases cited by Defendants are distinguishable and fail to support Defendants' position with
26  respect to the loss causation analysis before this Court. *See, e.g., Weiss v. Amkor*, 527 F. Supp. 2d
    938, 947 (D. Ariz. 2007) (stock price actually increased after corrective disclosure undercut
27  allegations of loss causation); *Langley Partners, L.P. v. Tripath Tach.*, Inc., 2006 U.S. Dist.
    LEXIS 12927, at *17 (N.D. Cal. March 7, 2006) (dismissing §10(b) claim for failure to plead
28  scienter, but offering no analysis with respect to loss causation allegations); *In re DOT Hill Sys.*
    *Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 22022, at *42 (S.D. Cal. March 18, 2009) (finding loss
    causation allegations insufficient since falsity inadequately pled).

1  as the "law does not clearly support this interpretation." *In re New Century*, 588 F. Supp. 2d at

2  1236.

3      After the August 7th disclosures, "the defendant's share price fell significantly after the

4  truth became known." *Metlzer*, 540 F.3d at 1062, quoting *Dura*, 544 U.S. at 347. NextWave's

5  stock plummeted $1.90 per share to close at $0.95 per share. ¶ 69. NextWave's shares were

6  hammered by massive sales of 12.5 million shares, over 50 times the average three-month volume,

7  after this announcement, sending them down 92% from their Class Period high, as a direct result

8  of Defendants' admissions regarding the truth about demand for NextWave's products and its

9  financial situation. ¶¶ 69, 70, 71, 72. The drop in NextWave's stock price removed the inflation

10  from NextWave' stock, causing real economic loss to investors who had purchased the stock

11  during the Class Period. ¶ 73.[9] Plaintiffs would not have purchased NextWave common stock at

12  the prices they paid, or at all, if they had been aware that the market prices had been artificially

13  and falsely inflated by Defendants' misleading statements. ¶ 83. *See In re PMI Group*, 2009 U.S.

14  Dist. LEXIS 56709, at *38 (finding loss causation sufficiently alleged); *Rudolph v. UTStarcom*,

15  2008 U.S. Dist. LEXIS 63990, at *12 (N.D. Cal. Aug. 21, 2008) (same). Thus, the SAC's

16  allegations are sufficient to deny Defendants' motion to dismiss.

17      **B.    The Complaint Adequately Alleges Control Person Liability Under Section
             20(a)**

18

19      Control person claims under § 20(a) are properly alleged where a plaintiff pleads that the

20  defendant (1) exercised "control" over (2) a primary violator of the securities laws. *See Fouad v.*

21  *Isilon Sys., Inc.*, 2008 U.S. Dist. LEXIS 105870, at *33 (W.D. Wash. Dec. 29, 2008) (citing

22  *Howard v. Everex Sys., Inc.*, 228 F.3d at 1065. The Rule 8 notice pleading standard applies to the

23  Court's consideration of the "control" element of these claims. *Id.* Here, Plaintiffs have alleged

24  the predicate primary violation of the securities laws, and have more than sufficiently alleged the

---

25  [9]  Whether and to what extent economic conditions, or what Defendants dramatically characterize

26  as "the impact of adverse worldwide economic conditions," Defs. Brief at 24, somehow impacted
   the price of NextWave's stock is a classic factual dispute which cannot be decided at this

27  procedural juncture. *See In re Gilead*, 536 F. 3d at 1057 (loss causation "is a matter of proof at
   trial and not to be decided on a Rule 12(b)(6) motion to dismiss"). Furthermore, a plaintiff is not

28  required to show that Defendants' misrepresentations were the only cause of the stock decline. *In*
   *re Daou*, 411 F. 3d at 1025

1   Individual Defendants' control over the Company for purposes of § 20(a).   *See* ¶¶ 7-9.

2   Accordingly, Defendants' motion to dismiss the control person claims should be denied.

3   **IV.      CONCLUSION**

4          For the reasons set forth herein, Plaintiffs respectfully submit that Defendants' motion to

5   dismiss should be denied in its entirety.[10]

6   DATED: May 28, 2010                          HULETT HARPER STEWART LLP
                                                  KIRK B. HULETT
7                                                 BRIDGET FOGARTY GRAMME

8

9                                                   */s/ Bridget Fogarty Gramme*
                                                  BRIDGET FOGARTY GRAMME
10

11                                                525 B Street, Suite 760
                                                  San Diego, CA  92101
12                                                Telephone:     (619) 338-1133
                                                  Facsimile:      (619) 338-1139
13
                                                  LAW OFFICES BERNARD M.GROSS PC
14                                                BERNARD M. GROSS
                                                  DEBORAH R. GROSS
15                                                Wanamaker Building, Suite 450
                                                  100 Penn Square East
16                                                Philadelphia, PA  19107
                                                  Telephone:     (215) 561-3600
17                                                Facsimile:      (215) 561-3000

18                                                Attorneys for Lead Plaintiff
                                                  THE WHITE TRUST GROUP
19

20

21

22

23

24

25

26

27   _____

28   [10]   Should the Court grant Defendants' motion, Plaintiffs respectfully requests that leave to amend
     be granted.  *Eminence Capital, L.L.C. v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (leave
     to amend should be liberally granted, particularly in securities cases).

**PROOF OF SERVICE**
*Sandra Lifschitz v. Nextwave Wireless Inc., et al.*
CASE NO: 3:08-CV-01697 LAB (WMC)
*Alex Benjamin v. Nextwave Wireless Inc., et al.*
CASE NO. 3:08-CV-01934 LAB (CAB)

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is: 525 B Street, Suite 760, San Diego, CA 92101.

That on May 28, 2010, I served the following document(s) entitled:  **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT** on ALL INTERESTED PARTIES in this action.

■    **BY CM/ECF Electronic Service:** I caused such document to be served via the Court's (NEF) electronic filing system on all registered parties as follows:

jboschee@gibsondunn,com; anathan@gibsondunn.com; tstephens@gibsondunn.com; wsmith@gibsondunn.com; defkennedy@gibsondunn.com; myoung@gibsondunn.com; pmclean@gibsondunn.com;

bridget@hulettharper.com; office@hulettharper.com; kbh@hulettharper.com;

debbie@bernardmgross.com;

jlurie@weisslurie.com; infoca@weisslurie.com; lparker@weisslurie.com;

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on May 28, 2010, at San Diego, California.

 */s/ Bridget Fogarty Gramme*
BRIDGET FOGARTY GRAMME